# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

\- - -

| | | |
|---|---|---|
| SARA S. ECHEVARRIA, | : | CASE NO. |
| Plaintiff, | : | 05-284 (GMS) |
| v. | : | |
| U-HAUL INTERNATIONAL, INC., ROGER MAYFIELD, and NATIONWIDE GENERAL INSURANCE COMPANY, | : | |
| Defendants. | : | |

\- - -

January 24, 2007

\- - -

Oral deposition of FRANK M. COSTANZO, held in the offices of Murphy, Spadaro & Landon, Suite 210, 1011 Center Road, Wilmington, Delaware 19805, beginning at 3:03 p.m., on the above date, before Shenna M. Basye-Cara, a Professional Reporter and a Notary Public in the State of Delaware.

\- - -

ESQUIRE DEPOSITION SERVICES
Suite 760, One Commerce Center
12th & Orange Streets
Wilmington, Delaware 19801
(302) 426-9857

800a8074-2ed2-4bb5-ac88-4570b6b32c8e

APPEARANCES:

MURPHY, SPADARO & LANDON
BY: ROGER D. LANDON, ESQUIRE
Suite 210
1011 Centre Road
Wilmington, Delaware 19805
(302) 472-8105
Representing the Plaintiff

QUARLES & BRADY, LLP
BY: FRANCIS H. LOCOCO, ESQUIRE
411 East Wisconsin Avenue
Milwaukee, Wisconsin 53202-4497
(414) 277-5341
Representing Defendant U-Haul International, Inc.

FERRY, JOSEPH & PEARCE, P.A.
BY: ROBERT K. PEARCE, ESQUIRE
Suite 904
824 Market Street Mall
Wilmington, Delaware 19801
(302) 575-1555
Representing Defendant Roger Mayfield

SHELSBY & LEONI
BY: MICHAEL LOGULLO, ESQUIRE
221 Main Street
Stanton, Delaware 19804
(302) 454-7430
Representing Defendant Nationwide General Insurance Company

- - -

- - -

INDEX

- - -

EXAMINATION OF: Frank M. Costanzo
BY MR. LOCOCO......................4, 82
BY MR. PEARCE.........................79

- - -

EXHIBITS

- - -

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Costanzo-1 | Curriculum Vitae | 4 |
| Costanzo-2 | 10/20/06 Collision Reconstruction Report | 4 |
| Costanzo-3 | 1/20/05 Statement of S. Echevarria | 53 |
| Costanzo-4 | Copies of Photographs of Jetta, Accident Scene & Trailer | 65 |
| Costanzo-5 | Copies of Photographs of Exemplar Trailer | 65 |

NOTE: Exhibits 3, 4, and 5 were retained by the witness and are not attached to the transcript.

- - -

(Exhibits Costanzo-1 and Costanzo-2 were marked for identification.)

- - -

FRANK M. COSTANZO, after having been duly sworn, was examined and testified as follows:

- - -

EXAMINATION

- - -

BY MR. LOCOCO:

Q. Mr. Costanzo, could you state your full name and spell your last name, please?

A. Francis Costanzo, C-O-S-T-A-N-Z-O.

Q. And what's your date of birth?

A. 1/15/60.

Q. What's your business address, sir?

A. One Phillips Lane, P-H-I-L-L-I-P-S Lane, Chester Springs, PA 19425.

Q. What business is that?

A. Accident Cause & Analysis.

Q. Is that your business?

A. Yes.

Q. Is it incorporated?

A. No.

Q. Do you have any other employees?

A. No.

Q. And how long have you operated Accident Cause & Analysis?

A. Fifteen years.

Q. Can I call it ACA?

A. That's fine.

Q. You've given testimony before?

A. Yes.

Q. How many times have you given deposition testimony?

A. Total?

Q. Yes, sir.

A. Probably about 30 times.

Q. And have you testified in court?

A. Yes.

800a8074-2ed2-4bb5-ac88-4570b6b32c8e

Q. How many times?
A. I think about 55.
Q. Have you testified in federal court --
A. Yes.
Q. -- before?
A. Yes.
Q. What federal courts have you testified in?
A. Philadelphia, New Jersey, and Ohio.
Q. Where in New Jersey?
A. Camden, I think that's where the federal court is.
Q. And how about Ohio, where in Ohio?
A. That's a good question. I don't remember where I was in Ohio.
Q. South, north?
A. I could get the address for you. I'm not sure where it was.
Q. Was it within the last four years?
A. No.

Q. Don't worry about it, unless I follow up with Mr. Landon on it.
Before convening here today we sent a notice around to the parties, and I think we sent a subpoena to you as well, which included an attachment that was called Schedule A that basically asked you to bring your whole file with you. Have you done that?
A. The file I have associated with this case, yes.
Q. Is there anything that's been -- has anything been removed from your file?
A. No.
Q. There are a few other things that we asked for in that Schedule A that I didn't see here, and I told you before we went on the record that I'd ask you about it. One is, your Rule 26 list of testimony. Do you have such a list?
A. Yes.
Q. And that you -- you didn't bring with you today, correct?
A. No, I did not.

Q. You've already agreed off the record, but if you could get that to Mr. Landon so he can get it to us, and I'll reserve my right to ask some follow-up questions once I look at the list.
And I'm going to ask you in a few minutes some general questions about the types of cases that you've worked on.
The other thing that I didn't see in looking at that binder of materials that we asked for were your billing records in this case. Are those in there and I just missed it?
A. It doesn't appear to be in here. I certainly can provide that to you. I apologize.
Q. That's fine. Again, if you could get that to Mr. Landon so he can get it to us, so again, I'll reserve my rights to ask some follow-up questions about that.
Can you tell me, not counting today, approximately how much time you've spent on this matter?
A. Timewise, I can't. I think

the total bill is around $2500 so far.
Q. And how much do you charge for your time?
A. Two hundred an hour. Now, we talked about that.
Q. I did remember to bring your check.
A. Thank you.
Q. Yep.
What does ACA do?
A. ACA does accident investigations, defect investigations. We do forensic inspections of vehicles, animations. That's about it.
Q. Is all of your work related to investigation of accidents?
A. Yes.
Q. Okay. And so is all of your work either work that's in litigation or might lead to litigation?
A. Yes.
Q. Have you worked for Mr. Landon in the past?
A. No.

800a8074-2ed2-4bb5-ac88-4570b6b32c8e

Q. Have you worked for anyone in his firm in the past?
A. No.
Q. Do you know a lawyer named Rick DiLiberto?
A. Yes.
Q. Have you worked with him in the past?
A. No. Well, have I done a case for him in the past?
Q. Sure.
A. No.
Q. Something tells me I'm missing something in there.
A. I guess I missed the -- I did meet with him, and he was the first one who retained me for this case.
Q. All right. When did Mr. DiLiberto retain you in this case?
A. Prior to the first -- I don't know when that date was. Prior to my association with Mr. Landon.
Q. I would have guessed that, because I knew Mr. DiLiberto had the case

early on.
A. I could probably find out because there was an initial bill sent to Rich. I could research that and find out when the bill was first sent out, but no work was done for him in this case.
Q. The date of this incident was May 15, 2004, the Echevarria incident, correct?
A. That's correct.
Q. Can you give me a ballpark as to how long after May 15, 2004 you were retained?
A. I think I was retained back in -- it was probably six months after I met with Mr. DiLiberto that I had initial contact with Mr. Landon. That's just a guess, six months. His contact -- his first contact to me was -- appears to be --
Q. Let me ask that, so we have a clean question. When did Mr. Landon contact you?
A. July -- October 23rd, 2006.
Q. And how long before that was

your first contact with Mr. DiLiberto?
A. I think probably about six months prior to that.
Q. But your billing records should tell us one way or another?
A. I think so, yes.
Q. Did Mr. DiLiberto provide you with any materials when he initially retained you?
A. No.
Q. Did he tell you that he had inspected the trailer shortly after the accident?
A. No.
Q. Did he provide -- have you been provided with any photographs that he or his expert at the time, or investigator who was with him, took of the trailer?
A. Not that I know of, no.
Q. Okay. We're going to get to this in your report, but are you aware of Mr. DiLiberto ever sending a letter to U-Haul or to me or to U-Haul's insurance carrier asking or demanding that both the

truck and the trailer be sequestered and preserved?
A. No.
Q. By the time you were asked to start doing work in this case by Mr. Landon, all you knew is that the trailer and the truck had been released back to service --
A. Yes.
Q. -- is that correct? Is that correct?
A. Yes.
Q. Okay. Since Mr. Landon contacted you, have you spoken with Mr. DiLiberto or anyone at his firm?
A. About this case?
Q. Yes, sir.
A. No.
Q. Just a few ground rules. I know you've been through this. Obviously, I'm going to ask you some questions today. I represent the U-Haul entities. If I ask you something that you don't understand, don't answer it. Tell me that you don't understand it and I'll try and ask a better

800a8074-2ed2-4bb5-ac88-4570b6b32c8e

question. Do you understand that?
A. Yes.
Q. Do you understand the oath you gave at the beginning of the deposition to tell the truth is the same oath you would give if you were in a courtroom in front of a judge and jury?
A. Yes.
Q. If you need to take a break at any time, just let me know and we'll do that. All right?
A. Yes.
Q. Going back to your company for a second, any of the work that you described to me, do you ever enlist help from other professionals?
A. Yes.
Q. Who, or what type of profession?
A. My forensic mechanic is an individual named Denny Dewane.
Q. How do you spell Denny's last name?
A. Capital D, little E, W-A-N-E.

Q. Anyone else?
A. The animations, I work with Dr. George Govatos in Delaware.
Q. How do you spell Dr. George Govatos' name?
A. Govatos is G-O-V-A-T-O-S.
Q. Does he have a business or is he at a school?
A. He's another engineer consultant.
Q. What kind of engineer? I mean, what's his back -- what's his discipline?
A. He does accident reconstruction and he does highway -- he's more of a civil engineer.
Q. Okay. Mr. Dewane does not have a college degree; is that correct?
A. He has a -- I believe he has a BA degree from Stroudsburg in business management.
Q. Did you utilize either of these consultants in your work in this case?
A. No.

Q. Has anyone else assisted you on your professional work in this case?
A. No.
Q. Exhibit-1 is -- you tell us, what is that?
A. It's my curriculum vitae.
Q. And is it current as of today?
A. Yes.
Q. Where do you live, what state?
A. Pennsylvania.
Q. Mr. Costanzo, you are not an engineer, correct?
A. No.
Q. What I said was correct?
A. Yes, I'm not an engineer.
Q. Okay. And you're not a design engineer?
A. No.
Q. You've not attended an engineering college, correct?
A. That's correct.
Q. Have you ever designed any product?
A. No.

Q. A subset question: Have you ever designed a trailer?
A. No.
Q. Have you ever worked on the design of a trailer?
A. No.
Q. Have you ever designed the coupler or any other component part of a trailer?
A. No.
Q. Have you ever designed a warning or instruction for a trailer?
A. No.
Q. Have you ever served on any safety standard committees that write safety standards for trailers like the one in this case?
A. No.
Q. Would you agree with me, Mr. Costanzo, that you're not an expert in the design of trailers like the U-Haul trailer in this case?
A. That's correct.
Q. Have you ever rented a U-Haul

800a8074-2ed2-4bb5-ac88-4570b6b32c8e

trailer like the one in this case?
A. Yes.
Q. How often have you done that?
A. Approximately three times.
Q. Have you done that in connection with your work in this case?
A. No.
Q. When did you -- when you did rent the U-Haul trailers, was that personal or part of some case you were working on?
A. Personal.
Q. All right. I'll come back to that.
Have you ever worked at a U-Haul rental center?
A. No.
Q. Have you ever worked at any other rental facility or facility who -- that rented trailers of any kind?
A. No.
Q. Have you ever given instruction to anyone who was about to rent a trailer?
A. No.

Q. I represent four U-Haul entities in this case. Are you aware of that and of who those entities are?
A. No.
Q. Okay. I represent U-Haul International, U-Haul Company of Colorado, U-Haul Company of Arizona, and U-Haul Company of Florida. Do you have any understanding of how those four corporate entities fit into this case, what -- what specific responsibilities each had or didn't have?
A. No.
Q. Okay. When you use "U-Haul" in your report -- and this may be an overbroad question. We may have to go to the report. But when you use the term "U-Haul" in your report, did you have a corporate entity in mind?
A. No.
Q. The list of cases that you're going to send to me, did any of those cases involve, at least as part of their facts, towing a U-Haul trailer?

A. No.
Q. When you are retained, do you have a sense or maybe even an actual number or percentage, plaintiff retention versus defendant retention?
A. Yes.
Q. What is that?
A. It's about 60/40 plaintiff.
Q. Is a substantial part of your professional time spent doing accident reconstruction?
A. Yes.
Q. And when I say accident reconstruction, when you hear me ask that, what's your definition of accident reconstruction?
A. Accident reconstruction, defect investigations, anything related to accidents. If it's involved in an accident, that's what I classify as an accident reconstruction.
Q. Did you do a reconstruction in this case?
A. No.

Q. Let me ask a cleaner question since we were saying accident reconstruction. Did you do an accident reconstruction in this case?
A. No.
Q. If you look at Exhibit-2, that's your report, correct?
A. Yes.
Q. If you look at Section 4.0, which starts on page 4, and if you could, just read through that section to yourself.
A. Okay.
Q. That section is based on the facts that you reviewed from the police report and their commercial vehicle inspection report, correct?
A. Correct.
Q. Earlier when I asked you what does ACA do, which is, I guess, really you, what do you do, you used the term "defect investigation." What do you mean by that?
A. For defect investigations, air bag analysis, restraint failures, seat back failures, component failures, vehicle

800a8074-2ed2-4bb5-ac88-4570b6b32c8e

failures such as braking failures, tractor-trailer inspections as far as failures associated with tractor-trailers, defects in regards to vehicles' causation, tire forensics.

Q. To your knowledge, has an opposing counsel ever challenged your ability to testify in a case?

A. No.

Q. This may be related to that question, but to your knowledge, have you ever been precluded from testifying in a case?

A. No.

Q. What were you asked to do in this case?

A. I was asked to review the case file information and see if I was able to determine the cause as far as the detachment of the trailer and the tow vehicle, if there was a possible causation to link.

Q. Have you formed an opinion as to the cause of the detachment?

A. Yes.

Q. What's that opinion?

A. The opinion is that the unit that was rented out was defective.

Q. In what way?

A. In what way?

Q. How was it defective?

A. How was it defective? The detachment of the tongue from the ball, there's only a couple reasons why that detachment would occur if the unit was functioning properly. More likely, it was defective that -- the dog switch, which is the locking mechanism, the spring-loaded locking mechanism.

Q. Anything else?

A. Well, that's the focus, is the dog switch. If the dog switch is working properly, then the unit won't detach.

Q. Let's go back to -- I want to go back to the -- one of the first things you said. You said the detachment of the tongue from the ball can only happen with certain -- I mean, there's certain possible explanations for that, something to that

effect. Correct?

A. Well, in general, given this scenario, I believe it's the tongue switch.

Q. I know, but I want to go back and try and catalog what the possibilities are first, and then we'll talk about the dog switch. Where did you come up with the term "dog switch"?

A. I've always referred to that as the dog switch.

Q. Okay. It's not from some U-Haul document?

A. No.

Q. Okay. What other -- what are the possible explanations for this trailer to become detached from the truck?

A. I guess I'll ask you to qualify it. In this case?

Q. Yes.

A. In this case it can only be the dog switch, in my opinion.

Q. Did you offer that opinion in your report? Strike that. Let me withdraw it. I'll ask a different question.

You did not offer that opinion in this report, correct?

MR. LANDON: Objection to the form.

THE WITNESS: Possibly -- number six. Not specifically listed as the dog switch, but listed as the coupler mechanism, which is part of the dog switch.

BY MR. LOCOCO:

Q. And then in paragraph 7, you say that: U-Haul's destruction of evidence -- which we're going to get to -- including the disposal of the subject trailer coupler mechanism, prevented the writer from identifying the exact nature of the coupler mechanism defect.

That was as of October 20th, 2006. My question is, when between October 20th, 2006 and today did you form the opinion that it's most likely the dog switch?

A. That's included in number six, coupler mechanism. Coupler mechanism --

800a8074-2ed2-4bb5-ac88-4570b6b32c8e

number six says, rented a defective trailer coupler mechanism. The dog switch is part of the coupler mechanism.

Q. Read paragraph 7 where you say you can't identify the exact nature of the coupler mechanism defect.

A. Right.

Q. Are you now identifying the exact nature of the coupler mechanism defect?

MR. LANDON: Objection to the form of the question.

THE WITNESS: I know a couple facts about the case. If the coupler mechanism -- if the dog switch is working properly and the hand wheel is tightened down and the dog switch is working correctly, it won't detach. The idea that it did detach can only focus in on certain objects in the coupler mechanism.

BY MR. LOCOCO:

Q. I'm going to move to strike your answer as being nonresponsive and ask

the court reporter to reread my question, and Mr. Costanzo, I'm going to ask you to answer that question.

A. Okay.

\- - -

(The requested notes of testimony were read by the court reporter.)

\- - -

THE WITNESS: My answer would be, with a probability, yes.

BY MR. LOCOCO:

Q. Which you didn't specifically identify in your report.

A. No.

Q. Let me go back to explanations for the trailer detaching from the truck.

An explanation is that Mr. Mayfield didn't properly attach the trailer to the truck when he reattached the trailer. Correct?

A. I don't find that as a viable explanation.

Q. Well, I want to just know whether that's in the catalog of possible

explanations.

A. In my opinion, no.

Q. Why not?

A. The distance he operated the unit after he detached it.

Q. Assuming that he never unhooked it and rehooked it after he left North -- you're assuming that he never unhooked it again after he left North Carolina; is that correct?

A. Yes.

Q. And if that testimony is inaccurate, would you agree that his failure to properly hook up the trailer is another explanation for the detachment in this case?

A. It would depend when he detaches the vehicle.

Q. Are you still of the opinion that Mr. Mayfield was negligent?

A. Yes.

Q. Okay. Why was he negligent?

A. Well, he did have the ability, whenever the vehicle -- whenever -- whenever the tow unit, as described by Mr. Mayfield,

was loosening, he did have the opportunity of just not using the vehicle.

Q. Anything else?

A. No.

Q. Let's talk about other things Mr. Mayfield could have done that he didn't do. He could have gotten the unit fixed or replaced, correct?

A. That's correct.

Q. And that would have prevented this incident, even if you're right about the defect and the coupler. Correct?

A. Correct.

Q. He could have properly attached the safety chains, correct?

A. I believe the safety chains were properly attached.

Q. If they were properly attached, this incident wouldn't have happened. Agreed?

A. Connected properly, yes. If they were -- if the breakaway chains held tight, then the unit wouldn't have broke free. That's true.

800a8074-2ed2-4bb5-ac88-4570b6b32c8e

Q. And do you understand that the design of the safety chains is to make sure that you don't get a detachment if the coupler comes off the ball?
A. That's correct.
Q. All right. So he failed to properly attach the safety chains, correct?
A. That's correct.
Q. And if he had done that, we wouldn't have had this incident. Correct?
A. Correct.
Q. He failed to properly attach the emergency brake chain, correct?
A. The emergency brake chain activated in the accident.
Q. And came loose.
A. It activated in the accident, so it was attached properly.
Q. And then detached. Didn't it detach?
A. You're talking about the brake chain?
Q. Yes, sir.
A. The brake chain was activated,

so it doesn't matter whether it's detached or not. The breakaway chains -- it was attached to one of the breakaway chains.
Q. And how do you know it was attached to one of the breakaway chains?
A. As he was describing in his deposition.
Q. Did you, in your work in this case, decide to accept the truthfulness and veracity of everything Mr. Mayfield testified to?
A. That's kind of a broad question. I accepted the facts that he presented in his deposition. I don't recall every fact that he presented. We could certainly discuss it.
Q. Do you agree that the testimony of Mr. Rarick and Mr. Mayfield are in conflict?
A. Yes.
Q. For example, Mr. Rarick testified that the trailer would not have left U-Haul premises, U-Haul Florida premises, without it being securely fastened

and the safety chains properly attached. Do you recall reading that testimony?
A. Yes.
Q. Mr. Mayfield said -- testified that he thought the coupler began to loosen almost immediately after he left U-Haul Co. of Florida's facility. Do you recall reading that?
A. Yes.
Q. Who are you choosing to believe?
A. Mr. Mayfield.
MR. LANDON: Objection.
BY MR. LOCOCO:
Q. Why? Why are you believing Mr. Mayfield -- why are you crediting Mr. Mayfield's testimony and not Mr. Rarick's testimony on that issue?
A. Don't really have an opinion on that.
Q. Aren't you -- I'm sorry.
A. I just believe what Mr. Mayfield is saying.
Q. Is your -- isn't it your role

in this case to be an independent expert witness?
A. Yes.
Q. You read Mr. Leonard's report, correct?
A. Yes.
Q. Do you agree or disagree with his observation that the coupler shows that it was completely -- almost completely backed off at the time of the accident, not tightened down at all?
A. Now, can you show me where in his report he states it?
Q. Sure. Well, you've got it there. Let me find it.
Paragraph 4 on page 5 of his report, it says: Postaccident photographs show that the coupler hand wheel was in the fully loosened position when it was on the flatbed truck. The hand wheel nut was in close proximity to or contacting the coupler bolt roll pin.
Do you disagree with that?
A. Yes. I don't know how he sees

800a8074-2ed2-4bb5-ac88-4570b6b32c8e

that by a photograph.
Are you looking for case files?
Q. I'm looking for the photographs.
A. There you are.
Q. Let me show you UHI -- Bates number UHI 84. The bottom photograph, which is photograph 10, do you see that nut on the coupler is -- how did he put it -- the coupler hand wheel was in the fully loosened position when it was on the flatbed truck. The hand wheel nut was in close proximity to or contacting the coupler bolt roll pin.
Do you see that in this photograph I'm showing you, photo 10 on UHI 84?
A. No. I see a damaged hand wheel.
Q. Do you know what the roll pin is that he's talking about in his report?
A. Yes.
Q. Where is it?
A. He's talking about the coupler

hand wheel towards -- that couples down on the -- there's the dog pin. I guess he's talking about the dog pin, the locking pin.
Q. He's not.
A. Okay.
Q. Let me go back to his report. All right. He first talks about the hand wheel nut. Do you know what that is?
A. Yes (indicating).
Q. And you just pointed to that on this photograph.
A. That's the hand wheel.
Q. I'm going to put an X on it.
A. Okay.
Q. The hand wheel nut was in close proximity to or contacting the coupler bolt roll pin. Do you know what the coupler bolt is?
A. Yes. I don't see --
Q. Where is that?
A. What?
Q. Where is the coupler bolt?
A. Coupler bolt is the piece that goes in (indicating)...

Q. This?
A. Yes.
Q. I'm going to put a B on that.
A. Okay.
Q. And do you see the roll pin that he's talking about?
A. No.
Q. Do you see that, that I'm pointing to (indicating)?
A. Actually, no, to be honest with you.
Q. Have you looked at any exemplar trailer in your work in this case?
A. Yes.
Q. Do you have pictures of that?
A. Yes.
Q. Let me see those. Where was this exemplar that you looked at?
A. Exton, Pennsylvania.
Q. Do you see the coupler, the nut?
A. Yes.
Q. The bolt?
A. Yes.

Q. Do you see the roll pin?
A. Yes.
Q. Where is the roll pin?
A. I don't see it in the photograph on the one you just showed me. It's the piece that locks in -- the dog switch locks in --
Q. They call -- U-Haul calls that a locking tab.
A. All right.
Q. I want to ask you about the roll -- do you know what a roll pin is?
A. I don't see the roll pin.
Q. Do you know what a roll pin is?
A. No.
Q. Okay. Mr. Costanzo, would you agree you're not an expert in the design of this coupler mechanism?
A. In this type of coupler mechanism, no.
Q. All right.
A. I understand the functions of this coupler mechanism.

800a8074-2ed2-4bb5-ac88-4570b6b32c8e

Q. Other than the three times that you've rented a U-Haul trailer, do you have any other experience with a U-Haul coupler mechanism?
A. No.
Q. When was the last time you rented a U-Haul trailer?
A. Probably about five years ago.
Q. Where did you rent it from?
A. Route 1 and 3 in Upper Darby, Pennsylvania.
Q. Was that a facility that had a big U-Haul sign on it, U-Haul center, or was it like a gas station?
A. It's a U-Haul center.
Q. All right. What kind of trailer did you rent?
A. I don't recall. It was similar to this. I attached it to my Dodge Dakota.
Q. Did it have surge brakes?
A. Yes. It was a 2-inch -- it attached to my receiver. I had to rent a receiver, a 2-inch receiver with a 2-inch

ball that was connected to my Dodge Dakota.
Q. And what did you use it for?
A. Transportation.
Q. Did you have any trouble with it?
A. No.
Q. How long did you rent it?
A. A day.
Q. Did you have to unhook it and rehook it -- or strike that. Did you unhook it and reattach it?
A. No.
Q. Have you ever attached a U-Haul trailer?
A. No.
Q. When you did your inspection of the exemplar, when did you do that in this case?
A. During the course of the preparation of the report.
Q. Did you operate that coupler mechanism at all onto a ball, off a ball while you did your inspection?
A. No.

Q. You told me the last time you personally rented a U-Haul trailer was about five years ago. How long before that did you rent one?
A. Oh, I don't recall.
Q. Years?
A. Years.
Q. You said that you've now formed the opinion that the -- you call it a dog switch, I think, in your report -- let me look at Leonard's report one more time.
A. You can just take it out.
Q. I'll pull it up on my computer.
All right. U-Haul calls that -- Mr. Leonard calls that a latch tang. You've told me that you've now formed the opinion that the latch tang was defective. What's your basis for that opinion?
A. I list the causations -- I know for a fact if the latch pin -- is that how he refers to it?
Q. Latch tang.
A. Latch tang. If the latch tang

was functioning properly, tightened down, it's grooved; it would stop it from reversing and loosening.
Q. Assuming the hand wheel is tightened down to begin with, correct?
A. Correct. If it's tightened all the way down, it would prevent the hand wheel from counterclockwising (sic) and loosening up.
Q. Okay. Any other bases that you have for your claim that the latch tang was defective?
A. Just the function -- just the knowledge of its function and the knowledge of how this unit separated.
Q. What you're telling me is, because of the detachment, that's the basis for you saying the latch tang was defective. Correct?
A. Yes. There's two reasons why this trailer would detach itself, human error, if this wasn't placed on it properly, or if it was placed on properly and tightened down correctly and it did, in

800a8074-2ed2-4bb5-ac88-4570b6b32c8e

fact, loosen and separate, it is that locking pin, or what I call a dog switch. That was the defective component in the coupler mechanism.

Q. And what specifically was defective in it?

A. Well, those lock -- those latching -- I call it dog switches. I'm sorry.

Q. That's fine.

A. Those dog switches get bent, and they're grooved, and as they get older, they may not lock into place and let the wheel kind of counterclockwise rotate. And if it doesn't lock in place, the torquing of the unit will counterclockwise rotate and loosen it. Mr. Mayfield said it was constantly kind of getting loose and he would try to tighten it down with the hand wheel, it would get loose again. That explanation shows me that there's a problem with that latch pin and the dog switch, because if it's working properly, there will be no -- it wouldn't be necessary to keep

tightening it down. It would just lock in place.

Q. But what wasn't operating properly in the latch tang?

A. That I don't know.

Q. So if I understand your testimony, you're critical of the people at U-Haul Florida for letting this trailer go out, assuming the latch tang was not properly functioning -- just -- we obviously disagree about that, but let's just assume that for purposes of my question. That is -- because of that, you're critical of the people at U-Haul in Florida renting this trailer to Mr. Mayfield. Is that correct?

A. Yes.

Q. You're not here to provide some opinion that the design itself or the design of this coupler is defective; is that correct?

A. That's correct.

Q. All right. Do you have any -- we talked about you -- that issue with respect to U-Haul of Florida, the people who

rented this. Do you have any opinions, negative opinions, regarding U-Haul Co. of Arizona? And I will tell you, I think they owned the truck.

A. They owned the truck?

Q. Yes, sir.

A. No.

Q. All right. Do you have any opinions critical of U-Haul Co. of Colorado?

A. What is their function?

Q. I believe that the record -- I don't even know if the record establishes this yet, that the trailer was titled to U-Haul Co. of Colorado. I mean, it was licensed in Colorado. That's their -- that's why they got sued. Do you have any opinions critical of U-Haul Co. of Colorado?

A. That owned the trailer?

Q. Yes.

A. No.

Q. And then U-Haul International has been sued as well. They designed the trailer. And you just told me you don't have a criticism of the design of the

trailer, correct?

A. Correct.

Q. All right. So your criticisms are focused on the people down in Florida.

A. Yes.

Q. All right. Have you ever worked on another case -- this is overbroad, but I'll put it this way anyway -- like this one, similar to this one?

A. Yes.

Q. Not involving a U-Haul trailer?

A. Yes.

Q. Okay. When was that?

A. I used to do the crash investigations for Jayco and Jevic in Elkhart, Indiana.

Q. And Jayco and Jevic rent trailers?

A. Rent all kinds of things. Trailers, mobile homes, yes.

Q. Okay. So did you ever work on a case involving one of their trailers that you believe is similar to this case?

800a8074-2ed2-4bb5-ac88-4570b6b32c8e

A. Similar as in the size?
Q. No. Similar as to the trailer became detached from the tow vehicle and hit another vehicle.
A. Yes.
Q. Okay. Either of those types of trailers use this kind of coupler mechanism?
A. No.
Q. Have you ever worked on any cases that you consider to be similar, with a similar coupler mechanism?
A. No.
Q. And I think you answered this. If you didn't -- if you did, I apologize. This is the first case you've worked on involving a U-Haul coupler mechanism?
A. Yes.
Q. Did you inspect the Jetta?
A. The Jetta?
Q. That Ms. Echevarria was driving.
A. No. It was not available.
Q. Did you ask to inspect it?

A. Yes. I was told it was salvaged.
Q. Okay. Who told you that?
A. I think I was contacted by -- that's a good question. I think someone from Mr. DiLiberto's office, I was contacted by.
Q. Can you go to page 5 of Mr. Leonard's report. And just so -- for the record, you have reviewed that report, correct?
A. Yes.
Q. Mr. Landon sent it to you, asked you to review it and give him a call, correct?
A. Yes.
Q. Did you call him about it?
A. Yes.
Q. What did you all discuss with respect to Mr. Leonard's report?
A. Conclusions, observations.
Q. What specifically?
A. Specifically, I don't recall the conversation.

Q. Okay. Let me ask you about paragraph 5 on page 5. He writes: Photographs show markings at the base of the hand wheel made by the latch tang.
First of all, did you observe those markings?
A. I saw markings, yes.
Q. He says: These markings are at a uniform height and indicate that the hand wheel latch and coupler spring were operational and undamaged. The height of the markings was also consistent with that of a coupler with new components.
Do you disagree with any of that?
A. I don't share his opinion. I think he's -- I don't see how he gets those observations in regards to the photographs that were provided.
Q. So you disagree with what he says in paragraph 5, correct?
A. I agree with the first sentence, he sees markings. The photographs do show markings on the base of the hand

wheel made by a latch tang. As far as the other section, I don't share those observations. I don't see how he gets that from a photograph.
Q. Are they uniform -- are the markings at a uniform height?
A. I don't see how he gets that from a photograph.
Q. I'm asking you.
A. I don't know.
Q. Okay. Would you -- the last sentence there I want to focus on for a second, in paragraph 5. Would you agree with me, Mr. Costanzo, that you don't have the experience to know whether the height of the markings is consistent with that of a coupler with new components?
MR. LANDON: Objection to the form.
BY MR. LOCOCO:
Q. Agreed?
A. Can I answer?
Q. Sure.
A. No.

800a8074-2ed2-4bb5-ac88-4570b6b32c8e

Q. What I said was correct?
A. I don't have the experience, yes, with that particular coupler mechanism.
Q. Even assuming that this coupler started to back off or loosen up after a short -- after -- shortly after Mr. Mayfield left the Florida rental facility, you agree that no one at U-Haul in Florida could fix that problem unless Mr. Mayfield reported it?
A. That's correct.
Q. Okay. I want to go back to your report, Exhibit-2. If you go to page 3, please, I want to go through your section 3.0, Activities of Objective, and I just have a few questions here.
Paragraph 2, you say, a complete site inspection on October 18, 2006 -- that was the day you went to the scene of the accident?
A. Uh-huh, yes.
Q. And then you go on to say, and the inspection of an International Navistar owned by U-Haul on October 18, 2006.

What do you mean by that?
A. Partial inspection, it really should read. I saw an International -- the same time I saw the trailer unit, I saw the International Harvester at the same location.
Q. You saw a U-Haul truck or the U-Haul truck?
A. No, a. An exemplar, it should be. An International Navistar. I was more focusing on the tow hitch on it.
Q. But was it coincidental that that U-Haul truck was there?
A. That I don't know. I don't know that answer.
Q. Well, where did you see this truck? Was the truck at the scene?
A. I guess I'm a little confused.
Q. I'm confused by what you wrote here.
A. Okay, sorry. I showed you photographs of the exemplary trailer.
Q. Yes.
A. At the same time I saw an

exemplary International Navistar owned by U-Haul.
Q. Okay. So on October 18, 2006 you did an inspection of the accident scene, correct?
A. Yes.
Q. And then you also -- that's the day you went to the U-Haul facility and took the pictures that we looked at earlier of the U-Haul trailer.
A. Yes. I didn't personally inspect any of the units involved in this accident.
Q. Okay. But the -- so that paragraph 2 is meant to tell me that you also inspected an exemplar trailer.
A. Yes.
Q. Okay. Then you list the three depositions that you reviewed. Were you provided complete copies of those depositions?
A. Yes.
Q. Were you provided any other depositions in the case?

A. Just those three.
Q. Were you told that the two eyewitnesses were deposed?
A. I didn't have knowledge of that, no.
Q. Okay. You say you reviewed Ms. Sara Echevarria's statement taken on 1/20/05. Do you have that with you?
MR. LOCOCO: Off the record.
- - -
(Discussion held off the record.)
- - -
MR. LOCOCO: Let's mark that as 3.
- - -
(Exhibit Costanzo-3 was marked for identification.)
- - -
BY MR. LOCOCO:
Q. We've marked that statement as Exhibit-3, correct?
A. Yes.
Q. If you go to page 4 of your report, then, paragraph 9 says: Review of

800a8074-2ed2-4bb5-ac88-4570b6b32c8e

engineering reference texts for the applicable engineering principles.
What did you review there?
A. Oh, that's a kind of...
Q. Is that boilerplate?
A. Yes.
Q. Okay. Did you review anything specific for this case?
A. Nothing that would be applicable in this case, no.
Q. Okay. Have you ever rented a U-Haul truck?
A. No, not to my knowledge. Oh, I take that back. Yes.
Q. When?
A. Quite a few years ago. Over 10 years ago.
Q. Did you pull a trailer with it?
A. No.
Q. Was it smaller than the International involved in this case?
A. I believe it was same size.
Q. Okay. On page 13 of your

report, you say, at the very top: Based on the writer's field investigation, there was insufficient space next to the center ball to place and successfully use an additional size-towing ball as suggested in testimony from Mr. Todd Rarick.
Did you test that? Did you take another hitch ball and try and put it in there?
A. It's very visual that you wouldn't be able to. First of all, from what I viewed, the 2-inch ball is welded onto the frame, so to be able to use another size tow ball, a smaller tow or a larger tow, you'd have to go next to it since the -- since the 2-inch is bolted. You wouldn't be able to use a tongue -- a tongue wouldn't place over -- if the center ball was still there and you wanted to use another one next to it, it wouldn't fit over it.
Q. And that's just based on a visual, an eyeballing by you?
A. I know it couldn't fit. Yes, that's a visual.

Q. You didn't test it at all?
A. No.
Q. On page 17, second paragraph, you write: During the routine six-point inspection conducted by U-Haul prior to rental of this unit to Mr. Mayfield, the components of the trailer's coupler were not properly inspected.
What's your basis for saying that?
A. Well, if they were properly inspected, and that is based on Mr. Mayfield's statement more than anything, if it was properly inspected, it wouldn't loosen in the short period of time after he left the -- initially left the U-Haul place in Florida.
Q. So there you're taking his testimony at face value that it actually did loosen?
A. Yes.
Q. Does it make sense to you that if that, in fact, were the case, he didn't turn around and go back and have them check

it immediately?
MR. LANDON: Objection.
THE WITNESS: That's something you'd have to ask Mr. Mayfield.
BY MR. LOCOCO:
Q. Wouldn't that -- doesn't that strike you as a common sense thing to do?
A. I have no opinion on that. He may have thought it was something he would be able to resolve and fix himself.
Q. Well, then he's responsible. Agreed?
MR. LANDON: Objection.
THE WITNESS: Partially responsible. I think we already went over that.
BY MR. LOCOCO:
Q. Okay. You would have -- I mean, he should have turned around and gone back before he left on his trip --
MR. LANDON: Objection.
MR. LOCOCO: -- if what he reports is true.
MR. LANDON: Objection.

BY MR. LOCOCO:
Q. Correct?
A. Since it was such a long-distance tow, I would think he would try to get it resolved somewhere before he -- I think he stopped in North Carolina. Stopped somewhere, Atlanta. Get the problem resolved before the long-distance tow took place.
Q. You'd agree it's pretty easy to find a U-Haul dealer or a U-Haul center?
A. Yes.
Q. You then go on in that same paragraph to say: Nor was Mr. Mayfield given the proper instructions regarding the attachment and proper use of the trailer during his cross-country towing of this trailer.
What's your basis for that? His testimony?
A. Not just his testimony. Some of the statements that the representative from Florida made.
Q. Rarick?

A. Rarick made, I find unusual in my experience with towing as far as the location of the breakaway chains. And they definitely differ, Mr. Mayfield's opinion and the instructions that U-Haul said they gave him. Some of the instructions they said that they gave Mr. Mayfield are contradictory to my knowledge of towing as far as the location of the breakaway chains.
Q. Like what?
A. Well, my knowledge is, the holes next to the tongue ball -- or the -- the tow bar, that tow, that's used to attach the breakaway chains. Cross -- they're supposed to cross, like they were explained. My knowledge is, you always attach them to that, and that's not the explanation that they gave in U-Haul. I find that unusual. My experience is, it's always attached to the holes next to the tongue ball.
Q. Well, I want to be clear. You've never attached a U-Haul trailer to a U-Haul truck, correct?
A. No, I have not.

Q. You've never seen a U-Haul trailer attached to a U-Haul truck by a U-Haul person, correct?
A. Correct.
Q. Are you testifying that the manner described by Mr. Rarick for attaching the safety chains on the U-Haul trailer to the U-Haul truck is wrong?
A. It's contradictory to what I know, my knowledge.
Q. It's not consistent with your knowledge of what?
A. Placement of the breakaway chains in regards to the hitch.
Q. With respect to what kind of trailer and what kind of truck?
A. Not in regards to U-Haul. I'm speaking from experience and my knowledge with Jayco trailers, and the breakaway chains were always attached close to the tongue bar where the holes are.
Q. Was there anything wrong in the way Mr. Rarick described the proper hookup? In other words, would that have

worked just fine if those instructions had been followed?
A. Yes.
Q. It would have worked fine?
A. If it was superior to the undercarriage somewhere that had an attachment, yes.
Q. As part of your work in this case, have you looked at the undercarriage of a Navistar U-Haul truck to see what is available for running the safety chains?
A. No.
Q. Is there anything else on the coupler mechanism that you believe didn't function properly at and before this accident, other than the latch tang?
A. No.
MR. LOCOCO: Let's go off the record.

- - -

(A short break was taken.)

- - -

BY MR. LOCOCO:
Q. While we were off, I looked

800a8074-2ed2-4bb5-ac88-4570b6b32c8e

through the rest of your file here. I pulled out a couple of things that I want to ask you about, but I want to read into the record the rest of what's in your file so that I have a record of it later, and I also have a few questions from here.

There's a July 28, 2006 letter from Mr. Landon to you; there's some driving directions in your office to upper Pike Creek in Newark, Delaware; there's a December 27, 2006 transmittal letter from Mr. Landon, which sends along Mr. Leonard's report; there is U-Haul equipment guide information that you pulled off the Internet, as well as a U-Haul location finder that you pulled off the Internet; you've got the accident report, which was highlighted; you've got some photographs of Mrs. Echevarria's injuries; you've got photographs that were produced by my clients as part of discovery; you have a copy of the Complaint in this case; you have a letter dated August 11, 2006 from Mr. Landon to you, passing on the transcripts of Mr.

Mayfield and Mr. Rarick.

If you remember, that first letter I cited to you was July 28, '06, okay? So if we go with July 28, '06, you were at least working for Mr. Landon by then. I thought you had said to me earlier that it wasn't until October of '06. It was actually much earlier in '06 that Mr. Landon called you?

A. That -- that's fine. Whatever is the correct date.

Q. Whatever that date is, we go six months further back to when Mr. DiLiberto called you.

A. I believe so. I didn't mean to mislead you. I just wasn't sure of the date.

Q. And I wasn't saying that.

A. Okay.

Q. You have a copy of the plaintiff's deposition, and that was sent to you with a transmittal letter of October 23, '06, a copy of Mr. Mayfield's testimony, and a copy of Mr. Rarick's testimony. There is

then also, as part of that August 11 letter from Mr. Landon, he sends along what he says in his letter are lawsuits and police reports regarding other trailer detachments received in discovery in this case, and that makes up tabs 1 through 20 in your binder here. Did you review those materials?

A. I cursorily read them.

Q. Any relevance to your opinions in this case?

A. No.

Q. You then have a copy of the U-Haul renter vehicle user instructions and the trailer user instructions, correct?

A. Correct.

Q. Where did you get those from?

A. I downloaded them.

Q. Okay. And that's everything -- other than some photographs I'm going to ask you about, that's everything that you've either been provided or that you've prepared in connection with this case?

A. I brought my whole file.

That's everything.

Q. Is there anything that you asked for that Mr. Landon said, no way, I'm not sending that to you?

A. No.

Yeah, more money. No.

Q. Yeah, right. Is there anything that you asked to do that Mr. Landon said, no, you can't do that?

A. No.

Q. Is there anything that Mr. Landon asked you to do that you said, no, I can't do that, or I'm not able to do that?

A. No.

MR. LOCOCO: Okay. I pulled out -- let's mark these, if we can.

\- - -

(Exhibits Costanzo-4 and Costanzo-5 were marked for identification.)

\- - -

BY MR. LOCOCO:

Q. First, let me show you what I had marked as Exhibit-5. Are these the

800a8074-2ed2-4bb5-ac88-4570b6b32c8e

photographs that you took while you were at the U-Haul center, inspecting an exemplar trailer?

A. Yes.

Q. Did you check in with anyone when you were there?

A. I just asked permission to photograph them.

Q. Do you remember who you talked to?

A. No.

Q. What did you tell that person about who you were, if anything?

A. Yeah, I just asked them, I was interested in photographing a trailer, and they were very nice and said go ahead.

Q. Did they ask why?

A. No, they didn't.

Q. Okay. Exhibit-4 is a packet of photographs. My first question is, who did you get those photographs from?

A. I got all my information from Mr. Landon's office.

Q. Okay. Do you know -- let me

just go through the first -- let me count them. The first 13 pages are photographs of the Jetta that appear to have been taken at a junkyard. Do you know who took these photographs?

A. No.

Q. The next section of photographs appear to be right from the scene at the time of the accident. Do you know who took these photographs?

A. No.

Q. And the last section of photographs, and I'm going to start that last section with an X on the bottom of the page, are of the trailer. It looks like it's while it's on a flatbed. Agreed?

A. Yes.

Q. Did you review these photographs as part of your work in this case?

A. Yes.

Q. Do you know who took these photographs?

A. No.

Q. Do you know if Mr. DiLiberto took these photographs?

A. No, I do not know.

Q. Okay. If we look at the photograph that I put the X on, do you see that roll pin next to or contacting the nut?

A. Yes, now I do see it.

Q. Okay.

A. It's a better photograph than the one...

Q. So can we now agree -- can you now agree with Mr. Leonard that postaccident photographs show that the coupler hand wheel was in the fully loosened position when it was on the flatbed truck?

A. The hand wheel is fully loosened? The hand wheel looks damaged to me. I don't know.

Q. The hand --

A. Okay. Sorry.

Q. Let me go backwards. Can you agree with Mr. Leonard that the hand wheel nut is in close proximity to or contacting the coupler bolt roll pin?

A. Yes.

Q. Do you agree that that shows that the coupler hand wheel was in the fully loosened position as it sat there on the flatbed truck?

A. No.

Q. Okay. Do you know what that shows?

A. What this photograph shows?

Q. Other than -- no. Do you know what is proven by the fact that the nut is contacting or in close proximity to that roll pin?

A. No.

Q. Now, if we go to another photograph that you've got a little yellow highlight on that I'm going to circle, does that photograph show the markings caused by the latch tang?

A. I believe he's showing these markings that are along the bottom of the hand wheel that he's saying are made from the latch tang or the dog switch.

Q. Do you know whether those

800a8074-2ed2-4bb5-ac88-4570b6b32c8e

markings are made by the latch tang or the dog switch?
A. They are, yes.
Q. Okay.
A. It clicks into place and it scuffs it as it's turned.
Q. Do you agree that those markings are uniform -- are at a uniform height?
A. Yes.
Q. Do you agree that those markings being at a uniform height indicate that the hand wheel latch and coupler spring are operational and undamaged?
A. No.
Q. Okay. Are you able to draw any conclusion from the fact that those markings are at a uniform height?
A. No.
Q. And that's because you don't have prior experience with this coupler mechanism?
A. And design experience.
Q. Okay. So you agree that the

fact that those markings are at a uniform height may indeed indicate that the hand wheel latch and coupler spring were operational and undamaged?
MR. LANDON: Objection.
THE WITNESS: They were operational and appear at a time that this unit was in service, yes.
BY MR. LOCOCO:
Q. Okay. Are you able to draw the conclusion -- the further conclusion from the height of the markings that those are consistent with that of a coupler with new components?
A. No.
Q. And again, that's because you don't have any experience with this coupler?
A. Plus, the visual looking at this hand wheel doesn't appear to be a new component. Is that what he's talking about?
Q. I guess we'll have to ask him.
A. Yeah.
Q. Have you formed any other opinions in connection with your work in

this case that we haven't discussed?
A. No.
Q. I know the answer to this, but I've got to ask it to make sure my record is clear. You haven't designed anything as part of your work in this case, correct?
A. No.
Q. What I said is correct?
A. Oh, yes.
Q. Okay. And you haven't designed or developed or written any alternative warnings or instructions that could or should have been used with this trailer rental, correct?
A. Correct.
Q. I'd asked you early in the deposition whether you'd ever designed anything, and you answered that you hadn't. Have you ever been involved in the design process?
A. Of...
Q. Of a product.
A. Yes.
Q. And you agree there is a whole

process that's involved when you're designing a piece of equipment or any kind of product?
A. Yes.
Q. And I'm not an engineer. I've got a philosophy degree, so I won't get all the parts of the design process right, but I want to see whether you and I can agree on certain parts of that design process. Do you agree that there's a concept phase where some body or people come up with a design concept?
A. Yes.
Q. You do some preliminary design work, and it used to be drawings, now it's probably computer drawings, but you put pencil or pen to paper. Correct?
A. Correct.
Q. At some point, one of the parts of that process is to come up with a prototype of a design.
A. That's correct.
Q. You probably do some field testing at some point.

800a8074-2ed2-4bb5-ac88-4570b6b32c8e

A. Yes.
Q. Maybe some lab testing?
A. Yes.
Q. You get feedback from the field testing and the lab testing that will help you make revisions to the design.
A. Yes.
Q. And those components of the design process you have not worked on or engaged in, in this case, correct?
A. No.
Q. I want you to assume for a moment that Mr. Landon said that he had an American Express card with absolutely no limit; you could do anything else you wanted to in this case to get ready for trial. Is there anything else that you would put on that list?
A. I would probably take apart the mechanism.
Q. The coupler mechanism?
A. Uh-huh.
Q. Is that a yes?
A. Yes. Sorry.

Q. Anything else?
A. Not that I can think of.
Q. Is there any reason why you haven't done it to date?
A. No.
Q. And why would you want to take apart the coupler mechanism?
A. To have a thorough understanding of the coupler mechanism. Like any component, unless you really take it apart -- hopefully, we'll get more knowledge to it.
Q. Would you agree that you currently have an incomplete understanding of the coupler mechanism?
MR. LANDON: Objection.
THE WITNESS: I don't know until I take it apart.
BY MR. LOCOCO:
Q. Well, if you do that or anything else, would you let Mr. Landon know so he can tell me about that?
A. Absolutely.
Q. And when do you think you

might be able to get those billing records and the Rule 26 list to Mr. Landon?
A. Tomorrow.
Q. Okay.
A. It's in a PDF format, so he can just forward it to you.
Do you want the initial contact with Mr. DiLiberto, too?
Q. Yes. Anything you have from your time with -- on this matter, I don't care whether it was Mr. DiLiberto or Mr. Landon, I would like to get, please. All right?
A. That's fine.
Q. Are there any drafts of your report?
A. No.
Q. When you prepare a report, what's the process? Do you hand write -- write it in longhand, do it on a computer?
A. Do it on a computer.
Q. Did anyone edit your report?
A. No.
Q. Did Mr. Landon see it before

you finalized it?
A. Yes.
Q. Did he make any suggested changes?
A. No.
Q. How did he see it? Did you send it by e-mail?
A. I send drafts in a PDF format so they can read it.
Q. But they can't change it?
A. They can't change it.
Q. Do you have any other correspondence with Mr. Landon that isn't here today, other than your billing records?
A. No.
Q. We talked generally about Mr. Leonard's report and I asked you some specific questions. When I looked at your copy in your file, you had some highlighting in there. Is there anything that we haven't discussed that you specifically disagree with in his report?
A. Not to my knowledge, no.
Q. You have no criticisms of Ms.

800a8074-2ed2-4bb5-ac88-4570b6b32c8e

Echevarria's conduct, correct?
A. No.
MR. LOCOCO: Okay. Subject to follow-up questions based on the materials you're still going to provide me, I don't have any further questions at this time. Thanks very much for coming down. I appreciate your time.
THE WITNESS: Thank you.
MR. LOCOCO: I should say, for the record, I did give you a check before we started today for $700, which is your retainer for giving testimony. Correct?
THE WITNESS: Correct.
MR. LOCOCO: Thank you.
THE WITNESS: Do you want color copies?
MR. LOCOCO: Yes, I do want color copies of those photographs, please.
MR. LOGULLO: I don't have any questions.

MR. PEARCE: I have a couple.
- - -
EXAMINATION
- - -
BY MR. PEARCE:
Q. With regard to Mr. Mayfield's negligence, I think what you did say, and correct me if I'm misunderstanding, that he had the ability or the opportunity to not use the vehicle once he became aware that the coupler mechanism was coming loose. Is that -- did I understand it correctly?
A. Yes.
Q. Would you agree that that would mean -- would have to mean that in order for Mr. Mayfield to be negligent, he knew that -- knew or should have known that that problem could result in the trailer detaching from the truck?
MR. LOCOCO: Object to the form.
THE WITNESS: I believe his statement was, he felt the trailer was loosening and he had to keep

tightening down the trailer. I think that knowledge would somehow draw a conclusion that it may detach somewhere during the movement of the vehicle, if the trailer hitch is loosening.
BY MR. PEARCE:
Q. Do you have any idea as to the degree in which the coupler was loosening when Mr. Mayfield was tightening it down?
A. No.
Q. What basis do you have that Mr. -- other than what you've already said, that Mr. Mayfield knew or should have known that that problem would lead to the trailer coming loose or detaching?
A. It's just my opinion.
Q. Any other facts you're basing it on?
A. No.
Q. I think you agreed, and correct me if I'm wrong, with one of Mr. LoCoco's statements that Mr. Mayfield could have gotten the coupler repaired when he

became aware that it was coming loose. Did you agree with that or did you disagree with that?
A. I think the question was, did he have an opportunity to stop and get it fixed at a local U-Haul, and my answer would be, I guess he would have the opportunity.
Q. Did you have an understanding as to whether or not he called or had the thing looked at by U-Haul?
A. Yes, he did, during the course of his operation, I believe.
Q. And if he did that, would you agree that he would not be negligent in that respect?
MR. LOCOCO: Object to the form.
THE WITNESS: No.
BY MR. PEARCE:
Q. You agree with that?
A. Can you repeat the question?
Q. If he did do that, that is, call U-Haul and explain the problem and/or have them look at the problem and they did

800a8074-2ed2-4bb5-ac88-4570b6b32c8e

whatever it is that they did, would you agree that he was not negligent in that respect?

A. Yes.

Q. Are there any other manners in which you believe that Mr. Mayfield was negligent?

A. No.

MR. PEARCE: Thank you. I have nothing further.

MR. LOCOCO: I've got a few follow-up questions.

- - -

RE-EXAMINATION

- - -

BY MR. LOCOCO:

Q. You said -- I just want to keep entities clear here. You said it's your understanding that Mr. Mayfield at least testified that he stopped somewhere and had some U-Haul entity look at this coupler. Correct?

A. That's what he testified to, yes.

Q. All right. Do you know whether it was a dealer, a center?

A. I'd have to look back on his deposition. I don't recall. I recall him saying he looked up a U-Haul phone number in the phone book, so someone who is associated with U-Haul. I'm not sure if it was a service center or where it was located.

Q. Okay. So sitting here today, you don't know, even assuming that happened, that he talked to anybody who's a party in this case?

A. That's correct.

Q. Okay. Do you believe him when he says he stopped? Are you crediting his testimony that he stopped and had some U-Haul entity look at this coupler?

A. Yes.

Q. So what you're telling us today is that the people at U-Haul in Florida sent out a coupler mechanism that wasn't working properly. Correct?

A. Correct.

Q. And that people at U-Haul --

some U-Haul entity in North Carolina looked at that same mechanism and let him on his way and didn't see anything wrong with it?

A. I believe his testimony was, they tightened it down and told him he was okay and keep going.

Q. So the people in Florida got it wrong and the people in North Carolina got it wrong?

A. Yes.

Q. That's your opinion?

A. Yes.

Q. Or it was working fine and he never tightened it himself after he put it back together, correct?

A. Well, it wasn't disconnected from the time he said he had it looked at again for the second time. He drove it up to Newark and I believe he testified he disconnected it in Newark and drove it down to Delaware, and that's when the accident happened. So if they properly tightened it down in -- somewhere during his course of travel before the accident, the accident

would have never happened, if it wasn't a problem with the mechanism itself. He'd have to disconnect it again.

Q. And not tighten it.

A. And not tighten it.

Q. And not get the safety chains on properly.

A. He would have to make it from North Jersey to Delaware, not having it properly attached.

Q. Either by the chains -- with the coupler and the chains?

A. Yes.

MR. LOCOCO: That's all I have. Thank you.

THE WITNESS: Thank you.

MR. LANDON: We will read.

- - -

(Discussion held off the record.)

- - -

COURT REPORTER: So you want at least a rough draft by Tuesday?

MR. LOCOCO: Yes, and then a final as soon as you can.

800a8074-2ed2-4bb5-ac88-4570b6b32c8e

COURT REPORTER: Does everybody else need a copy of this?

MR. LANDON: Yes.

MR. LOGULLO: Yes.

MR. PEARCE: Yes.

\- - -

(Witness excused.)

\- - -

(Deposition concluded at 4:55 p.m.)

CERTIFICATE

I HEREBY CERTIFY that the witness was duly sworn by me and that the deposition is a true record of the testimony given by the witness.

It was requested before completion of the deposition that the witness, FRANK M. COSTANZO, have the opportunity to read and sign the deposition transcript.

____________________________

Shenna M. Basye-Cara

Delaware Certified Shorthand Reporter and Notary Public in the State of Delaware
DE Certification No. 167-PS
Dated: January 30, 2007

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

\- - - - - -
ERRATA
\- - - - - -

| PAGE | LINE | CHANGE |
| --- | --- | --- |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

800a8074-2ed2-4bb5-ac88-4570b6b32c8e

ACKNOWLEDGMENT OF DEPONENT

I,_____________________, do hereby certify that I have read the foregoing pages, 1 - 87, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_________________________________________

Frank M. Costanzo DATE

Subscribed and sworn to before me this _____ day of ______________, 20____.

My commission expires:______________

_________________________________________

Notary Public



LAWYER'S NOTES

PAGE LINE

| PAGE | LINE | |
|---|---|---|
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |





800a8074-2ed2-4bb5-ac88-4570b6b32c8e