# Murphy & Landon

ATTORNEYS

1011 CENTRE ROAD, SUITE 210
WILMINGTON, DELAWARE 19805

PHONE 302.472.8100
FAX 302.472.8135

CHASE T. BROCKSTEDT
DIRECT DIAL: (302) 472-8109

February 23, 2007

The Honorable Gregory M. Sleet
United States District Court
844 N. King Street
Lock Box 19
Wilmington, DE  19801

**Re:**   ***Sara S. Echevarria v. U-HAUL Co. of Florida, et al.***
        **United States District Court, District of Delaware, No. 05-284 GMS**
        **MS&L File No. 06-0227**

Dear Judge Sleet:

Defendants assert that Plaintiff cannot proceed on her claim of strict liability pursuant to *Martin v. Ryder Truck Rental, Inc.*, 353 A.2d 581 (Del. 1976) and its progeny, without expert opinion testimony. Plaintiff disagrees for the following reasons.

Pursuant to the *Martin* holding, Plaintiff can prevail against Defendant U-Haul Co. of Florida on a theory of strict liability, without proof of negligence, if she can prove the trailer placed in circulation by U-Haul had a defect that proximately caused Ms. Echevarria's injury. *Id.* at 588-589. The parties have conferred on this issue and U-Haul's counsel has represented that it relies on *Baylis v. Red Lion Group, Inc.*[1], No. 06-1010, 2007 WL 188879 (3rd Cir. Jan. 24, 2007) for the position that plaintiff cannot prevail on her strict liability claim without expert testimony. U-Haul's reliance on *Baylis* is misplaced.

The *Baylis* case involved injuries sustained as a result of a fire extinguisher that leaked $CO_2$ from an area where piping was connected to the handle. In that case, plaintiff alleged negligent design/manufacturing, strict liability and breach of the implied warranty of merchantability. The District Court granted summary judgment and relied on *Joseph v. Jamesway Corp.*, 1997 WL 524126 (Del. Super. 1997); *Ciociola v. Del. Coca-Cola Bottling Co.*, 172 A.2d 252 (Del. 1961); and *DiIenno v. Libby Glass Div.*, 668 F. Supp. 373 (D. Del. 1987) in holding the plaintiff had to affirmatively prove the extinguisher was negligently designed or

---

[1] All cases cited in this letter are attached.

Ms. Sara S. Echevarria
February 23, 2007
Page 2 of 3

manufactured. All four cases (including *Baylis*) involved allegations of negligent manufacturing. To prove such a claim, the Courts collectively held that without an expert opinion regarding a manufacturing defect in the product, the plaintiff had to eliminate all other potential causes through circumstantial evidence. However, the reasoning applied in these cases does not apply to the strict liability claims brought by Sara Echevarria because she is not alleging a design or manufacturing defect.[2] Rather, she is alleging that the coupler mechanism was broken and not working properly when the trailer was rented to Mayfield. She can prove this through direct evidence from Mayfield.

The *Joseph* case, cited in *Baylis*, involved injuries resulting from a defective stationary bicycle. In analyzing the evidence in support of a manufacturing defect, the Delaware Superior Court stated that when attempting to prove a defect circumstantially, it must be established that negligent manufacturing is the only possible inference. *Joseph*, 1997 WL 524126 at *3 (citing to *Ciociola*, 172 A.2d at 257). As a result, the Court granted summary judgment "as to a claim of a manufacturing defect." Id. at *5.

In *Ciociola*, the Delaware Supreme Court affirmed a directed verdict in favor of a defendant involving an action brought to recover injuries resulting from a glass bottle of Coca-Cola breaking in the plaintiff's hand. The claim relevant to the issue before the Court was whether that plaintiff could prove circumstantially that the bottle was defectively bottled or defectively delivered and such defects somehow caused the glass bottle to break. *Ciociola*, 172 A.2d at 257. The Court agreed with the defendant that the bottle being broken could have resulted from negligence other than the bottling or delivery process and held the conclusion asserted by plaintiff "that the bottle was delivered with a defect does not necessarily follow from the proof in this record." Id. at 258.

In *Dilenno*, this Court granted summary judgment against a plaintiff injured when a jar of peanuts shattered while the plaintiff was attempting to secure the lid. The Court determined that the design of the jar was reasonable and that with respect to the claim of a manufacturing defect, the plaintiff did not meet her burden of proof. *Dilenno*, 688 F.Supp. at 377-378. Specifically, the plaintiff provided testimony that the jar broke and expert opinion that for it to shatter, the jar must have been defectively manufactured. Id. at 378. However, the plaintiff could not meet its burden in explaining how or why it shattered. Id. Therefore, the Court dismissed the manufacturing defect claim. Id.

In affirming the *Baylis* decision, the Third Circuit Court noted the well established rule that in a products liability case, the plaintiff must show the product is defective and proximately caused injury. *Baylis*, 1997 WL 188879 at *2 (citing to *Reybold Group, Inc. v. Chemprobe Technologies, Inc.*, 721 A.2d 1267, 1269 (D. Del. 1998). There, the plaintiff could not prove the fire extinguisher was defective when it was delivered to the consumer. Id.

---

[2] In fact, plaintiff has dismissed her claims against U-Haul International, Inc. which is the entity that designed and manufactured the trailer. The remaining U-Haul entity in the case is U-Haul Co. of Florida which rented the trailer.

Ms. Sara S. Echevarria
February 23, 2007
Page 3 of 3

  Ms. Echevarria is not alleging the U-Haul trailer coupler was defectively designed or manufactured. Hers is not a products liability case. She's not suing the product manufacturer. Simply, Ms. Echevarria claims that the coupler mechanism was not working properly when it was rented to Mayfield. U-Haul has admitted that when the coupler mechanism works properly it cannot come loose. The testimonial evidence from Mayfield is that U-Haul connected the trailer to Mayfield's vehicle and that the coupler mechanism loosened on the ride from U-Haul to Mayfield's home. Furthermore, on the trip from Delaware to New Jersey, Mr. Mayfield had to tighten the coupler several times because it kept coming loose. U-Haul acknowledges that's not supposed to happen if the coupler is working properly. Rather, U-Haul contends, through its retained liability expert, that the coupler was working properly and argues that Mayfield should not be believed.

  There will be sufficient evidence for the jury to conclude the coupler mechanism was not working properly when the trailer was rented to Mayfield. If the jury resolves the factual issue in that way and believes Mayfield, then U-Haul is strictly liable under *Martin v. Ryder Truck Rental, Inc.* Expert testimony is not necessary to establish that the coupler wasn't working properly since Mayfield perceived the problem almost immediately after renting the trailer. U-Haul's defense is not that what Mayfield says does not establish a defect; but rather, that Mayfield should not be believed.

        Very truly yours,

        */s/ Chase T. Brockstedt*

        Chase T. Brockstedt

CTB/krw
cc:  Roger D. Landon, Esq.
   Francis H. LoCoco, Esq.
   Robert K. Pearce, Esq.
   Robert J. Leoni, Esq.
   Steven Caponi, Esq.

353 A.2d 581, Martin v. Ryder Truck Rental, Inc., (Del.Supr. 1976)                    Page 1

**\*581** 353 A.2d 581

18 UCC Rep.Serv. 870

Supreme Court of Delaware.

**Dorothy MARTIN and James E.
Martin, Plaintiffs Below, Appellants,**
v.
**RYDER TRUCK RENTAL, INC., a
Florida Corporation, et al., Defendant
Below, Appellee.**
Submitted Sept. 10, 1975.

Decided Feb. 19, 1976.

Motorist and her husband brought strict tort
liability action against truck rental business for
injuries arising out of accident caused by failure of
rented truck's brakes to function properly. The
Superior Court granted summary judgment in favor of
truck rental business, holding that strict tort liability
doctrine was not applicable, and plaintiffs appealed.
The Supreme Court, Herrmann, C.J., held that
bailment lease of motor vehicle, entered into in
regular course of truck rental business, was subject to
application of doctrine of strict tort liability in favor
of injured bystander; and that truck rental business
could be held liable in tort, without proof of
negligence, if truck it placed in circulation proved to
have defect that proximately caused personal injury or
property damage to motorist whose automobile was
rear-ended by truck due to failure of its braking
system.

Reversed and remanded.

Duffy, J., concurred with opinion.

West Headnotes

[1]    Bailment ⬤⟿9

    50 ----
        50k9 Condition of and Defects in Property,
        and Negligence of Bailor.

Warranty provisions of Uniform Commercial Code
are clearly limited to sales of goods; thus, legislature
has not preempted field as to bailments and leases and
court was free, in common-law tradition, to apply
doctrine of strict tort liability to bailment lease. 6
Del.C. § 2-318.

[2]    Automobiles ⬤⟿387

48A ----
    48AVIII Garage Keepers, Repairmen, Auto
    Liverymen, and Filling Stations
    48Ak386 Renting Out of Vehicle by Auto
Liverymen
    48Ak387 In General.

Doctrine of strict tort liability would be extended to
bailor lessor of truck rented in regular course of
business.

[3]    Automobiles ⬤⟿391

    48A ----
        48AVIII Garage Keepers, Repairmen, Auto
        Liverymen, and Filling Stations
        48Ak386 Renting Out of Vehicle by Auto
Liverymen
        48Ak391 Injuries to Third Persons.

Bailment lease of motor vehicle, entered into in
regular course of truck rental business, was subject to
application of doctrine of strict tort liability in favor
of bystander injured when brakes of truck failed to
function properly. 6 Del.C. § 2-318.

[4]    Automobiles ⬤⟿391

    48A ----
        48AVIII Garage Keepers, Repairmen, Auto
        Liverymen, and Filling Stations
        48Ak386 Renting Out of Vehicle by Auto
Liverymen
        48Ak391 Injuries to Third Persons.

Truck rental business would be strictly liable in
court action brought by motorist injured in
automobile accident caused by failure of rented
truck's brakes to function properly.

[5]    Automobiles ⬤⟿391

    48A ----
        48AVIII Garage Keepers, Repairmen, Auto
        Liverymen, and Filling Stations
        48Ak386 Renting Out of Vehicle by Auto
Liverymen
        48Ak391 Injuries to Third Persons.

Truck rental business could be held liable in tort,
without proof of negligence, if truck it placed in
circulation proved it had defect that proximately
caused personal injury or property damage to injured
motorist, when due to failure of its braking system,

© 2006 Thomson/West. No claim to original U.S. Govt. works.

**Page 2**

truck did not stop for traffic light and struck rear of automobile which had stopped for signal, causing that automobile to collide with vehicle driven by injured motorist.

Upon appeal from the Superior Court. Reversed.

John M. Bader and Robert Jacobs, Bader, Dorsey & Kreshtool, Wilmington, for plaintiffs below, appellants.

H. Alfred Tarrant, Jr. and Everett P. Priestley, Cooch & Taylor, Wilmington, for defendant below, appellee.

Before HERRMANN, C.J., and DUFFY and McNEILLY, JJ.,

**\*582** HERRMANN, Chief Justice.

We hold today that a bailment-lease of a motor vehicle, entered into in the regular course of a truck rental business, is subject to application of the doctrine of strict tort liability in favor of an injured bystander.

I.

According to the plaintiffs in this case:

A truck was leased by the defendant, Ryder Truck Rental, Inc., to Gagliardi Brothers, Inc., in the regular course of Ryder's truck rental business. ([FN1]) The truck, operated by a Gagliardi employee, was involved in an intersectional collision. Due to a failure of its braking system, the truck did not stop for a traffic light and struck the rear of an automobile which had stopped for the signal, causing that automobile to collide with the vehicle driven by the plaintiff, Dorothy Martin. As a result, she was injured, her car was damaged, and this suit was brought by her and her husband against Ryder.

The plaintiffs base their cause of action solely upon the doctrine of strict tort liability, i.e., tort liability without proof of negligence. ([FN2]) The Superior Court granted summary judgment in favor of Ryder, **\*583** holding that the doctrine is not applicable to the factual situation here presented. We disagree.

II.

This is a case of first impression in this Court on the subject of strict tort liability in the law of products liability. Ciociola v. Delaware Coca Cola Bottling Company, Del.Supr., 3 Storey 477, 172 A.2d 252 (1961), which was decided prior to the evolution of that doctrine during the 1960's, stood for the proposition that in products liability cases Delaware was committed to the common law rules of privity governing actions in contract based upon implied warranty, and that any change required legislative action. Uniform Commercial Code, 6 Del.C. s 2--318, abrogating such privity requirements, was the legislative response to Ciociola. ([FN3]) In Jackson v. Hearn Brothers, Inc., Del.Supr., 212 A.2d 726 (1965), this Court disposed of a strict tort liability contention by assuming, without deciding, that such a rule was available, but concluded that its application was unjustified in that case.

In the Superior Court, Kates v. Pepsi Cola Bottling Company of Salisbury, Md., Del.Super., 263 A.2d 308 (1970); Moore v. Douglas Aircraft Co., Del.Super., 282 A.2d 625 (1971), and Dillon v. General Motors Corporation, Del.Super., 315 A.2d 732 (1974), recently touched upon the subject. ([FN4]) All were sale cases; none directly addressed the question here presented.

[1] The defendant contends that if the Legislature intended to create a strict liability for bailments for hire, it would have done so in the UCC. Thus, the threshold question in the instant case is whether, by the enactment of the UCC and the limitation of its strict warranty provisions to sales, the Legislature has preempted this field of the law of products liability; or whether, the UCC notwithstanding, the courts are free to provide for bailments and leases the alternate, but somewhat conflicting, remedy of strict tort liability. ([FN5])

**\*584** The warranty provisions of Article 2 of the UCC, ss 2--313 (express) and 2--315 (implied), are clearly limited to the sales of goods; the Statute is 'neutral' as to other types of relationships. ([FN6]) Manifestly, the Legislature has not preempted the field as to bailments and leases by enactment of the UCC. ([FN7]) Silence on the subject may not be deemed to be such preemption.

Hence, we are free, in the common law tradition, to apply the doctrine of strict tort liability to a bailment-lease. The question is whether that course should be adopted; and for that decision, consideration of the nature and evolution of the doctrine is important:

III.

[2] The development of the doctrine of strict tort

© 2006 Thomson/West. No claim to original U.S. Govt. works.

liability in the law of products liability has evolved rapidly during the past decade, until it has become the prevailing remedy throughout the country. It is now the rule in approximately two-thirds of the states, including Pennsylvania and New Jersey. ([FN8]) Prosser, The Law of Torts (4th ed.1971); 2 Frumer & Friedman, Products Liability, s 16A(3), at 3--248 n. 2 (1975).

Strict tort liability in the field of products liability has developed in a 'step by step' process out of the law of contract warranty into the law of tort, for the purpose of the greater protection of the user and the public against defective goods by eliminating the 'luggage' and 'undesirable complications' of the contract-warranty remedy in direct sales transactions, such as the requirement of a sale and notice, and the provision for limitation and disclaimer, generally prescribed by the Uniform Sales Act and the UCC. See Prosser, The Law of Torts, s 97, at 655--56; Prosser, The Assault Upon the Citadel, 69 Yale L.J. 1099 (1960); Prosser, The Fall of the Citadel, 50 Minn.L.Rev. 791 (1966); 2 Frumer & Friedman, s 16A(4)(a), at 3--262.5 Et seq.

At the forefront of this development was the landmark case of Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 161 A.2d 69 (1960), which brought a 'break-through' in extending strict warranty liability to products other than food and drink.

The first significant application of the strict tort liability concept in a products liability case was the landmark decision of Greenman v. Yuba Power Products, Inc., 59 Cal.2d 57, 27 Cal.Rptr. 697 ,377 P.2d 897 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897 decision since Henningsen and perhaps the most important since MacPherson v. Buick (217 N.Y. 382, 111 N.E. 1050 (1916)).' 2 Frumer & Friedman s 16A(1), at 3--238. The defendant remote-manufacturer there sought to avoid liability for breach of warranty on a defective power tool on the ground that reasonable notice *585 of the breach had not been given under the notice requirements of the California Sales Act governing contract warranties. The Court held otherwise, stating:

'A manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being. * * *

'Although * * * strict liability has usually been based on the theory of an express or implied warranty running from the manufacturer to the plaintiff, * * * the liability is not one governed by the law of contract warranties but by the law of strict liability in tort. Accordingly, rules defining and governing warranties that were developed to meet the needs of commercial transactions cannot properly be invoked to govern the manufacturer's liability to those injured by their defective products unless those rules also serve the purposes for which such liability is imposed.

'* * * The purpose of such liability is to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves. Sales warranties serve this purpose fitfully at best. * * * Implicit in the machine's presence on the market * * * was a representation that it would safely do the jobs for which it was build. * * * To establish the manufacturer's liability it was sufficient that plaintiff proved that he was injured while using the (product) in a way it was intended to be used as a result of a defect in design and manufacture of which plaintiff was not aware that made the (product) unsafe for its intended use.' 377 P.2d at 900, 901.

Influenced, as were other courts, by Yuba's reasoning, the Supreme Court of New Jersey in 1965 abandoned the warranty terminology of Henningsen and embraced strict tort liability in Santor v. A. and M. Karagheusian, Inc., 44 N.J. 52, 207 A.2d 305 (1965). Warranty concepts were there side-tracked because:

'As was noted in Henningsen, in seeking justice for ultimate consumers the courts were hard put to find legal mechanisms to overcome the strictures of the long-standing privity of contract requirement. * * * We chose at that time to measure the manufacturer's responsibility under modern marketing conditions by an implied warranty of reasonable suitability of the article manufactured for the use for which it was reasonably intended to be sold. * * *

'It must be said that in the present-day marketing milieu, treatment of the manufacturer's liability to ultimate purchasers or consumers in terms of implied warranty is simply using a convenient legal device or formalism to accomplish the purpose. It has been suggested, however, that conceptually such a doctrine is somewhat illusory because traditionally warranty has had its source in contract.

© 2006 Thomson/West. No claim to original U.S. Govt. works.

* * * Ordinarily there is no contract in a real sense between a manufacturer and an expected ultimate consumer of his product. The fact is that as a matter of public policy the law has imposed on manufacturers a duty to such persons irrespective of contract or a privity relationship between them. Such concept expressed in terms of breach of implied warranty of fitness or merchantability bespeaks a Sui generis cause of action. Its character is hybrid, having its commencement in contract and its termination in tort. * * *

'In this developing field of the law, courts have necessarily been proceeding step by step in their search for a stable principle which can stand on its own base as a permanent part of the substantive law. The quest has found sound expression, we believe, in the doctrine of strict liability in tort.' 207 A.2d at 311.

**\*586** Strict tort liability was found preferable to warranty language because:

'The obligation of the manufacturer (must become) what in justice it ought to be--an enterprise liability, and one which should not depend upon the intricacies of the law of sales. The purpose of such liability is to insure that the cost of injuries or damage, either to the goods sold or to other property, resulting from defective products, is borne by the makers of the products who put them in the channels of trade, rather than by the injured or damaged persons who ordinarily are powerless to protect themselves.' 207 A.2d at 311-12.

Since Yuba and Santor, the doctrine of strict tort liability has met with widespread acceptance throughout the country. Consequently, in the past decade, the protection afforded to a person injured by a defective product has been greatly enhanced by the steady and consistent expansion of the concept. The doctrine was developed at the outset for application against remote manufacturers for the protection of users and consumers. See 2 Frumer & Friedman, ss 16A(1)--(3), at 3--237 Et seq. It has been in a constant state of refinement and extension, however. One of the extensions of the doctrine has been to bailors and lessors; another has been to injured bystanders. Once again, the leading decisions emanate from California and New Jersey:

### A.

In Cintrone v. Hertz Truck Leasing, etc., 45 N.J. 434, 212 A.2d 769 (1965), the New Jersey Supreme Court applied strict liability in tort to a motor vehicle bailment situation because '(a) bailor for hire, such as a person in the U-drive-it business, puts motor vehicles in the stream of commerce in a fashion not unlike a manufacturer or retailer'; subjects such a leased vehicle 'to more sustained use on the highways than most ordinary car purchasers'; and by the very nature of his business, exposes 'the bailee, his employees, passengers and the traveling public * * * to a greater Quantum of potential danger of harm from defective vehicles than usually arises out of sales by the manufacturer.' 212 A.2d at 777.

The California Supreme Court endorsed the Cintrone 'step' in Price v. Shell Oil Company, 2 Cal.3d 245, 85 Cal.Rptr. 178, 466 P.2d 722 (1970):

'* * * (A) broad philosophy evolves naturally from the purpose of imposing strict liability which 'is to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves.' (Citing Yuba). Essentially the paramount policy to be promoted by the rule is the protection of otherwise defenseless victims of manufacturing defects and the spreading throughout society of the cost of compensating them. * * *

'* * * (W)e can perceive no substantial difference between Sellers of personal property and Non-sellers, such as bailors and lessors. In each instance, the seller or non-seller 'places (an article) on the market, knowing that it is to be used without inspection for defects, * * *.' (Citing Yuba) In the light of the policy to be subserved, it should make no difference that the party distributing the article has retained title to it. Nor can we see how the risk of harm associated with the use of the chattel can vary with the legal form under which it is held. Having in mind the market realities and the widespread use of the lease of personalty in today's business world, we think it makes good sense to impose on the lessors of chattels the same liability for physical harm which has been imposed on the manufacturers and retailers. The former, like the latter, are able to bear the cost of compensating for injuries resulting from defects by spreading the loss through an **\*587** adjustment of the rental.' 85 Cal.Rptr. at 181, 466 P.2d at 725--26.

The extension of the doctrine of strict tort liability to bailors-lessors has been limited, however, to leases made in the regular course of a rental business, the doctrine being applicable only in a commercial setting

© 2006 Thomson/West. No claim to original U.S. Govt. works.

by its very nature. Price, supra, 85 Cal.Rptr. at 183--84, 466 P.2d at 727--28; Cintrone, supra, 212 A.2d at 777. Strict tort liability has been found 'peculiarly applicable' to the lessor of motor vehicles in 'today's society with 'the growth of the business of renting motor vehicles, trucks and pleasure cars' * * * and the persistent advertising efforts to put one 'in the driver's seat. " Price, supra, 85 Cal.Rptr. at 183, 466 P.2d at 727, quoting from Cintrone, supra, 212 A.2d at 776, 777.

For the reasons so well stated by the leading authorities in this field, we are of the opinion that, since the General Assembly has not preempted this area of the field, the common law must grow to fulfill the requirements of justice as dictated by changing times and conditions.

The present-day magnitude of the motor vehicle rental business, and the trade practices which have developed therein, require maximum protection for the victims of defective rentals. This translates into the imposition of strict tort liability upon the lessor. The public policy considerations which appeared in the development of the doctrine during the past decade, are especially relevant where, as in the instant case, the bailor-lessor retains exclusive control and supervision over the maintenance and repair of the motor vehicle it places in circulation upon the highways. All of the societal policy reasons leading to the expansion of strict tort liability in sales cases are equally applicable in this motor vehicle rental case: (1) the concept that the cost of compensating for injuries and damages arising from the use of a defective motor vehicle should be borne by the party who placed it in circulation, who is best able to prevent distribution of a defective product, and who can spread the cost as a risk and expense of the business enterprise; (2) the concept that the defective motor vehicle was placed on the highways in violation of a representation of fitness by the lessor implied by law from the circumstances and trade practices of the business; and (3) the concept that the imposition upon the lessor of liability without fault will result in general risk-reduction by arousing in the lessor an additional impetus to furnish safer vehicles.

Accordingly, we hold that the doctrine of strict tort liability is applicable to Ryder in the instant case. Accord, Stang v. Hertz Corporation, 83 N.M. 730, 497 P.2d 732 (1972); Stewart v. Budget Rent-A-Car Corporation, 52 Haw. 71, 470 P.2d 240 (1970); Coleman v. Hertz Corporation, Okl.App., 534 P.2d 940 (1975); Galuccio v. Hertz Corporation, 1 Ill.App.3d 272, 274 N.E.2d 178 (1971); See Bachner

v. Pearson, Alaska, 479 P.2d 319 (1970); Rourke v. Garza, Tex.Civ.App., 511 S.W.2d 331 (1974).

The remaining question is whether the doctrine is applicable to the case of an injured bystander.

### B.

[3] The doctrine of strict liability in tort has been extended to injured bystanders. We endorse the rationale of Elmore v. American Motors Corporation, 70 Cal.2d 578, 75 Cal.Rptr. 652, 451 P.2d 84 (1969):

'If anything, bystanders should be entitled to greater protection than the consumer or user where injury to bystanders from the defect is reasonably foreseeable. Consumers and users, at least, have the opportunity to inspect for defects, * * * where as the bystander ordinarily has no such opportunities. In short, the bystander is in greater need of protection from defective products which are dangerous, and if any distinction should be made between bystanders and users, it should be made * * * to extend *588 greater liability in favor of the bystanders.' 75 Cal.Rptr. at 657, 451 P.2d at 89.

Bystander recovery is the prevailing rule in the application of the doctrine of strict tort liability by the overwhelming weight of authority. ([FN9]) Fairness and logic, as well as the philosophy underlying the doctrine, require that an injured bystander be covered in its application. We so hold.

It is noteworthy that under the UCC s 2--318 an injured bystander may be protected as one 'affected by' a defective product in a direct sale situation covered by an implied warranty. See Wasik v. Borg, 2d Cir., 423 F.2d 44, 48--49 (1970). Thus, the conclusion reached here is in accord with the public policy underlying s 2--318.

### IV.

[4] Ryder contends that the imposition of any new measure of liability in this field (1) should be left to the Legislature, citing Bona v. Graefe, 264 Md. 69, 285 A.2d 607 (1972); or (2) should be made effective prospectively only. As to the first point: where, as here, the Legislature has not preempted the field the common law must be kept abreast of the time and must grow to fulfill the demands of justice. As to the second point: these plaintiffs may not be deprived of the benefits of the development of the law they have prompted by their perseverance in this litigation; to

do so would render this opinion pure Dictum. See Great Northern Ry. Co. v. Sunburst Oil & Refining Co., 287 U.S. 358, 53 S.Ct. 145, 77 L.Ed. 360 (1932); Schaefer, The Control of 'Sunbursts'; Techniques of Prospective Overruling, 42 N.Y.U.L.Rev. 631 (1967). We decline to limit the rulings herein to prospective application.

V.

To summarize:

[5] Under the doctrine of strict tort liability in the instant case, Ryder may be held liable in tort, without proof of negligence, if the truck it placed in circulation proved to have a defect that proximately *589. caused personal injury or property damage to the plaintiffs.

The judgment below is reversed and the cause remanded for further proceedings consistent herewith.

DUFFY, Justice (concurring):

I agree with the judgment of the Court and I concur in the opinion. But it seems to me desirable to particularly emphasize that the result is consistent with Delaware statutory policy which provides a remedy to third persons injured under comparable circumstances, and that it is an extrapolation of Delaware decisional law in strict tort liability to the products area. In sum, the result is completely consistent with public policy as expressed by the General Assembly, with our decisional law, with case law which has evolved in many other jurisdictions, and with the plain requirements of justice.

In my view, justice requires that an innocent third person, injured as plaintiff Dorothy Martin alleges she was, have a remedy against the person who caused those injuries. The General Assembly has not provided her with a statutory remedy but, as the opinion notes, the public policy underlying 6 Del.C. s 2--318 is broad enough to permit the Court to rely on it in our evolution of the common law. And, in principle, a bailor-lessor engaged in the business of putting motor vehicles in the stream of traffic is no different from a seller (who is bound by the statute) who does the same thing, cf. Cintrone v. Hertz Truck Leasing, etc., 45 N.J. 434, 212 A.2d 769 (1965). In addition, Delaware has applied the principle of strict tort liability over the years to varying fact situations (where damage had been done by a vicious animal, for example), and while efforts to extend the doctrine have met with mixed results in our Courts, see the comprehensive study by Chief Judge Latchum in Handy v. Uniroyal, Inc., D.Del., 327 F.Supp. 596 (1971), this case is a reasonable enlargement in the products liability field. And the case law which has emerged so rapidly in recent years in other jurisdictions certainly supports our result.

(FN1.) The rental was from year to year, covered by a 'Truck Lease and Service Agreement' under which Ryder agreed, at its own cost and expense:

'A. To provide from Ryder's garages fuel, oil, lubricants, tires, tubes and all other operating supplies and accessories necessary for the proper and efficient operation of the vehicles.

'B. To provide fuel, oil and lubricants at service stations authorized and designated by Ryder to furnish such supplies on its behalf, provided, Lessee shall pay to Ryder the amount by which the cost of such fuel (including fuel taxes) to Ryder exceeds the 'maximum fuel allowance' per gallon indicated on Schedule A for the applicable vehicle.

'C. To maintain and repair the leased vehicles and furnish all labor and parts which may be required to keep the vehicles in good operating condition. Maintenance shall include road service due to mechanical and tire failure.

In turn, Gagliardi agreed:

'C. To return each vehicle to Ryder for service and maintenance at the location stated on Schedule A for a minimum of eight hours each week during Ryder's normal business hours, at such scheduled time as is agreed by the parties.

'D. Not to cause or permit any person other than Ryder or person expressly authorized by Ryder to make repairs or adjustments to vehicles, governors and other accessories. In all cases where repair of vehicles is necessary, Lessee shall notify Ryder by the speediest means of communication available. Ryder will not be responsible for any repair or service while such vehicle is away from Ryder's garage, unless expressly authorized by Ryder and unless Lessee submits an acceptable voucher of the repairs or services.'

The agreement also contained termination and purchase provisions.

(FN2.) An early statement of the doctrine of strict tort liability appears in Restatement (Second) of

Torts s 402A (1965) as follows:

's 402A. Special Liability of Seller of Product for Physical Harm to User or Consumer.

'(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.'

*589_ As to leased chattels, compare Restatement (Second) of Torts s 408 (1965):

's 408. Lease of Chattel for Immediate Use

'One who leases a chattel as safe for immediate use is subject to liability to those whom he should expect to use the chattel, or to be endangered by its probable use, for physical harm caused by its use in a manner for which, and by a person for whose use, it is leased, if the lessor fails to exercise reasonable care to make it safe for such use or to disclose its actual condition to those who may be expected to use it.'

(FN3.)  6 Del.C. s 2--318 provides:

's 2--318. Third party beneficiaries of warranties express or implied.

'A seller's warranty whether express or implied extends to any natural person who may reasonably be expected to use, consume or be affected by the goods and who is injured by breach of the warranty. A seller may not exclude or limit the operation of this section.'

The official text of s 2--318, recommended as 'Alternative A' by the American Law Institute Draftsman, extended the sellers express or implied warranty to any person 'who is in the family or household of his buyer or who is a guest in his home * * *.' The version of s 2--318 adopted by Delaware was subsequently suggested by the A.L.I. Draftsman as 'Alternative B.' See 2 L. Frumer & M. Friedman, Products Liability, s 16.04(3), at 3--218 (1975).  Delaware's variation of s 2--318 was enacted in order to abrogate the privity requirements theretofore prevailing in this State under Ciociola, supra.  As appears in the Delaware Study Comment to s 2--318:

'The variation in the language of s 2--318 is required to accomplish this purpose because of the decision of the Delaware Supreme Court in Ciociola v. Delaware Coca Cola Bottling Co., 53 Delaware 477, 172 A.2d 252 (1961). In that case the Court held that Delaware was committed to the common law rule governing actions for breach of implied warranties, and that any change would have to be made by the Legislature rather than the Judicial Branch.'

(FN4.)  For a careful review of earlier Delaware Superior Court cases dealing with the application of strict tort liability to the owners of dangerous or vicious animals, and to abnormally dangerous instrumentalities and activities, see Handy v. Uniroyal, Inc., D.Del., 327 F.Supp. 596, 603--05 (1971).

(FN5.)  For the contrariety of opinion upon the question of legislative preemption in the field of products liability by reason of the enactment of the UCC, see Markle v. Mulholland's Inc., 265 Or. 259, 509 P.2d 529, 535 (1973), especially the concurring opinion of Chief Justice O'Connell, 509 P.2d at 536 Et seq.; Titus, Restatement (Second) of Torts Section 402A and the Uniform Commercial Code, 22 Stan.L.Rev. 713 (1970); Speidel, The Virginia 'Anti-Privity' Statute: Strict Products Liability Under the Uniform Commercial Code, 51 Va.L.Rev. 804 (1965); Franklin, When Worlds Collide: Liability Theories and Disclaimers in Defective-Product Cases, 18 Stan.L.Rev. 974 (1966); Dickerson, The ABC's of Products Liability--With a Close Look at Section 402A and the Code, 36 Tenn.L.Rev. 439 (1969). See also Chapman v. Brown, D.Haw., 198 F.Supp. 78 (1961), Aff'd, 9th Cir., 304 F.2d 149 (1962); Larson v. Clark Equipment Co., Colo.App., 518 P.2d 308 (1974).

© 2006 Thomson/West. No claim to original U.S. Govt. works.

(FN6.) The A.L.I. Official Comment to s 2--313 reads:

'Although this section is limited in its scope and direct purpose to warranties made by the seller to the buyer as part of a contract for sale, the warranty sections of this Article are not designed in any way to disturb those lines of case law growth which have recognized that warranties need not be confined either to sales contracts or to the direct parties to such a contract. They may arise in other appropriate circumstances such as in the case of bailments for hire * * *. (T)he matter is left to the case law with the intention that the policies of this Act may offer useful guidance in dealing with further cases as they arise.'

*589_ (FN7.) Reserved for another day is the question of whether the Legislature has preempted the field as to direct sales cases and whether the warranty provisions of the UCC are, therefore, the exclusive source of strict liability in such cases.

(FN8.) Webb v. Zern, 422 Pa. 424, 220 A.2d 853 (1966); Santor v. A. and M. Karagheusian, Inc., 44 N.J. 52, 207 A.2d 305 (1965); but not Maryland, Myers v. Montgomery Ward & Co., 253 Md. 282, 252 A.2d 855 (1969).

(FN9.) Accord, Fulbright v. Klamath Gas Company, Or.Supr., 533 P.2d 316 (1975); See Passwaters v. General Motors Corporation, 8th Cir., 454 F.2d 1270 (1972); Wasik v. Borg, 2d Cir., 423 F.2d 44 (1970); White v. Jeffery Galion, Inc., E.D.Ill., 326 F.Supp. 751 (1971); Sills v. Massey-Ferguson, Inc., N.D.Ind., 296 F.Supp. 776 (1969); Giberson v. Ford Motor Company, Mo.Supr., 504 S.W.2d 8 (1974); Codling v. Paglia, 32 N.Y.2d 330, 345 N.Y.S.2d 461, 298 N.E.2d 622 (1973); Howes v.

Hansen, 56 Wis.2d 247, 201 N.W.2d 825 (1972); Elmore, supra; Darryl v. Ford Motor Company, Tex.Supr., 440 S.W.2d 630 (1969); Webb v. Zern, 422 Pa. 424, 220 A.2d 853 (1966); Mieher v. Brown, 3 Ill.App.3d 802, 278 N.E.2d 869 (1972); Lamendola v. Mizell, 115 N.J.Super. 514, 280 A.2d 241 (1971); Caruth v. Mariani, 11 Ariz.App. 188, 463 P.2d 83 (1970); Preissman v. Ford Motor Company, 1 Cal.App.3d 841, 82 Cal.Rptr. 108 (1969); Mitchell v. Miller, 26 Conn.Sup. 142, 214 A.2d 694 (1965); Cf. Ford Motor Company v. Cockrell, Miss.Supr., 211 So.2d 833 (1968); See also Klimas v. International Telephone and Telegraph Corp., D.R.I., 297 F.Supp. 937 (1969).

Bystander recovery in warranty actions include: Moss v. Polyco, Inc., Okl.Supr., 522 P.2d 622 (1974); Toombs v. Fort Pierce Gas Company, Fla.Supr., 208 So.2d 615 (1968); Piercefield v. Remington Arms Co., 375 Mich. 85, 133 N.W.2d 129 (1965); Cawley v. General Motors Corporation, 67 Misc.2d 768, 324 N.Y.S.2d 246 (1971). See also Deveny v. Rheem Manufacturing Company, 2d Cir., 319 F.2d 124 (1963).

Other materials relating to bystander recovery include: 2 Frumer & Friedman, s 16.04(2)(c), at 3--169 Et seq.; Noel, Products Liability: Bystanders, Contributory Fault and Unusual Uses, 50 F.R.D. 321 (1971); Comment, Strict Product Liability to the Bystander: A Study in Common Law Determinism, 38 U.Chi.L.Rev. 625 (1971); Noel, Defective Products: Extension of Strict Liability to Bystanders, 38 Tenn.L.Rev. 1 (1970); Annot., Products Liability: Extension of Strict Liability in Tort to Permit Recovery by a Third Person Who Was Neither a Purchaser Nor User of Product, 33 A.L.R.3d 415 (1970); Note, Strict Products Liability and the Bystander, 64 Colum.L.Rev. 916 (1964).

© 2006 Thomson/West. No claim to original U.S. Govt. works.

Westlaw.

Slip Copy                                                                    Page 1
Slip Copy, 2007 WL 188879 (C.A.3 (Del.))
**(Cite as: Slip Copy)**

# H

Briefs and Other Related Documents
Baylis v. Red Lion Group, Inc.C.A.3
(Del.),2007.Only the Westlaw citation is currently
available.This case was not selected for publication
in the Federal Reporter.NOT PRECEDENTIAL
Please use FIND to look at the applicable circuit
court rule before citing this opinion. Third Circuit
Local Appellate Rule 28.3(a) and Internal Operating
Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3
IOP APP I 5.3.)

United States Court of Appeals,Third Circuit.
April BAYLIS, Appellant,
v.
RED LION GROUP, INC., A Corporation of the
State of Pennsylvania, Appellee.
**No. 06-1010.**

Submitted Under Third Circuit LAR 34.1(a) Jan. 8,
2007.
Filed Jan. 24, 2007.

On Appeal from the United States District Court for
the District of Delaware (D.C. Civil No.
04-cv-01462), District Judge: Honorable Kent A.
Jordan.

Bayard Marin, Wilmington, DE, for Appellant.
Norman H. Brooks, Jr., Marks, O'Neill, O'Brien &
Courtney, Wilmington, DE, for Appellee.

Before SLOVITER, RENDELL, Circuit Judges, and
IRENAS,[FN*] Senior District Judge.

> FN* Honorable Joseph E. Irenas, Senior
> United States District Judge for the District
> of New Jersey, sitting by designation.

## OPINION
IRENAS, Senior United States District Judge.
*1 Appellant commenced this action claiming that
she was injured by an unreasonably dangerous fire
extinguisher manufactured and distributed by Ap-
pellee.[FN1] Appellant advanced five claims against
Appellee: (1) negligent manufacture; (2) failure to
warn; (3) strict liability; (4) warranty of merchantab-
ility; and (5) implied warranty of fitness for a particu-

lar purpose. On December 7, 2005, the District Court
(Jordan, J.) granted Appellee's motion for summary
judgment on all claims. Appellant now appeals the
granting of summary judgment with respect to claims
(1), (3), and (4).

> FN1. The basis of subject matter jurisdiction
> in this case is diversity of citizenship. Under
> the *Erie* Doctrine, we must apply the sub-
> stantive law of Delaware. *See Erie Railroad
> Co. v. Tompkins,* 304 U.S. 64 (1938).

I.

*1 On November 14, 2002, Appellant participated in
a "Health and Safety Day" event at Honeywell Inter-
national, Inc. ("Honeywell"), her place of employ-
ment. This program included hands-on fire extin-
guisher training, using fire extinguishers supplied by
Appellee. Appellant had never operated a fire extin-
guisher before.

*1 Appellee leased 21 extinguishers to Honeywell
and delivered them the day before the
demonstration.FN2 Honeywell received the extin-
guishers and moved them from the loading dock to a
storeroom located in the same building as the loading
dock, where they were stored overnight. The storage
room was locked at the end of that day and unlocked
the following morning. The temperature in the stor-
age room was average room temperature. Three of
the 21 extinguishers had a capacity of five pounds,
while the remainder were of a different size.

> FN2. "Before they were delivered to Honey-
> well, the extinguishers were recharged, in-
> spected, and deemed to be safe and in good
> working condition by Red Lion ... Red Lion
> transported the extinguishers in an upright
> position in a van, in which they were se-
> cured by ratchet strap belts while in transit."
> *Baylis v. Red Lion Group, Inc.,* 2005 WL
> 3309613 (D.Del.), at *1.

*1 The following morning, Honeywell transported
the extinguishers from the storage room to the
"Boneyard" where the demonstrations took place.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Honeywell used a three foot by four foot handcart with four inch sides to move the extinguishers, although there is no evidence in the record as what method, if any, was used to fasten the extinguishers in place or any evidence concerning the nature of the terrain over which the handcart moved.

**\*1** The distance between the storage room and the Boneyard was 150 yards. Appellant received instructions and a lecture prior to her operation of the fire extinguisher. When it was her turn, she pulled the trigger to release CO2 from one of the three five pound extinguishers. However, CO2 leaked from a compression fitting where Appellant was holding the device with her left hand, and not from the nozzle as designed. Appellant suffered a burn on her left hand. According to a witness, Patrick McCarthy, carbon dioxide leaked from the area where the piping was screwed into the handle.

**\*1** After Appellant's injury, the extinguishers were returned and Honeywell reported the incident to Appellee. Russell Davis, a Honeywell health safety environmental specialist, flagged the extinguisher he thought that Appellant had used. However, Mr. Davis stated later in a letter that he was unsure that he actually tagged the correct extinguisher. Appellee tested only the tagged extinguisher and found no defect.FN3

> FN3. On December 19, 2002, thirty-six days after the occurrence, Davis wrote to Vincent that: "When the fire extinguishers were moved to the loading dock the extinguisher in question was mixed with the other two of the same type. While on the loading dock, I place a 'Danger-DO NOT USE," tag on the extinguisher I believed to be involved in the incident. However, I was not sure." (Appx. at p. 38).

**\*1** Elton Vincent, Appellee's Director of Service and Training, testified in deposition that during the operation of the fire extinguisher, CO2 should not leak out of any place but the end of the nozzle. (Appx. at p. 36). Indeed, he testified that something is wrong if CO2 leaks out anywhere except the nozzle. (Appx. at p. 37).

**\*2** Appellee moved for summary judgment, which the District Court granted with respect to all claims.FN4 As to Appellant's negligent design/ manufacturing, strict liability, and implied warranty of merchantability claims, the District Court reasoned that "the plaintiff must establish that the product was defective" in order to prevail. *Joseph v. Jamesway Corp.,* 1997 WL 524126, at \*3 (Del.Super.1997) (negligence theory); *see also Reybold Group, Inc. v. Chemprobe Techs., Inc.,* 721 A.2d 1267, 1269 (Del.1998) (strict liability theory); *Kates v. Pepsi Cola Bottling Co.,* 262 A.2d 308 (Del.Super.1970) (merchantability theory). When, as here, Appellant presented no direct evidence of a manufacturing defect based on expert examination of the product, she may make a circumstantial *prima facie* case that the product was defective by showing "(1) a malfunction and (2) evidence eliminating abnormal use or reasonable secondary causes for the malfunction." *Joseph* at \*2. FN5 The District Court concluded that Appellant failed to satisfy the second prong and granted summary judgment to Appellee.

> FN4. Because Appellant is not appealing the District Court's decision on the claims for failure to warn and implied warranty of fitness for a particular purpose, this opinion will not discuss them.

> FN5. Since negligence involves an element of defendant's fault, merely finding a product defect may be insufficient. Thus, proving negligence, especially with circumstantial evidence, is particularly difficult. "In order to prove the defendant's negligence by circumstantial evidence, however, it is necessary that the conclusion of negligence be the only inference possible from the admitted circumstances." *Ciociola v. Coca-Coca Bottling Co.,* 172 A.2d 252, 257 (Del.1961).

II.

**\*2** This Court reviews a District Court's granting of summary judgment *de novo,* and we must grant all reasonable inferences from the evidence of the non-moving party below. *Atkinson v. LaFayette College,* 460 F.3d 447, 451 (3d Cir.2006); *see also Anderson*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                      Page 3
Slip Copy, 2007 WL 188879 (C.A.3 (Del.))
**(Cite as: Slip Copy)**

*v. Consol. Rail Corp.,* 297 F.3d 242, 246-47 (3d Cir.2002).

### III.

**\*2** Appellant appeals the District Court's ruling on its negligence, strict liability,[FN6] and merchantability claims. The District Court determined that Appellant failed to present sufficient circumstantial evidence that the extinguisher was defective when it was delivered to Honeywell. In granting summary judgment to Appellee, the District Court primarily relied on three cases. *Joseph,* 1997 WL 524126; *Ciociola v. Del. Coca-Cola Bottling Co.,* 172 A.2d 252, 257 (Del.1961); *Dilenno v. Libby Glass Div.,* 668 F.Supp. 373, 377 (D.Del.1987).

> FN6. The Delaware Supreme Court held in *Cline v. Prowler Indus. of Md., Inc.,* that the UCC preempted common law strict liability in cases of sales of goods. 418 A.2d 968 (Del.1980). At the time of this decision, the preemption did not apply to leased products. *Id.* at 980 ("the U.C.C. makes no reference to a bailment-lease ."). An argument can be made that Delaware's subsequent adaption of Article 2A of the UCC, which governs commercial transactions involving leasing, preempted common law strict liability in cases of leased goods. However, no Delaware court has definitively ruled on this question, and Appellee did not raise this argument.

**\*2** In *Ciociola,* the plaintiff injured her hand when a Coke bottle broke as she attempted to pry off the cap. 172 A.2d at 255. After describing in great detail both the possible movement of coke bottles within the store and the number of people who had access to the cooler where Coke bottles were stored, 172 A.2d at 254, the court upheld a directed verdict for the defendant on the plaintiff's negligent manufacturing theory, finding the plaintiff failed to eliminate the possibility that the bottle was damaged after it was delivered by the defendant. "The defect in the bottle, if it existed at the time the minor plaintiff applied the bottle opener, could well under the evidence have been caused by jostling or hitting the bottle after it

was delivered to the Ciociola store. *Id.* at 259-60.

**\*2** *Dilenno* involved a peanut filled glass jar which shattered when plaintiff attempted to replace the cork lid after removing some peanuts. After purchasing the jar, the plaintiff had kept the it on a shelf near her desk where she and her co-employees accessed the jar and removed peanuts several times per day. 668 F.Supp. at 375. The court granted summary judgment for the defendant because the plaintiff "produced no evidence of a manufacturing defect apart from the occurrence of the accident itself. This is wholly insufficient." 668 F.Supp. at 378. The plaintiff in that case failed to eliminate the possibility that the jar, which broke in her hand, was "dropped or mishandled" after it was delivered by the defendant and left openly on her desk for almost a week. *Id.* at 379. Similar reasoning was applied in *Joseph,* 1997 WL 524126, at \*5 (granting summary judgment on a negligent manufacturing claim due to insufficient evidence showing that a stationary bicycle was defective when delivered).

**\*3** It is well-established under Delaware law that a plaintiff in a products liability case must show a defect in the product and that the defect was the proximate cause of the injury. *Reybold Group, Inc. v. Chemprobe Technologies, Inc.,* 721 A.2d 1267, 1269 (Del.1998). That the accident occurred and someone sustained injury, without more, is insufficient to infer that a manufacturing defect existed at the time of sale. *Dilenno,* 668 F.Supp. at 377.

**\*3** In this case, Appellant did not eliminate the possibility of damage during the time between the extinguisher's delivery and its alleged malfunction. After Appellee delivered the extinguishers, they were transported to a storeroom, kept there overnight, and again moved by Honeywell employees the next day to the area used for the demonstration.

**\*3** The loading dock and the storage room were in the same building, but after unloading the extinguishers were moved about 40 feet to the back of the storage room. John Garzia was working in the loading dock/storage room area when the extinguishers were delivered, (Appx. at p. 42) but there is no affidavit or deposition testimony from him. Appellant produced

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

an affidavit from Charles McClain which provided that the extinguishers were not dropped or damaged "to the best of [the witness'] knowledge and belief," (Appx. at p. 24), but nothing in the affidavit suggests that he actually observed the extinguishers during their movement from place to place. Another witness, Patrick McCarthy, testified that he knew the extinguishers were in storage (Appx. at p. 39) but that he did not know who moved them to the demonstration site (Appx. at p. 41), although he believed that they were delivered there in a three foot by four foot handcart with four inch sides. (Appx. at p. 40).

*3 In short, between their delivery by Appellee to Honeywell on November 13 to their use at the fire safety training on November 14, the extinguishers, which are relatively bulky items, appear to have been moved by Honeywell at least five times: (i) after initial receipt from Appellee they were moved 40 feet from the loading dock to the overnight storage location; (ii) the next day they were moved from their storage location to the edge of the loading dock; (iii) then they were moved from the loading dock into the small handcart; (iv) once in the handcart they were moved 150 yards to the place where the incident occurred; and (v) finally, at the Boneyard the extinguishers were unloaded from the handcart for use in the training program.

*3 Significantly, with respect to the loading of the extinguishers into the handcart and their movement to the demonstration site, there is no evidence as to how or whether the extinguishers were fastened or secured in the small handcart,[FN7] the nature of the terrain over which they were moved, or the identity of the person or persons who handled this task. Other than a few generalizations, there is really no meaningful evidence as to what happened during any of these five movements, any one of which might have caused damage to an extinguisher. *See, e.g., Ciociola; DiLenno.*

> FN7. Compare fn.2, *supra.*

IV.

*4 The circumstantial evidence offered by Appellant is insufficient to "negate other reasonable causes of the injury sustained." *Reybold,* 721 A.2d at 1270; *Fatovic,* 2003 WL 21481012, at *3. It therefore does not support an inference that the fire extinguisher used by Appellant was defective at the time it was delivered to Honeywell. For the reasons set forth above, the Order of the District Court granting summary judgment in favor of Appellee will be affirmed.

C.A.3 (Del.),2007.
Baylis v. Red Lion Group, Inc.
Slip Copy, 2007 WL 188879 (C.A.3 (Del.))

Briefs and Other Related Documents (Back to top)

• 06-1010 (Docket) (Jan. 5, 2006)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1997 WL 524126, Joseph v. Jamesway Corp., (Del.Super. 1997)                                    **Page 1**

**\*524126**    Only the Westlaw citation is currently available.


UNPUBLISHED OPINION.    CHECK COURT RULES BEFORE CITING.

Superior Court of Delaware.

**Harry JOSEPH and Brenda JOSEPH, individually and as husband and wife, Plaintiffs,**

v.

**JAMESWAY CORPORATION, a Delaware corporation, and ROADMASTER CORPORATION, a Delaware corporation, Defendants.**

No. Civ.A. 93C-12-182-JO.
July 9, 1997.

Elwood T. Eveland, Jr., Woloshin, Tenenbaum & Natalie, P.A., for Plaintiffs.

Francis J. Jones, Jr., and Eileen K. Andersen, of Morris, James, Hitchens & Williams, for Defendant Roadmaster Corporation.

### *MEMORANDUM OPINION*

HERLIHY, Judge.

**\*\*1**    Defendant Roadmaster Corporation has moved for summary judgment in this personal injury action.  Plaintiff Harry Joseph claims he was riding a stationary bicycle, manufactured by Roadmaster, when it broke and he fell.

The bicycle was returned to the store from which it had been purchased.  It has now disappeared. Joseph's expert, thus, has been unable to examine it. Joseph has brought an action for negligence and breach of warranty.  The expert has offered testimony about possible design and/or manufacturing defects in the bicycle.

Roadmaster contends those opinions establish neither negligence nor proximate cause.  It also argues that since the bicycle has been lost and is unavailable for examination, plaintiffs cannot maintain their claims.  The issues are whether Joseph has shown there is a genuine issue of material fact on the issues of negligence or breach of warranty and the impact on the lost bicycle to Joseph's claims.

### *FACTS*

Joseph injured his knee in an industrial accident in June 1991, ultimately resulting in knee cap replacement surgery.  In 1992, as part of Joseph's continuing rehabilitation, Joseph's physician prescribed that Joseph ride an exercise bicycle for fifteen minutes, twice a day.  With the approval of the worker's compensation adjuster, a stationary bicycle was purchased from Jamesway Corporation (FN1) and, on April 15, 1992, delivered to Joseph.  With his family's help, Joseph assembled the bicycle.

On June 22, 1992, Joseph was riding the stationary bicycle when he heard a crack and then fell backwards onto a basket full of clean towels.  He alleges that he injured himself in the fall.

Joseph's wife returned the bicycle to Jamesway and exchanged it for a new one.  The broken bicycle was discarded before it could be inspected.  It has never been recovered.

Joseph's expert, Dr. Lacek, has now been deposed. Because of the importance and length of his deposition testimony to the issues raised in the current motion, the Court will cite and discuss it in greater detail later in this decision.

### *STANDARD OF REVIEW*

Summary judgment is proper when there are no genuine issues of material fact and the defendant is entitled to judgment as a matter of law.  (FN2)  The Court must view the evidence in a light most favorable to the non-moving party.  (FN3)  If there is no material factual issue, the defendant is entitled to summary judgment.  (FN4)

### *DISCUSSION*

#### *Manufacturing Defect*

During oral argument and throughout this litigation, Joseph maintains that his claim involves both a design defect and a manufacturing defect.  The substance of Joseph's expert's views, however, is that there was more likely a manufacturing defect than a design defect.  In large part, he bases that view on the testimony of two of Roadmaster's employees.  Their deposition testimony was that there had been no breakage of the seat pole, such as allegedly occurred here, on similar model bicycles.

The Court's analysis, therefore, will first focus on the claim of a manufacturing defect.  Roadmaster

© 2006 Thomson/West. No claim to original U.S. Govt. works.

argues Joseph's claim is barred outright because of the disposal of the bicycle in question. It also contends that the record shows there is insufficient evidence of a manufacturing defect.

### Loss of Bicycle

**\*\*2** Roadmaster argues in favor of a *per se* rule that loss of the bicycle results in dismissal of Joseph's claim. There is some authority in manufacturing defect cases to support this argument but the Court's analysis of case law in this area suggests a *per se* rule is too harsh.

In *Troy v. Kampgrounds of America, Inc.* (FN5), there was an explosion of a propane gas tank that was connected to several washing machines. Several official investigators examined the various remains right after the explosion, along with an investigator from the gas supplier. Several days after the explosion, the remains of the various equipment were destroyed. No plaintiff or defendant expert examined any part of the appliances.

That inability was a factor in the trial court's award of summary judgment in favor of the defendants. However, employing a "malfunction" theory of products liability, that court held the trial court's award of summary judgment was in error. Such a theory allows a *prima facie* case to be made where there is (1) a malfunction and (2) evidence eliminating abnormal use or reasonable secondary causes for the malfunction. (FN6) This appears to be a circumstantial means of showing defect.

*Troy* is of limited value in the sense that the trial court appeared to have ignored that plaintiffs' expert opinion about the explosion's cause. Inferentially, however, the value is the plaintiffs were allowed to proceed even though no expert for any *party* saw the devices at issue.

In a case involving a shattered coffee pot, the broken glass portions were lost by the plaintiffs or their counsel. (FN7) This loss prevented General Electric from preparing a defense and possibly suing one of the six or so suppliers of the glass component of the pot. The court quoted language from the unreported case of *Martin and Greenspan v. Volkswagon of America* (FN8):

The defendant has been deprived of the opportunity to have an expert examine the car and to testify if appropriate, that a defect did not cause the Audi to malfunction. Therefore, the plaintiffs should not be

permitted to proceed without producing the vehicle.

......................................................

\* \* \*

To permit claims of defective products where a purchaser of the product has simply thrown it away after an accident, would both encourage false claims and make legitimate defense of valid claims more difficult. It would put a plaintiff (or a plaintiff's attorney) in the position of deciding whether the availability of the item would help or hurt his or her case. Where producing the product for defense inspection would weaken rather than strengthen a case, we unfortunately are obliged to conclude that some plaintiffs and attorneys would be unable to resist the temptation to have the product disappear. (FN9)

The court went on to discuss the malfunction theory of recovery but in the context of recovery under strict liability. (FN10) Delaware does not recognize or allow recovery for strict liability in sales. (FN11)

**\*\*3** In another case, where a sample of an "exploding" drain cleaner could not be provided, the court said summary judgment, under *Roselli,* would be awarded to the cleaner manufacturer. (FN12)

In *Dilenno v. Libbey Glass Div., Owens-Illinois, Inc.* (FN13), the plaintiff bought a glass jar containing candy and peanuts. It was used for several days. While attempting to refasten its cork lid, the jar shattered and the plaintiff cut her wrist. Co-workers threw out the glass pieces.

Experts for both parties examined similar jars and found no defects. The court noted that such absence did not mean there were no manufacturing defects. It noted, however, that the plaintiff had the burden of proving a defect. It did not dismiss the plaintiff's action based alone on the absence of the glass jar pieces. (FN14)

In this case, there is no suggestion that the return of the bicycle to Jamesway was for an evil or other improper motive. A replacement bicycle was obtained. Nor does it appear, based on the record to date, that Joseph's injuries immediately manifested themselves to any great degree alerting him to the need to take protective measures about the bicycle.

For these reasons, the Court is reluctant to adopt a bright line rule that loss of evidence in a products

liability case compels dismissal. The Court concurs that there are occasions where a plaintiff may be able to circumstantially prove a negligence case involving a manufacturing defect even where the product is lost or destroyed. Of course, the burden is not light; the plaintiff must establish that negligence is the only possible inference from the circumstantial evidence. (FN15)

*Evidence of Manufacturing Defect*

Negligence is never presumed. It must be proven. (FN16) Ordinarily, questions of negligence are not decided on motions for summary judgment but are left for the trier of fact. (FN17) Where undisputed facts compel only one conclusion, however, the Court has the duty to enter a judgment accordingly. (FN18)

In order to prove a claim of negligence in the context of a products liability action alleging a manufacturing defect, the plaintiff must establish that the product was defective. (FN19) Where a plaintiff is attempting to prove negligence circumstantially, he must establish that negligence is the only possible inference. (FN20) If the defendant can demonstrate the complete failure of proof concerning an essential element of the plaintiff's case, such as the existence of a defect, summary judgment is warranted. (FN21)

Joseph must present some evidence of a manufacturing defect at the time of delivery to Jamesway. (FN22) Joseph's expert testified in his deposition as follows:

Q. Now, I think you told me earlier you think there was a defect in the manufacturing of the product?

A. Yes. I believe I answered why on the basis for that.

Q. Because if failed under normal, expected conditions?

A. That was part of the answer, yes. The second part was the deposition testimony, where neither of the two gentlemen from Roadmaster testified, that they were aware of a rash of these kinds of failures. And my earlier response to that line of questioning was, that leads me to believe we are dealing more with a rogue.

................................................................

* * *

**4 Q. I started by asking you: Do you know what was the manufacturing defect? Why the bicycle failed? And I think you said, No, you didn't, because you did not have enough information. Is that accurate?

A. Yes.

................................................................

* * *

Q.... You can't specify for me the fractures or the deformities on the bicycle after the incident, other than in an area near [the seat post] all you know is that it was deformed in some way?

A. No. All I know is it broke.

Q. You don't know how it broke.

A. Since I don't have the pieces, no. All I know, I have, essentially, a new unit that was under maximum load being used within the prescribed time frame and frequency of the manuals, and it failed.

Q. But you can't describe for me the specific deformities or fractures; is that fair?

A. That's correct. I can describe for you various ones. Are they applicable in this one? I can't say.

................................................................

* * *

Q. The second part of your conclusion, the bicycle was defective is a manufacturing defect; correct?

A. When this report was prepared, yes. If I had strictly this report to go on, without noting else, absolutely a manufacturing defect.

Q. But you can't tell me what the specific manufacturing defect is, other than it failed?

A. In this particular case, yes. Seat post was too weak. It failed. But I can't tell you why it failed. I can tell you it should not have failed.

................................................................

© 2006 Thomson/West. No claim to original U.S. Govt. works.

* * *

Q. In other words, you can't tell me specifically what caused it. Just that it happened?

A. Based on your line of questioning, yes.

Q. And what is in the report?

A. Yes.

Q. Well, your answer troubles me, I thought I asked the question enough times.

A. To say that I don't know specifically the mode of failure?

Q. Right.

A. That's correct

...................................................................

* * *

Q. Were any tests ever done on [an exercise bicycle] or any other similar model?

A. Not on thatexhibit; nor of any additional parts. What I was going to do is buy a bunch of seat posts.

Q. That has not been done?

A. No.

Q. Is that being contemplated?

A. It was contemplated.

Q. Why was it rejected?

A. Because the fracture or the exact parts that failed weren't available. I couldn't determine the mode of failure. Then I, therefore, can't determine the mode of loading under which it failed. Therefore, any testing I do, would be, essentially, erroneous. All I would be able to do is to be able to perform a different series of tests under load conditions, under different directions, and set up what I will call a matrix. That's all as far as I could ever go with it.

Q. Did you get that far?

A. No. No testing was done. (FN23)

This testimony and Joseph's version of how the bicycle seat pole broke are strikingly similar to the record before the Court in *Dilenno:*

The sum total of Dilenno's evidence on this issue consists of her deposition testimony of the circumstances surrounding the accident and an expert report concluding that the jar was defective. At her deposition, Dilenno gave a detailed account of the jar's shattering, but she offered no explanation as to what caused the jar to shatter or how the jar was defective. The report of her expert concludes that the jar must have been defective to shatter the way it did. However, this conclusion was not based on scientific tests or data but solely on Dilenno's account of the accident and the assumption that the jar must have been defective because it shattered. Thus, Dilenno has produced no evidence of a manufacturing defect apart from the occurrence of the accident itself. This is wholly insufficient. (FN24)

**5 This Court has said that while the inability to produce and test the broken bicycle is not *per se* fatal to Joseph's claim, his circumstantial evidence case must be that negligence is the only possible inference from the circumstantial evidence. (FN25)

In short, viewing the evidence in a light most favorable to him, all Joseph has shown is that the bicycle broke but no other Roadmaster bicycles broke. This is no more than conjecture or, at most, a possibility. That is insufficient even to survive a motion for summary judgment. (FN26)

Therefore, as to a claim of a manufacturing defect, Roadmaster's motion for summary judgment must be **GRANTED.**

### Design Defect

As noted, Joseph has also alleged there was a design defect in the bicycle.

### Inability to Produce Bicycle

The inability to produce the product used is less important, if important at all, on a claim of a design defect. Such a defect implicates a product line flaw. Thus, Joseph's inability to produce the bicycle is less critical to his case. (FN27)

### Evidence of Design Defect

© 2006 Thomson/West. No claim to original U.S. Govt. works.

In his deposition testimony, Joseph's expert stated:

Q. Your quarrel with the design is that there was no testing using the dynamic or cyclic loading. Is that what you are saying?

A. Dynamic or cyclic loading.

..............................................................

* * *

Q. So your complaint with the design of this product is that there is no evidence to you that it was ever tested with, basically, the pedals moving?

A. Tested under greater than anticipated load conditions and at maximum rated load conditions to failure.

..............................................................

* * *

Q.... So, the design defect, in your opinion, is the failure to test?

A. that's were I would hold it. Yes.

Q. Any other design defect with respect to this product ... or the bicycle involved in the incident itself?

A. I would have to say, no.

..............................................................

* * *

A. So, we are both clear, and you have a complete answer. Since I don't have the bicycle, I can't say even there was a design defect in what I will call insufficient or incomplete test program. Did it have a bearing on this accident?  That, I don't know.

..............................................................

* * *

Q.... I think you told me today, as a result of reading Mr. Craig's and Mr. Wilkerson's depositions and seeing their exhibits, that you now have an opinion with respect to design that we have already gone over?

A. We have gone over, and I have also said, yes. I regard that as a design defect as part of the designs or the testing of the product. I also said, I can't tell you that had any bearing. I suspect it may have, but I can't say.

..............................................................

* * *

Q. One area I want to make sure I'm clear on, because I'm confused. You have told us about an opinion with respect to design defect. Are you prepared to testify at this point that that design defect caused the incident with Mr. Joseph?

**6 A. I would have to say, no, for the reasons I explained earlier. (FN27) ?

There are two issues raised in this testimony. One, is there a cause of action for failure to test?  Second, and more importantly, does this testimony demonstrate that Joseph cannot satisfy the proximate cause element of his claim?

As to the first issue, there is no separate cause of action for failure to test.

In *Kociemba v. G.D. Searle & Co.* (FN28), the court refused to permit a claim based solely on the failure to test. The court explained why the failure to test cannot stand as an independent cause of action.

Presumably, the reason that manufactures are under a duty to test their products is to discovery defects or dangers associated with use of the products. Once the manufacturer has discovered a defect or danger the manufacturer should either change the product's design or manufacturing process, or warn consumers of the danger associated with using the product.

Thus, unless the manufacturer's breach of its duty to test leads the manufacturer to produce a product that is defective in design, manufacture, or warning, no injury can result. If the manufacturer designs the product safely, manufactures the product safely, and provides an adequate warning of dangers inherent in the use of the product, then a failure to test the product cannot, standing alone, cause any injury. The duty to test is a subpart of the other three duties because a breach of the duty to test cannot by itself cause any injury. (FN29)

© 2006 Thomson/West. No claim to original U.S. Govt. works.

1997 WL 524126, Joseph v. Jamesway Corp., (Del.Super. 1997)                                    **Page 6**

In *Adams v. G.D. Searle & Co., Inc.*, the plaintiff alleged negligence in the defendant's failure to test the product. The court adopted the reasoning of *Kociemba* and found that "a manufacturer's duty to inspect and test is not a separate cause of action. The duty to test ... is a subpart of a manufacturer's duty to design a product with reasonable care, and thus is subsumed in the plaintiff's claims for defective design and failure to worn." (FN30)

It is unclear from the expert's testimony that he considers the extent of Roadmaster's testing to be a failure to safely design the bicycle or a failure to warn potential users. While no discrete claim for failure to test will be recognized, for purposes of this motion, the Court will classify his opinion as coming within either the duty to design safely or the duty to warn.

But, Joseph's claim must fail for a more fundamental reason. As with negligence, the issue of proximate cause is ordinarily one for the jury. (FN31) As part of his claim, Joseph must show there is a proximate cause between Roadmaster's negligence and his injuries. (FN32)

Joseph's expert testified that the design defect he claimed existed did not cause, or he could not say it caused, the injuries sustained. Without that linkage, Joseph's claim fails. For that reason, Roadmaster's motion for summary judgment on the grounds of a design defect must be **GRANTED**.

### Breach of Warranty

Joseph also made claims of breach of express warranty, breach of warranty of merchantability and breach of warranty of fitness for a particular purpose. Joseph's claims are based on the claim that the bicycle was defective. (FN33) Because Joseph cannot demonstrate that the bicycle was defective and/or that there was a defect (FN34) which caused injury, the claims for breach of warranty must fail. Defendants motion for summary judgment, as to the claims for breach of warranty, is **GRANTED**.

### CONCLUSION

**\*\*7.** For the reasons stated herein, the motion of defendant Roadmaster Corporation is **GRANTED**.

### IT IS SO ORDERED.

(FN1.) Jamesway was one of the two original defendants. It is no longer in the case.

(FN2.) *Merrill v. Crothall-American, Inc.*, Del.Supr., 606 A.2d 96, 99-100 (1992).

(FN3.) *Billops v. Magness Const. Co.*, Del.Supr., 391 A.2d 196, 197 (1978).

(FN4.) *Pierce v. International Ins. Co. of Ill.*, Del.Supr., 671 A.2d 1361, 1363 (1996).

(FN5.) Pa.Super., 399 Pa.Super. 41, 581 A.2d 665 (1990).

(FN6.) *Troy*, 581 A.2d at 668.

(FN7.) *Roselli v. General Electric Co.*, Pa.Super., 410 Pa.Super. 223, 599 A.2d 685 (1991).

(FN8.) E.D.Pa., No. 88-8261, 1989 WL 81296 (July 13, 1989).

(FN9.) *Roselli*, 599 A.2d at 687-88.

(FN10.) *Id.* at 688.

(FN11.) *Cline v. Prowler Industries of Maryland, Inc.*, Del.Supr., 418 A.2d 968 (1980).

(FN12.) *Lee v. Boyle-Midway Household Products, Inc.*, W.D.Pa., 792 F.Supp. 1001, 1006 (1992); accord *Bardaji v. Flexible Flyer Co.*, E.D.Pa., C.A. No. 95-CV-0521, McGlynn, J. (September 25, 1995) (1995 WL 568483) (sled broke but was returned to resort renting agency and was not produced).

(FN13.) D.Del., 668 F.Supp. 373 (1987).

(FN14.) Dilenno, at 378.

(FN15.) *Ciociola v. Coca-Cola Bottling Co.*, Del.Supr., 172 A.2d 252, 257 (1961).

(FN16.) *Wilson v. Derrickson*, Del.Supr., 175 A.2d 400, 401-02 (1961).

(FN17.) *Roper v. Stafford*, Del.Super., 444. A.2d 289, 291 (1982).

(FN18.) *Faircloth v. Rash*, Del.Supr., 317 A.2d 871, 871 (1974).

(FN19.) *Farm Family Mutual Ins. Co. v. Perdue, Inc.*, Del.Supr., No. 416, 1990, Walsh, J. (January 2, 1992) (ORDER).

© 2006 Thomson/West. No claim to original U.S. Govt. works.

(FN20.) *Ciociola,* 172 A.2d at 257.

(FN21.) *Garneski v. Martin,* Del.Super., C.A. No. 86C-OC-196, Del Pesco, J. (March 1, 1990) (*citing Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1987)).

(FN22.) *Kates v. Pepsi Cola Bottling Co. of Salisbury, Md.,* Del.Super., 263 A.2d 308, 311 (1970).

(FN23.) Lacek deposition at 59-60, 62-63, 67-68, 73-74, 102-103, 29-30.

(FN24.) *Dilenno,* 373 A.2d at 378.

(FN25.) *Ciociola,* 172 A.2d at 257.

(FN26.) *Phillips v. Delaware Power & Light Co.,* Del.Supr., 216 A.2d 281, 284 (1966).

(FN27.} *Dilenno,* 668 F.Supp. 373; *Evans v. FMC Corp.,* Del.Super., C.A.No. 89C-AU-27, Graves, J. (March 9, 1992); *Giordano v. The Firestone Tire & Rubber Co.,* N.D.Ill., No. 83C1298, Decker, J.

(April 25, 1985) (1985 WL 1000).

(FN27.) Lacek deposition at 56-57, 59, 72, 77 and 104.

(FN28.) D.Minn., 707 F.Supp. 1517 (1989).

(FN29.) *Id.* at 1527.

**\*\*7_** (FN30.) Fla.App., 576 So.2d 728, 730-31 (1991).

(FN31.) *In re: Asbestos Litigation Pusey Trial Group v. Owens-Corning Fiberglas Corp.,* Del.Supr., 669 A.2d 108, 113 (1995).

(FN32.) *Culver v. Bennett,* Del.Supr., 588 A.2d 1094, 1097 (1991).

(FN33.) Complaint at ¶ 16.

(FN34.) *Towe v. Justis Brothers, Inc.,* Del.Super., 290 A.2d 657, 658 (1972) and *Dilenno,* 668 F.Supp. at 377.

© 2006 Thomson/West. No claim to original U.S. Govt. works.

172 A.2d 252, 53 Del. 477, Ciociola v. Delaware Coca-Cola Bottling Co., (Del.Supr. 1961)          **Page 1**

**\*252** 172 A.2d 252

3 Storey 477, 53 Del. 477

Supreme Court of Delaware.

**Judith Ann CIOCIOLA, by her next friend,
Joseph P. Ciociola,
and Joseph P. Ciociola, individually, Plaintiffs
Below, Appellants,**
v.
**DELAWARE COCA-COLA BOTTLING
COMPANY, Defendant Below,
Appellee.**
June 6, 1961.

Action brought by grocer and by his minor daughter to recover from bottler which sold and delivered to grocer a bottle which broke in his daughter's hand as she was attempting to open it. The Superior Court in and for New Castle County, directed verdict for defendant at close of plaintiffs' case, and an appeal was taken. The Supreme Court, Wolcott, J., held that lack of privity would preclude recovery by grocer's daughter for breach of implied warranty; that plaintiffs were not entitled to benefit of doctrine of res ipsa loquitur, since it was not proved that defect in bottle could not have developed after delivery thereof to grocer; and that there was insufficient evidence of negligence on part of bottler to take case against it to jury.

Affirmed.

West Headnotes

[1] Sales ☞255
   343 ----
      343VI Warranties
         343k255 Parties; Privity.

[See headnote text below]

[1] Sales ☞425
   343 ----
      343VIII Remedies of Buyer
         343VIII(D) Actions and Counterclaims for
            Breach of Warranty
      343k425 Nature and Form of Remedy.
   Liability of seller or manufacturer for breach of warranty is based on contract, rather than tort, concepts; and while manufacturer or seller is, in effect, made insurer of quality and fitness of his product for human use, and proof of breach of implied warranty is sufficient to justify recovery irrespective of fault or negligence of manufacturer or seller, privity of contract, between seller or manufacturer and one injured as result of breach of warranty, is essential.

[2] Constitutional Law ☞70.3(11)
   92 ----
      92III Distribution of Governmental Powers and
            Functions
         92III(B) Judicial Powers and Functions
            92k70 Encroachment on Legislature
               92k70.3 Inquiry Into Motive, Policy,
                     Wisdom, or Justice of
                     Legislation
               92k70.3(9) Particular Subjects of
                     Legislation, Application
                     to
                  92k70.3(11) Contracts; Torts.

   (Formerly 92k70(3))
   It might well be desirable, as matter of public policy, to impose absolute tort liability upon manufacturer for injuries caused by defects in his product, but legislative rather than judicial branch of government would have to make policy.

[3] Constitutional Law ☞67
   92 ----
      92III Distribution of Governmental Powers and
            Functions
         92III(B) Judicial Powers and Functions
         92k67 Nature and Scope in General.
   Function of judicial branch of government is not to change established law but to apply it.

[4] Sales ☞255
   343 ----
      343VI Warranties
      343k255 Parties; Privity.
   Want of privity of contract between bottler and grocer's daughter would preclude recovery, on basis of breach of implied warranty, for injuries sustained by grocer's daughter when bottle broke while she was attempting to open it.

[5] Negligence ☞1550
   272 ----
      272XVIII Actions
         272XVIII(C) Evidence
            272XVIII(C)1 Burden of Proof
            272k1550 In General.

      (Formerly 272k121.1(4), 272k121(1))

[See headnote text below]

© 2006 Thomson/West. No claim to original U.S. Govt. works.

[5] Negligence ☜1579
  272 ----
    272XVIII Actions
      272XVIII(C) Evidence
        272XVIII(C)2 Presumptions and Inferences
        272k1579 Happening of Accident or Injury.

(Formerly 272k121.2(1), 272k121(2))
Negligence is never presumed from mere fact of injury, and plaintiff must affirmatively prove negligence on part of defendant.

[6] Negligence ☜1656
  272 ----
    272XVIII Actions
      272XVIII(C) Evidence
        272XVIII(C)5 Weight and Sufficiency
        272k1656    Direct    or    Circumstantial
                Evidence in General.

(Formerly 272k134(2))
Negligence may be established by direct testimony or by proof of circumstances from which inference of negligence follows logically.

[7] Negligence ☜1694
  272 ----
    272XVIII Actions
      272XVIII(D) Questions for Jury and Directed
                Verdicts
        272k1694 Standard of Proof; Evidentiary
                Showing Required.

(Formerly 272k136(9))
To prove negligence by circumstantial evidence, conclusion of negligence must be only inference possible from circumstances shown; and if proven circumstances are as consistent with absence of negligence as with existence of negligence, neither conclusion can be said to have been established by legitimate proof, and issue may not be submitted to jury.

[8] Products Liability ☜41
  313A ----
    313AI Scope in General
      313AI(B) Particular Products, Application to
      313Ak41 Bottles and Other Containers.

(Formerly 272k22)
A glass bottle is not an "inherently dangerous instrumentality," for purpose of rule imposing higher standard of care.

[9] Products Liability ☜89
  313A ----

313AII Actions
  313Ak87 Questions for Jury
  313Ak89 Bottles and Other Containers.

(Formerly 272k136(18))
Evidence, which showed that bottler had used due care and which failed to prove there could have been no damage to bottle after its delivery to grocer, was insufficient to justify submission of action by grocer and his minor daughter, on theory that bottler's negligence was responsible for injuries sustained by grocer's daughter when bottle broke in her hand as she was attempting to open it.

[10] Products Liability ☜78
  313A ----
    313AII Actions
      313Ak75 Presumptions and Burden of Proof
      313Ak78 Bottles and Other Containers.

(Formerly 272k121.3, 272k121(3))
Absent showing that defect, if any, in bottle had developed after it was delivered to grocer, grocer and his minor daughter were not entitled to benefit of res ipsa loquitur doctrine, in their action against bottler, predicated upon theory that negligence of bottler was responsible for injury sustained by grocer's daughter when bottle broke while she was attempting to open it.

[11] Products Liability ☜41
  313A ----
    313AI Scope in General
      313AI(B) Particular Products, Application to
      313Ak41 Bottles and Other Containers.

(Formerly 272k54)
Bottler, which had not manufactured bottle, would not be liable, on negligence theory, for injuries sustained by grocer's daughter when bottle broke in her hand, while she was attempting to open it, if bottle broke because of unequal application of pressure or because of latent weakness in glass itself.

[12] Appeal and Error ☜205
  30 ----
    30V Presentation and Reservation in Lower
                Court of Grounds of
                Review
      30V(B) Objections and Motions, and Rulings
                Thereon
        30k202 Evidence and Witnesses
        30k205 Exclusion of Evidence.
Question, as to whether trial court had committed prejudicial error in refusing to permit plaintiffs to

172 A.2d 252, 53 Del. 477, Ciociola v. Delaware Coca-Cola Bottling Co., (Del.Supr. 1961)                    **Page 3**

cross-examine defendant's president concerning methods followed by bottlers of other beverages, was not before reviewing court, where plaintiffs had made no offer of proof as to custom and usage in other bottling plants and of their similarity with defendant's operation. Superior Court Rules, Civil rule 43(b), Del.C.Ann.

**\*253** An appeal from the Superior Court in and for New Castle County.

|53 Del. 479| H. B. Rubenstein, of Leshem & Rubenstein, Wilmington, for appellants.

Albert W. James, Arthur J. Sullivan and Henry N. Herndon, Jr., of Morris, James, Hitchens & Williams, Wilmington, for appellee.

SOUTHERLAND, C. J., and WOLCOTT and BRAMHALL, JJ., sitting.

WOLCOTT, Justice.

This is an action for damages for personal injuries and medical expenses. The plaintiffs are Joseph P. Ciociola and his minor daughter, Judith, suing by her next friend. The complaint contains three causes of action: first, that the minor plaintiff is entitled to damages by reason of the breach by the defendant, Delaware Coca-Cola Bottling Company, of an implied warranty that a bottle, the breaking of which caused the injuries, was fit for its intended purpose; second, that the defendant was guilty of negligence which caused the injuries; and, third, that the doctrine of *res ipsa loquitur* establishes the liability of the defendant.

At the close of the plaintiffs' case a verdict for the defendant was directed on all causes of action. As to the cause of action based upon breach of implied warranty, the verdict was directed because of the lack of privity of contract between the minor plaintiff and the defendant. As to the cause of action based on the negligence of the defendant, the verdict |53 Del. 480| was directed for lack of sufficient facts to require the submission to the jury of the issue of defendant's negligence. As to the causes of action based upon the doctrine of *res ipsa loquitur*, the verdict was directed because of the inapplicability of the doctrine.

At the argument before us, counsel for the plaintiffs disclaimed as to the father any contention in his behalf based upon breach of implied warranty, no such contention having been made in the court below. Accordingly, upon the question of whether or **\*254**

not a verdict was properly directed for the defendant upon the issue of implied warranty, we are concerned solely with the right of the minor plaintiff to maintain the action upon this theory.

It is necessary to state the facts in some detail, which we necessarily do in the light most favorable to the plaintiffs.

Joseph Ciociola operates with his wife a retail grocery store in Richardson Park, a suburban community near Wilmington. The store is physically part of their home located on a corner property. Mr. and Mrs. Ciociola have three minor children, one of whom, Judith, is the minor plaintiff in this action.

The Ciociola store consists of one room and is operated partly as a self-service and partly as a customer-waited-on store. The front portion of the store is devoted to the display and sale of groceries. In the rear of the store is a large cooler in the upper part of which is kept fruit, milk and vegetables, and in the lower part of which is kept various types of bottled soda drinks. Alongside the cooler are racks in which are stored warm bottled soda drinks. It was the custom of the patrons of the Ciociola store to help themselves to warm soda drinks and occasionally to cooled soda drinks stored in the cooler, but ordinarily either Mr. or Mrs. Ciociola served their customers with cooled soda drinks. It was also the custom for | 53 Del. 481| the three minor Ciociola children to help themselves to cooled soda drinks from the cooler.

One brand of bottled soda drink kept in the cooler for sale was Coca-Cola, bottled, capped, sold and delivered by the defendant to the Ciociolas. Deliveries of bottled Coca-Cola to the Ciociolas were made on defendant's behalf by its employee described as a driver-salesman who made deliveries, accepted payment, and took back empty bottles. Deliveries were made ordinarily on Mondays and Thursdays of each week, except that if Thursday of a particular week was a holiday, delivery would be made on the day before.

The manner of making delivery of bottled Coca-Cola by defendant's driver-salesman was as follows: Upon arrival at the Ciociola store, defendant's employee would remove cases of Coca-Cola from his truck, place them on a hand dolly, pull the dolly up several steps into the store, and then remove the cases from the dolly and place cartons of bottled Coca-Cola in the rack next to the cooler, placing the cartons thus delivered on top of those still left in the rack so that, ordinarily, the most recently delivered cartons would

© 2006 Thomson/West. No claim to original U.S. Govt. works.

be located at the top of the rack.

Defendant's driver knew that the members of the Ciociola family, including the minor plaintiff, consumed some of the bottled Coca-Cola so delivered.

The accident which gives rise to this action happened on Thanksgiving Day. On the day before defendant's driver made a customary delivery of bottled Coca-Cola, received payment for it and took away such empty bottles as there were. On the day of delivery, Mrs. Ciociola, at 2:00 p. m. and again at 8:30 p. m., filled the cooler with bottled Coca-Cola from the top of the rack by filling empty spots in cartons already in the cooler with individual bottles and by placing whole cartons of bottled Coca-Cola in the back of the cooler, at the [53 Del. 482] same time moving cartons already in the cooler toward the front.

Any hitting of one bottle against another could have been heard and would have been noticed by either Mr. or Mrs. Ciocola. Prior to the accident in question no such noise had been heard. From this, plaintiffs argue that the inference is that the bottled soda drinks had been handled with care. On neither Thanksgiving Day nor the day before had there been any unusual temperature change either in the store proper or in the cooler, itself.

On Thanksgiving Day, about 2:00 p. m., one of the Ciociola children, not the minor plaintiff, took three bottles of Coca-Cola from the cooler for consumption by the *255 three Ciociola children. He noticed nothing unusual about the bottles. The minor plaintiff rested the one given to her on a table, holding it with her left hand grasping the bottle at about the middle, and attempted to open the bottle with an ordinary bottle opener held in her right hand. She applied normal pressure to the opener whereupon the bottle broke in two parts. The break started at the top of the bottle in the area of the lip and extended diagonally down to the level of the liquid. The break was clean and the two parts thereafter fitted together perfectly. The minor plaintiff looked at the bottle before she attempted to open it but noticed no defect in it.

As a result of the breaking of the bottle, a tendon in the left hand of the minor plaintiff was severed in the area of the base of the thumb and index finger.

In order to establish negligence on the part of the defendant, plaintiffs proved the method of the defendant's bottling operation. Generally speaking,

this is as follows:

Defendant obtains new bottles from bottle manufacturers which are required by specification to withstand a minimum pressure of 400 pounds per square inch. Defendant [53 Del. 483] reuses its bottles and the average use life of a bottle is 33 times. The limitation of the number of times a bottle may be used depends largely upon the failure of customers to return the empties and upon some breakage in the bottling operation.

The initial step in defendant's bottling plant is for empty bottles to be loaded on a conveyor belt, during the course of which no inspection of bottles for defects takes place. Thereafter, the bottles are conveyed to a washing process in the course of which some force is applied to the bottles but no visual inspection for defects takes place. From the washing process, bottles in groups of 16 on a steel conveyor belt pass in front of an employee whose duty it is to inspect these clean bottles visually for defects. The inspection area is well lighted and the inspector views the bottles against a white background. The employee thus engaged has approximately 5 or 6 seconds to inspect visually each batch of 16 bottles. In the course of this inspection the bottles do not turn. The inspecting employee is rotated from this duty every 30 to 45 minutes.

From this inspection point, the bottles are conveyed to the filler operation which is conducted mechanically under the supervision of an additional employee whose duty does not include the inspection of bottles for defects. When the bottles are filled, they are then fed to a machine by which the bottles are capped. In these processes a pressure of 45 pounds per square inch is placed upon the bottle. If a bottle going through the capping process is cracked, even with a hairline crack, the pressure involved in the process will explode the bottle. The employee operating the capping machine conducts a visual inspection of the bottles as they pass through the machine.

From the capping machine, the bottles pass on a conveyor belt to a case-packer in groups of 24 which are guided by flexible steel fingers into the pockets of cartons and thrust mechanically by cartons into cases. A conveyor belt then passes the cased cartons of bottled Coca-Cola to an employee [53 Del. 484] who stacks 30 cases in 5 layers manually on pallets. The laden pallets are then loaded by a forklift onto trucks, in the process of which the pallet is dropped approximately 2 inches to the bed of the truck.

© 2006 Thomson/West. No claim to original U.S. Govt. works.

The method of bottling employed at the defendant's plant, including the inspection system, complies with the standards followed by the Coca-Cola bottling industry, consisting of approximately 1100 plants. The defendant follows suggestions made by the Coca-Cola Company which conducts research on proper systems to be adopted and maintained by bottlers.

[1][2][3][4]  As one of her causes of action, the minor plaintiff claims recovery on the basis of a breach by the defendant of an *256 implied warranty that the container within which the Coca-Cola was bottled was fit for the use for which it was intended. The breach alleged, of course, is that there was a defect in the bottle which caused the injury and thus the container was not fit for its intended purpose. To this contention the defendant answers that the minor plaintiff cannot recover for breach of an implied warranty because there was no privity of contract between her and the defendant, which is an historical requisite to the maintenance of an action based upon breach of an implied warranty.

Liability by a seller or manufacturer of goods for breach of warranty originally was based upon tort concepts. Originally the action was always brought as an action on the case for the breach. Gradually, the concept of the nature of the action changed and an action was permitted finally to be brought on the contract itself. Thereafter, rightly or wrongly, actions for breach of an implied warranty were regarded as *ex contractu*. From this concept arose the necessity of some privity being in existence between the suing plaintiff and the implied warrantor. Prosser on Torts, 493; McLachlan v. Wilmington Dry Goods Co., 2 Terry 378, 22 A.2d 851.

[53 Del. 485] Instances are found in our reported decisions of actions seeking recovery in assumpsit for breach of the contract, or in case for the breach of the warranty. See Tyre v. Causey, 4 Har. 425; Burton v. Young, 5 Har. 233; McLachlan v. Wilmington Dry Goods Co., supra. In such actions, proof of the breach of the implied warranty is sufficient to recover damages irrespective of the fault or negligence of the warrantor. Jarnot v. Ford Motor Co., 191 Pa.Super. 422, 156 A.2d 568; Prosser on Torts, 706. In effect, therefore, the manufacturer or seller of goods or articles is made an insurer of the quality and fitness of his product for human use.

This concept of the common law, that an action brought for breach of implied warranty was an action on a contract, was thus early adopted in Delaware in all of its ramifications including the requirement that there be privity of contract between the plaintiff and the defendant. Absent such privity, the plaintiff could not impose upon the defendant the absolute liability of an insurer for injuries caused by a defect in its product. Barni v. Kutner, 6 Terry 550, 76 A.2d 801, and Behringer v. William Gretz Brewing Co., Del.Super. 169 A.2d 249.

It is argued in behalf of the minor plaintiff, however, that the modern trend of decisional law has progressed beyond the artificial and initially erroneous concept that actions for breach of warranty are actions upon a contract, and recognizes that in reality they are actions upon a tort. It is argued that in recognition of this many courts have sought means to avoid the result of the requirement of privity by an indulgence in legal fictions based upon concepts of fraud, agency, assignments, permitting the warranty to run with the goods, and a sanctioning of recovery where the goods, if defective, were inherently dangerous. It is argued that the modern trend of decisional law is that the remedies for injuries caused by defects in products should not depend upon the intricacies of the law of sales or contracts, but should be based [53 Del. 486] upon sound concepts of public policy and social welfare. We are asked to take the same approach.

Numerous cases are cited to us evidencing what is maintained to be the present majority view in this country. It appears to us that the great majority of the cases cited are cases of impurities in foods or beverages packaged and sold in sealed containers, or are cases involving products which, of themselves, are inherently dangerous if defects are contained within them.

With respect to defects or poisons or extraneous substances contained within foods or beverages, which, of themselves, make the consumption of such foods or beverages by humans harmful, it may well be that an exception to the rule of the requirement *257 of privity on the basis of public policy exists in the reported decisions. Indeed, in our own decisions, reference is made to the possible existence of this exception. It seems to us, however, that the mere presence of an impurity in a product intended for human consumption, packaged and sold in a sealed container, possibly justifies an inference of negligence on the part of the manufacturer sufficient to support an action based on negligence. It has little pertinence to the existence of an implied warranty in favor of the ultimate consumer.

© 2006 Thomson/West. No claim to original U.S. Govt. works.

Many text writers and courts have criticized the retention of the requirements of privity of contract in suits brought for breach of implied warranties, and have adopted a variety of devices to avoid what is considered to be the harshness of an archaic requirement. See Prosser, The Assault Upon the Citadel, 69 Yale Law Journal 1099. We think, however, that Delaware has been committed by its courts to the common law rule governing actions for breach of implied warranty. A part of that rule is the requirement that there be privity of contract between the plaintiff and the defendant. It may well be desirable as a matter of public policy to impose absolute liability upon a manufacturer for injuries caused by defects in [53 Del. 487] his product but, if such is to be the public policy of this State, it must be made so by the Legislature rather than the Judicial Branch of the Government, the function of which is not to change established law but to apply it.

We conclude, therefore, that the trial court properly directed judgment for the defendant in the minor plaintiff's cause of action based upon breach of warranty.

[5][6][7][8][9] The trial court also directed a verdict in favor of the defendant upon the causes of action based upon the negligence of the defendant by reason of the failure of the plaintiffs to prove a submissible case of negligence to the jury.

It is a fundamental rule that negligence of a defendant is never presumed from the mere fact of an injury. In all cases the plaintiff must affirmatively prove negligence on the part of the defendant. This rule is so fundamental as to require no citation of authority.

Proof of negligence may be made in a variety of ways. It may be established by direct testimony or by proof of other circumstances from which an inference of negligence follows logically. Klair v. Mundy, 5 Boyce 291, 92 A. 850, and Fahey v. Niles, 7 Boyce 454, 108 A. 135.

The proof of negligence by circumstantial evidence means merely the proof of certain circumstances from which another fact in issue, that of negligence, follows as a natural or very probable conclusion from the facts proven. It is necessary that the conclusion of negligence be the proven facts be the reasonable probability flowing from the admitted circumstances.

In order to prove the defendant's negligence by circumstantial evidence, however, it is necessary that the conclusion of negligence be the only inference possible from the admitted circumstances. If, therefore, the proven circumstances are as consistent with the absence of negligence as with the existence of negligence, neither conclusion can be said to have been [53 Del. 488] established by legitimate proof and the issue may not therefore be submitted to the jury. Law v. Gallegher, 9 W.W.Harr. 189, 190, 197 A. 479.

In the case before us, the plaintiffs argue that they have proven circumstances from which only one logical conclusion is possible, viz., that the defendant was negligent in the course of its bottling operation, or in the delivery of the finished product, and that that negligence caused the minor plaintiff's injury. In opposition, defendant points out that it conducts its bottling operation in accordance with standards and rules prescribed by the Coca-Cola Company and followed generally by approximately 1100 Coca-Cola bottlers in the country. Defendant also points out that there is no *258 proof in the record that the bottle in question, which broke under the application by the minor plaintiff of a bottle opener, contained at the time of its delivery to the Ciociola store any defect which could have caused the breakage.

We think that the method of bottling followed by the defendant, being as it was in conformity with the usual standards and practices required by the Coca-Cola Company of the licensed bottlers in the country, was the maintenance by the defendant of due care and a compliance with that standard of conduct toward the consuming public required of bottlers. 65 C.J.S. Negligence § 16(a).

In addition, the record falls short of proving that there could have been no damage to the bottle in question following the approximate twenty or so hours after the latest possible delivery of the bottle by defendant's delivery man, and the attempted opening of the bottle by the minor plaintiff. There is no precise proof as to the course through which the particular bottle went. It is as consistent to assume that it was left in a position in the store outside of the cooler in which it could have been struck or jostled by the Ciociola customers as that it was not. Under the circumstances, therefore, we [53 Del. 489] think the plaintiffs' conclusion that the bottle was delivered with a defect in it does not necessarily follow from the proof in this record.

Plaintiffs rely on three cases in support of their position under this heading of the appeal. In Drury v.

Armour & Co., 140 Ark. 371, 216 S.W. 40, the death of the plaintiff's wife was caused by the eating of poisoned sausage packed by the defendant company. In that case the proof established to a certainty that the sausage had not been tampered with following the packaging by the defendant, and that it had been eaten almost immediately by the deceased after purchase. Under these circumstances, the fact that the meat was poisoned permitted only one conclusion--that of negligent packaging on the part of the defendant.

Similarly in Whitehorn v. Nash-Finch Co., 67 S.D. 465, 293 N.W. 859, in a suit brought by a plaintiff for injuries resulting from eating poisoned candy instituted against the retailer and the manufacturer, it was held that an inference of negligence on the part of the manufacturer arose from the mere presence of impurities in its food product under circumstances which justified the conclusion that such impurities would not ordinarily appear in such a product except by reason of the negligence of the manufacturer.

We think the two cited cases are clearly distinguishable from the one at bar. First, because of proof that there was no possible intervening cause putting the impurities into the food product sold and consumed and, second, that in the case of foods packaged and sold in sealed containers, any impurity in the food itself necessarily must be presumed to have been intruded by reason of the negligence of the packer. We think, therefore, that the Drury and Whitehorn cases are not authority in support of the plaintiffs' position.

Finally, plaintiffs cite Ferrell v. Sikeston Coca-Cola Bottling Co., Inc., Mo.App., 320 S.W.2d 292. At first glance [53 Del. 490] this case seems to support plaintiffs' position since it, too, involved a bottle of charged soda water delivered to plaintiff's place of business and stored in a closet, and thereafter, while being transferred by the plaintiff from the closet to a dispenser, exploded in her hand. It was held that since the plaintiffs' proof demonstrated that there was no possibility of any customer causing damage to the bottle in question, an inference of negligence on the part of the bottler was warranted.

It is apparent, however, from the emphasis made in the court's opinion that the court entertained doubt as to the sufficiency of the proof by reason of the constantly recurring and emphasized statement that *259 the evidence in question was admitted without objection on the part of the defendant. The court then distinguishes its own decision of Kees v. Canada Dry Ginger Ale, 239 Mo.App. 1080, 199 S.W.2d 76, in which, under somewhat similar circumstances, the court had refused to permit the submission of the issue of negligence to the jury. The facts in the Kees case were that the bottle in question was delivered to a semi-self-service grocery store; that the bottles were openly displayed in the store; that the bottles were not tampered with while they were on display in the store, and, finally, that the customers in the store waited on themselves. Under these circumstances, the court concluded that the bottles obviously could have been mishandled by customers and, hence, there was no compelling inference of negligence on the part of defendant.

We think the facts and circumstances of the case at bar more nearly approach those of the Kees case than those of the Ferrell case, which we think is not authority for the plaintiffs' position in the case at bar.

Plaintiffs argue that a filled Coca-Cola bottle is an inherently dangerous object and that they are therefore entitled to the benefit of the rule which imposes a higher standard of care--indeed, almost that of an insurer--upon the defendant. Restatement of Torts, § 395; Gorman v. Murphy [53 Del. 491] Diesel Co., 3 Terry 149, 29 A.2d 145. To view preceding link please click here   The argument fails, however, because a glass bottle is not inherently a dangerous instrumentality. Slack v. Premier-Pabst Corp., 1 Terry 97, 5 A.2d 516.

We conclude, therefore, that the trial court was correct in directing a verdict for the defendant on the issue of negligence on the part of the defendant.

[10][11] As a separate cause of action, plaintiffs rely on the doctrine of *res ipsa loquitur*. Reliance is primarily placed upon Williams v. General Baking Co., 9 Terry 104, 98 A.2d 779, in which case a plaintiff was given the benefit of the doctrine as defined in Delaware Coach Co. v. Reynolds, 6 Terry 226, 71 A.2d 69.

The doctrine of *res ipsa loquitur* has been followed consistently by Delaware courts. See Edmanson v. W. & P. Traction Co., 2 W.W.Harr. 177, 120 A. 923; Thompson v. Cooles, 7 W.W.Harr. 83, 180 A. 522; Starr v. Starr, 5 W.W.Harr. 556, 170 A. 924, and Slack v. Premier-Pabst Corp., supra.

In the Slack case the rule was stated to be that if the cause of the injury was in the exclusive management and control of the defendant, and if the

© 2006 Thomson/West. No claim to original U.S. Govt. works.

172 A.2d 252, 53 Del. 477, Ciociola v. Delaware Coca-Cola Bottling Co., (Del.Supr. 1961)    **Page 8**

result--that is, the injury--was so unaccountable that the only fair inference of the cause was the negligence of the defendant, the doctrine of *res ipsa loquitur* was applicable to establish the negligence of the defendant.

In the Delaware Coach Co. case, however, the rule was modified to remove the requirement of exclusive control by the defendant and restated to be that if the facts of the case warrant an inference of negligence of such force as to call for an explanation or rebuttal from the defendant, that an issue for submission to the jury had been created. It seems to us that the rule announced in the Delaware Coach Co. case by [53 Del. 492] this Court's predecessor is not too dissimilar to the rule permitting an inference of negligence to be drawn from circumstances which we have discussed heretofore. What we have said, therefore, with respect to that argument is equally applicable to the argument for the application of the doctrine of *res ipsa loquitur*.

The circumstances of this case do not present an inference of negligence of such force as to call for an explanation or rebuttal by the defendant. The defect in the bottle, if it existed at the time the minor plaintiff applied the bottle opener, could well under the evidence have been caused by jostling or hitting the bottle after it was *260. delivered to the Ciociola store. Furthermore, since the minor plaintiff testified that she examined the bottle before trying to open it and noticed no defect or crack, it is an equally fair inference that there was no defect apparent upon inspection and that the bottle broke by means of an unequal application of pressure, or by reason of a latent weakness in the glass itself. None of these inferences calls for an explanation from the defendant for it was not the manufacturer of the bottle.

We think, therefore, a directed verdict for the defendant upon the count based on *res ipsa loquitur* was proper.

[12] Finally, plaintiffs argue that the trial court committed prejudicial error in refusing to permit them to offer evidence as to the custom and practices as to inspections followed in bottling plants other than Coca-Cola. The alleged error took place in the course of the examination of the defendant's president called by the plaintiffs as in cross-examination under Rule 43(b) of the Superior Court, Del.C.Ann. Plaintiffs questioned the witness as to defendant's bottling operation and, in particular, with respect to the manner of inspection of bottles for defects. Upon re-examination, after questioning by the defendant, the witness was asked concerning methods followed by other bottlers not bottling Coca-[53 Del. 493] Cola. This line of questioning was objected to and the objection sustained. The ruling is now urged as reversible error.

The difficulty with plaintiffs' argument is that, in reality, they made no offer of proof as to the custom and usage in other bottling plants, and of their similarity with the defendant's operations. The ruling was made upon a question in cross-examination of a witness who had been called for an entirely different purpose. We think, therefore, the question argued is not before us.

The judgment of the Superior Court is affirmed.

© 2006 Thomson/West. No claim to original U.S. Govt. works.

guage which excluded coverage for a vehicle "[f]urnished or available for the regular or frequent use of you, your spouse or any relative." *Id.* at 352. The Superior Court did not question the validity of the provision and stated that the provision served the purpose of "requir[ing] other insurance when the chance of liability is increased by the use of two cars under a one car premium policy."

*Martin* involved a similar type of exclusion. The plaintiff was an independent contractor who regularly leased trucks owned by Xpress Truck Lines. While driving one of these trucks, the plaintiff was hit from behind. The plaintiff sought to recover from Colonial which insured his personal vehicles. The Colonial policy stated that benefits would not be paid for an accident "involving a motor vehicle you or any member of your household owns or has available for regular use, but does not have insured under this policy." *Martin*, 644 F.Supp. at 353. The *Martin* opinion cites an earlier Superior Court opinion which explained the following:

> The purpose of the "other automobile" provisions of the policy ... is to provide coverage to a driver without additional premiums, for the occasional or infrequent driving of an automobile other than his own.... These provisions are not to take the place of insurance on automobiles which are furnished to the insured regularly in his business or occupation.

*Id.* at 352 (quoting *Home Ins. Co. v. Kennedy*, 52 Del. 42, 46, 152 A.2d 115, 118 (Del.Super.1959)).

This Court concludes that the OMV exclusion in the Carey policy mirrors the "regular use" exclusions in *Deeble* and *Martin* both in purpose and effect. The Carey policy contains another automobile provision which covers a temporary substitute car, a newly acquired car, and a car not owned by an insured, but driven with the owner's consent. (D.I. 12A at A–9.) This Court has no reason to believe that the Delaware Supreme Court would disagree with the *Kennedy* court's succinct expression of the purpose behind other

automobile provisions or that the Delaware Supreme Court would reach a holding at odds with *Deeble* and *Martin*. Therefore, the Court holds that the Delaware Supreme Court would affirm the validity of the OMV Exclusion in this particular case. Therefore, summary judgment will be entered in favor of State Farm with respect to Corso's claims for recovery under the Carey policy.

## CONCLUSION

State Farm's motion for summary judgment will be granted. Corso and Morgan's motion for partial summary judgment will be denied. A final judgment will be entered in conformity with this opinion.



Karen DiIENNO, Plaintiff,

v.

LIBBEY GLASS DIVISION, OWENS–ILLINOIS, INC., an Ohio corporation, Marstan Industries, Inc., a Pennsylvania corporation, and the Freshie Company, a Pennsylvania corporation, Defendants.

Civ. A. No. 85–703–JLL.

United States District Court, D. Delaware.

Aug. 21, 1987.

Consumer injured in using jar brought suit against manufacturer and distributor of jar under Delaware's Uniform Commercial Code. The District Court, Latchum, Senior District Judge, held that: (1) absent proof of reliance, manufacturer and distributor were not liable for breach of express warranty that jar would open and close properly as illustrated in catalog; (2) opening and closing was not some special purpose possessed only by injured consumer, and thus manufacturer and distributor were not liable on theory that they breach-

ed warranty of fitness for particular purpose; (3) there was no proof that jar was designed defectively so as to make manufacturer and distributor liable on theory of breach of implied warranty of merchantability; and (4) fact that accident occurred and consumer was injured was insufficient, without more, to infer that manufacturing defect existed at time of sale, and thus manufacturer and distributor were not liable for breach of warranty of merchantability involving manufacturing defect.

Summary judgment motions granted.

**1. Sales ⟐262**

Jar manufacturer and distributor were not liable, on theory of breach of express warranty that jar would open and close properly as illustrated in catalog, to consumer who cut her wrist when, in attempting to secure lid to jar, top portion of jar shattered, as there was no proof to suggest that consumer ever saw catalog or relied on it when she purchased jar. U.C.C. § 2–313; 6 Del.C. §§ 2–313, 2–313 comment.

**2. Sales ⟐273(1)**

Warranty of fitness for particular purpose under Delaware law arises when buyer has special purpose for certain goods, seller knew or had reason to know of that purpose, seller knew or had reason to know that buyer was relying on seller's superior skill to select goods that fulfilled that purpose, and buyer in fact relied on seller's superior skill. 6 Del.C. § 2–315.

**3. Sales ⟐284(4)**

Jar manufacturer and distributor were not liable, on theory of breach of warranty of fitness for particular purpose, to consumer who cut her wrist when, in attempting to secure lid to jar, top portion of jar shattered, as opening and closing was jar's ordinary purpose, not some special purpose possessed only by consumer. 6 Del.C. § 2–315.

**4. Sales ⟐427**

Successful merchantability action requires proof that merchant sold goods, which were defective at time of sale, caus-

ing injury to ultimate consumer, proximate cause of which was defective nature of goods, and that seller received notice of injury. 6 Del.C. § 2–314.

**5. Sales ⟐284(1)**

Jar was not defectively designed, and thus manufacturer and distributor were not liable, on theory of breach of warranty of merchantability, to consumer who cut her wrist when, in attempting to secure lid to jar, top portion of jar shattered; experts for both parties examined identical jars and concluded that they were free from any defects. 6 Del.C. § 2–314.

**6. Sales ⟐284(1)**

Jar was not defectively manufactured, and thus manufacturer and distributor were not liable, on theory of breach of warranty of merchantability, to consumer who cut her wrist when, in attempting to secure lid to jar, top portion of jar shattered; fact that accident occurred and consumer sustained injury was insufficient, without more, to infer that manufacturing defect existed at time of sale. 6 Del.C. § 2–314.

**7. Sales ⟐439**

Doctrine of res ipsa loquitur did not apply to allow inference that because consumer cut her wrist when, in attempting to secure lid to jar, top portion of jar shattered, jar must have been defectively manufactured and manufacturer and distributor were liable for breach of implied warranty of merchantability, as res ipsa loquitur applies only to negligence actions, and it was just as likely that damage to jar was caused by its mishandling at hands of consumer or others as it was by manufacturing defect or mishandling by manufacturer or distributor. 6 Del.C. § 2–314.

———

Louis P. Agostini, Jr., of Agostini, Levitsky and Agostini, Wilmington, Del., for plaintiff.

Walter L. Pepperman II and Palmer L. Whisenant of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for defendant Libbey Glass Div., Owens-Illinois, Inc.

Richard W. Pell and Anne L. Naczi of Tybout, Redfearn, Casarino & Pell, Wilmington, Del., for defendant Marstan Industries, Inc.

Mary E. Sherlock of Young & Sherlock, Dover, Del., for defendant The Freshie Co.

## MEMORANDUM OPINION

LATCHUM, Senior District Judge.

Plaintiff Karen DiIenno ("DiIenno") instituted this diversity action[1] against defendants Libbey Glass Division of Owens-Illinois, Inc. ("Owens-Illinois"), Marstan Industries, Inc. ("Marstan"), and The Freshie Company ("Freshie") to recover $90,000 in damages for injuries she sustained to her right hand when an allegedly defective jar, manufactured by Owens-Illinois, distributed by Marstan, and sold to DiIenno by Freshie shattered as she attempted to replace its lid. (Docket Item ["D.I."] 1.) Presently before the Court are motions for summary judgment from all three defendants. (D.I. 73; 96; 97.) The sole dispute between the parties is whether sufficient evidence exists in the record from which a jury could reasonably infer that the jar was defective at the time DiIenno purchased it. Because the Court finds there is no evidence from which a jury could reach that conclusion, the defendants' motions for summary judgment will be granted.

## FACTS PERTAINING TO THESE MOTIONS

The facts of this case are relatively straightforward and to a great extent undisputed.

On December 13, 1988, DiIenno purchased a glass jar filled with peanuts from the Rainbow's End, a small snack shop operated by Freshie. (D.I. 88 at 10–11.) The jar was a "30 ounce bean pot" with a cork lid, manufactured by Owens-Illinois for use as a decorative container. (D.I. 104 at A–1 to A–4.) Freshie purchased twelve of these jars from Owens-Illinois, in March of 1988, through the distributor Marstan. (D.I. 104 at A–12.) Freshie decided to fill these jars with candy and peanuts and sell them as Christmas gifts. (D.I. 94 at 19.) Upon receiving the jars, Freshie washed them in a dishwasher, filled them with peanuts and candy, and placed them on shelves in the Rainbow's End for customers to view and purchase. (Id. at 21–22.)

After purchasing one of these jars, DiIenno returned to her place of employment, Blue Cross and Blue Shield of Delaware, and placed the jar on a shelf beside her desk. (D.I. 88 at 17.) Over the next six days, DiIenno opened and closed the jar approximately twice a day to remove peanuts. (Id. at 21.) DiIenno's co-workers also removed peanuts from the jar during this period (D.I. 86 at 18), apparently without DiIenno's knowledge or consent. (D.I. 88 at 20.) The jar remained on the shelf by DiIenno's desk the entire six-day period, including nights and one weekend when DiIenno was not in the office. (Id. at 18–19.)

On Monday, December 19, 1988, DiIenno once again opened the jar and removed some peanuts. After placing the peanuts on a napkin on her desk, DiIenno attempted to close the jar, but was unable on her first try to secure the cork lid tightly on the jar. (D.I. 88 at 29.) On her second attempt to secure the lid, the top portion of the jar shattered and DiIenno cut her wrist on the now jagged bottom portion of the jar. (Id.)

## ANALYSIS

DiIenno's complaint originally contained five counts. (D.I. 1.) Count four, a strict liability claim against Freshie, was subsequently dismissed with prejudice by DiIenno. (D.I. 68.) Of the counts that remain, counts one through three are strict liability claims against Owens-Illinois, under the laws of Pennsylvania and Ohio, and Marstan, under the law of Pennsylvania. (D.I. 1.) The Court will grant defendants Owens-Illinois' and Marstan's motions for summary judgment as to counts one through three since, as DiIenno now concedes (D.I. 104 at 8), the law of Delaware

---

1. Jurisdiction is proper in this Court by virtue of 28 U.S.C. § 1332 (1966 & Supp.1987) since the plaintiff and all of the defendants are citi-
zens of different states and the amount plaintiff seeks is over $10,000. (D.I. 1.)

**376**          **668 FEDERAL SUPPLEMENT**

applies to this case,[2] and Delaware does not recognize the doctrine of strict products liability in cases involving the sale of goods. *Johnson v. Hockessin Tractor Inc.*, 420 A.2d 154, 156 (Del.Supr.1980); *Cline v. Prowler Inds. of Maryland, Inc.*, 418 A.2d 968, 980 (Del.Supr.1980).

In *Cline*, the Delaware Supreme Court held for the first time that the judicially created doctrine of strict products liability has been preempted in Delaware, with respect to cases involving the sale of defective goods, by the Delaware General Assembly's adoption of the warranty provisions of the Uniform Commercial Code ("UCC").[3] *Cline*, 418 A.2d at 980. After a thorough review of the similarity of coverage of the UCC warranty provisions and the doctrine of products liability, the *Cline* court concluded that:

> The General Assembly's choice to make the Code nearly coextensive with the coverage under § 402A, at least with respect to privity and the scope of injury, suggests clearly, we think, that it intended that products liability remedies in sales cases be treated within the confines of sales warranty law and that there be no remedy therefor outside the Code.

*Id.* at 979.

This Court is bound by the decision of the Delaware Supreme Court and must, therefore, reject DiIenno's strict liability claims. If DiIenno is to recover in this action it can only be under the UCC breach of warranty theory she alleges in Count five of her complaint. (D.I. 1.)

A warranty may arise under the UCC in three ways: an expressed warranty under section 2-313; an implied warranty of merchantability under section 2-314; or an implied warranty of fitness for a particular purpose under 2-315. *Del.Code Ann.* tit. 6, §§ 2-313, 2-314, 2-315 (1975 & Supp. 1987). In her complaint, DiIenno uses the generic term warranty, without specifying which of these warranties she is relying upon. (D.I. 1.) However, in her answering brief, DiIenno chooses to rely on the expressed warranty and the warranty of fitness for a particular purpose. (D.I. 104 at 3.) The Court is of the opinion that she made the wrong choice.

[1] DiIenno claims that she is entitled to relief under section 2-313 because defendants Owens-Illinois and Marstan breached their expressed warranty that the jar would perform as illustrated in the Owens-Illinois catalog: that it would open and close properly. (D.I. 104 at 7.) The Court disagrees. It is clear that a successful action for breach of an expressed warranty may not be maintained in Delaware absent some reliance by the buyer on the warranty. *Del.Code Ann.* tit. 6, § 2-313, Delaware Study Comment 1 (citing Delaware cases). There is no evidence in the record to suggest that DiIenno ever saw the Owens-Illinois catalog let alone relied on it when she purchased the jar. Absent such evidence, DiIenno's claim for breach of an expressed warranty must fail.

[2, 3] A warranty of fitness for a particular purpose arises when: (1) a buyer has a special purpose for certain goods; (2) the seller knew or had reason to know of that purpose; (3) the seller knew or had reason to know that the buyer was relying on the seller's superior skill to select goods that fulfilled that purpose; and (4) the buyer in fact relied on the seller's superior skill. *Cohen v. Hathaway*, 595 F.Supp. 579, 588 (D.Mass.1984) (applying Delaware law and quoting *Del.Code Ann.* tit. 6, § 2-315). None of these elements are present here. DiIenno contends that she purchased the jar for a particular purpose, to open and close it. (D.I. 104 at 4.) This argument is ridiculous. Opening and closing is a jar's ordinary purpose, not some special purpose possessed only by DiIenno. Moreover, DiIenno does not even attempt to establish any of the other elements listed above. An action for breach of the warranty for a particular purpose is thus unavailable to

---

2. The parties are in agreement that Delaware law applies to this case. (D.I. 101 at 8; 102 at 8; 103 at 7; 104 at 3).

3. The Uniform Commercial Code has been adopted in Delaware, as in most jurisdictions, and is codified at *Del.Code Ann.* tit. 6 §§ 1-101 to 11-109 (1975 & Supp.1987).

DiIenno. Her remedy lies, if at all, with the UCC's implied warranty of merchantability.

[4] A successful merchantability action requires proof (1) that a merchant sold goods, (2) which were defective at the time of sale, (3) causing injury to the ultimate consumer, (4) the proximate cause of which was the defective nature of the goods, and (5) that the seller received notice of the injury. *F.E. Myers Co. v. Pipe Maintenance Services, Inc.*, 599 F.Supp. 697, 703 (D.Del.1984); *Neilson Business Equip. Center Inc. v. Monteleone*, 524 A.2d 1172, 1174 (Del.Supr.1987).

The major dispute in this case focuses on the second element, that the goods be defective at the time of sale. DiIenno maintains that sufficient evidence exists in the record from which a jury could infer that the jar was defective at the time of sale, and summary judgment is thus inappropriate. (D.I. 104 at 5–7.) In response, Owens-Illinois, Marstan, and Freshie insist that the record is devoid of any evidence of a defect in the jar and this case is thus ripe for summary judgment. (D.I. 101 at 9–15; 102 at 16–18; 103 at 10–14.)

The United States Supreme Court has recently shed additional light on the standards applicable to summary judgment motions. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The rule has always been that a court may not grant summary judgment on an issue unless there is no genuine issue of material fact with regard to that issue, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56 (1986). After *Anderson*, it is clear that in order for an issue of fact to be genuine and thus make summary judgment inappropriate, there must be sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party on that issue. *Anderson*, 477 U.S. at ——, 106 S.Ct. at 2511. The existence of evidence which is merely colorable or not particularly probative will not render summary judgment inappropriate. *Id.* Summary judgment is appropriate in this case because DiIenno has produced no evidence that the jar was

defective at the time of sale. This is an essential element of her *prima facie* case and one on which she bears the burden of proof. *Kates v. Pepsi Cola Bottling Co. of Salisbury, Md.*, 263 A.2d 308, 311 (Del. Supr.1970); *Towe v. Justis Bros.*, 290 A.2d 657, 658 (Del.Super.1972).

A defect may take the form of a design defect, where an entire product line is designed improperly, or a manufacturing defect, where a product line is properly designed but a particular item was manufactured incorrectly. *O'Brien v. Muskin Corp.*, 94 N.J. 109, 463 A.2d 298, 304 (1983); *Anthony Pools, a Div. of Anthony Inds. v. Sheehan*, 295 Md. 285, 455 A.2d 434, 441 (1983). DiIenno has failed to produce any evidence of either type of defect.

[5] There is no evidence to indicate that the jar was designed defectively. On the contrary, the only evidence available on this issue suggests that the jar was free from design defects. The jar that injured DiIenno could not be examined for defects because her co-workers disposed of it immediately after the accident. (D.I. 88 at 33.) However, DiIenno purchased an identical jar from Freshie a week after the accident for an expert to examine for defects. (*Id.* at 25.) DiIenno's expert, James Faller, examined this "example jar" and concluded that it was free from any defects. (D.I. 101 at Ex. A.) Experts from Owens-Illinois reached a similar conclusion after examining another example jar from the same product line as the jar that injured DiIenno. (*Id.* at Ex. B.)

The Court finds this evidence conclusive on the issue of the reasonableness of the jar's design. The tested example jars were designed in the exact same way as the jar that injured DiIenno. (D.I. 88 at 25; 101 at Ex. B.) Thus, any defect in the design of the original jar would have shown up when the example jars were tested.

[6] This is not true, however, with respect to a manufacturing defect. A manufacturing defect in the jar that injured DiIenno would not necessarily have been present in the example jars. The jars were all of the same design but they were not

necessarily manufactured and packaged in the same manner. Thus, the absence of a defect in the manufacturing of the example jars is not conclusive evidence that DiIenno's jar was similarly free from a manufacturing defect. But it is not incumbent upon the defendants to prove the lack of a manufacturing defect. As stated above, DiIenno bears the burden of producing some evidence that the jar had a manufacturing defect at the time of sale. *Towe,* 290 A.2d at 658.

The sum total of DiIenno's evidence on this issue consists of her deposition testimony of the circumstances surrounding the accident and an expert report concluding that the jar was defective. (D.I. 88; 101 at Ex. A.) At her deposition, DiIenno gave a detailed account of the jar's shattering, but she offered no explanation as to what caused the jar to shatter or how the jar was defective. (D.I. 88.) The report of her expert concludes that the jar must have been defective to shatter the way it did. (D.I. 101 at Ex. A.) However, this conclusion was not based on scientific tests or data but solely on DiIenno's account of the accident and the assumption that the jar must have been defective because it shattered. *(Id.)*[4] Thus DiIenno has produced no evidence of a manufacturing defect apart from the occurrence of the accident itself. This is wholly insufficient.

The fact that the accident occurred and DiIenno sustained injury is insufficient, without more, to infer that a manufacturing defect existed at the time of sale. *O'Brien,* 463 A.2d at 803; *Caterpillar Tractor Co. v. Beck,* 593 P.2d 871, 877 (Alaska 1979). DiIenno must make a *prima facie* case of injury *and* defect in order to get to the jury on her warranty claim. *F.E. Myer Co.,* 599 F.Supp. at 708. She has offered some evidence of injury but no evidence of a defect.

[7] Nonetheless, DiIenno contends that a jury should be permitted to infer a defect from the evidence she presented. Al-

though not articulated as such, DiIenno's argument amounts to nothing more than a request for this Court to apply the doctrine of *res ipsa loquitur* ("res ipsa") to the facts of this case.

*Res ipsa* has been consistently applied in appropriate cases by the Delaware courts, *see, e.g., Skipper v. Royal Crown Bottling Co. of Wilmington,* 192 A.2d 910 (Del. Supr.1963); *Cicciola v. Delaware Coca-Cola Bottling Co.,* 172 A.2d 252 (Del.Supr. 1961); *Delaware Coach Co. v. Reynolds,* 45 Del. 226, 71 A.2d 69 (Supr.1950), and has been codified in *Del.Unif.R.Evid.* § 304 (1981 Repl.Vol.). *Res ipsa,* which is Latin for "the thing speaks for itself," is a rule of circumstantial evidence which permits a jury to infer negligence simply from the happening of an accident. *Del.Unif.R. Evid.* § 304(A)(1). Applying the doctrine of *res ipsa* to the facts of this case would greatly benefit DiIenno. It would permit the jury to infer a defect in the jar simply because the jar shattered. Unfortunately for DiIenno, however, the Court cannot apply *res ipsa* in this case for two reasons.

First, *res ipsa* applies only to negligence actions. It may not be used in actions for breach of warranty. *Hershenson v. Lake Champlain Motors Inc.,* 139 Vt. 219, 424 A.2d 1075, 1078 (1981); *Trust v. Arden Farms Co.,* 50 Cal.2d 217, 324 P.2d 583, 586 (1958).

Second, even if the Court were to ignore these decisions and consider applying the doctrine of *res ipsa* to this breach of warranty case, the facts do not justify its application. Del.Unif.R.Evid. 304 sets out four criteria which must be met before *res ipsa* can apply:

(1) The accident must be such as, in the ordinary course of events, does not happen if those who have management and control use proper care; and

(2) The facts are such as to warrant an inference of negligence of such force as

---

4. DiIenno's expert also based his opinion on the assumption that no trauma befell the jar between DiIenno's purchase of the jar and the accident. (D.I. 101 at Ex. A.) The Court be-

lieves this is much too generous an assumption. As will be discussed later in the text, there is a possibility that the jar experienced some trauma while at Freshies or in DiIenno's office.

DiIENNO v. LIBBEY GLASS DIV., OWENS–ILLINOIS, INC.    **379**

Cite as 668 F.Supp. 373 (D.Del. 1987)

to call for an explanation or rebuttal from the defendant; and

(3) The thing or instrumentality which caused the injury must have been under the management or control (not necessarily exclusive) of the defendant or his servants at the time the negligence likely occurred; and

(4) Where the injured person participated in the events leading up to the accident, the evidence must exclude his own conduct as a responsible cause.

*Del.Unif.R.Evid.* § 304(B). Without expressing any opinion as to the other three criteria, the Court finds that the facts of this case do not satisfy the first criterion.

The first criterion set out above mandates that the accident be one that would not have occurred, in the ordinary course of events, if the defendants had exercised proper care. This criterion does not require that the possibility of all other causes be eliminated but only that "their likelihood ... be so reduced that the greater probability of negligence lies at the ... [defendant's] door." *Phillips v. Delaware Power & Light Co.*, 202 A.2d 131, 133 (Del.Super. 1964).[5] The Delaware Supreme Court phrased the rule this way:

> *Res ipsa loquitur*, however, is subject to the same limitation as the rule permitting an inference of negligence from proven circumstances, i.e., if the injury is as consistent with the absence of negligence as with the existence of negligence, neither conclusion can be said to have been established by legitimate proof, and no issue is made for submission to the jury.

*Skipper*, 192 A.2d at 912.

The undisputed facts of this case do not suggest that the "greater probability" of fault for the accident lies with the defend-

ants. It is just as likely that the damage to the jar was caused by DiIenno or third parties. The jar remained on a self-service display shelf at Freshie and could have easily been dropped or jostled by Freshies' customers. (D.I. 94 at 11.) Moreover, the jar was placed on an open shelf near DiIenno's desk for six days, including nights and weekends while she was out of the office. (D.I. 88 at 18–19.) The jar could have been accidently mishandled by maintenance or security workers at night or DiIenno's co-workers while she was away from her desk.[6]

DiIenno argues that it is highly unlikely that the damage to the jar was caused by anyone in her office. In her opening brief she cautioned the Court against blaming the jar's shattering on "ghoulies and ghosties and long-legged beasties and things that go bump in the night." (D.I. 104 at 5.) While the Court concedes that the greater probability of fault does not lie with "ghoulies and ghosties," it must be remembered that they are not the only inhabitants of the Hercules Building. The Court does not find it so unlikely that a co-worker or maintenance man could have accidently dropped or mishandled the jar, perhaps while helping himself to some of DiIenno's peanuts.

Based on the above the Court concludes that it is just as likely that the damage to the jar was caused by its mishandling at the hands of DiIenno or others as it was by a manufacturing defect or mishandling by the defendants. This conclusion makes *res ipsa* unavailable in this case.

Without the aid of the doctrine of *res ipsa*, the undisputed facts are not sufficient to withstand the defendants' motions for summary judgment. The Court will thus grant the defendants' motions for

---

5. Rule 304 is basically only a codification of the common law of *res ipsa*. The first criterion, that the accident be one which would not have occurred in the ordinary course of events absent negligence on the defendants' part, has long been recognized in Delaware. *See, e.g., Skipper*, 192 A.2d at 912; *Phillips v. Delaware Power & Light Co.*, 202 A.2d 131, 133 (Del.Super.1964). Thus the cases cited by the Court which interpret this criterion predate the adoption of the Code.

6. There is evidence in the record that suggests the jar was handled by DiIenno's co-workers without her knowledge. DiIenno testified at her deposition that she never saw anyone remove peanuts from the jar. (D.I. 88 at 20.) But Mac Miller, DiIenno's co-worker, said that she removed peanuts from the jar on several occasions. (D.I. 86 at 18.)

summary judgment as to the count five warranty claim of DiIenno's complaint.

**CONCLUSION**

For the reasons stated above, the Court will grant the summary judgment motions of defendants Owens-Illinois, Marstan, and Freshie as to counts one, two, three and five of DiIenno's complaint and dismiss that complaint in its entirety.[7]

An order will be entered in accordance with this Memorandum Opinion.



**DAVIS CONSTRUCTORS, Plaintiff,**

v.

**DARTCO MANUFACTURING, INC., Defendant.**

Civ. A. No. 87-133-JRR.

United States District Court,
D. Delaware.

Sept. 2, 1987.

Defendant in action arising out of construction project moved to transfer. The District Court, Roth, J., held that: (1) jurisdiction would exist in Georgia even though plaintiff contractor had not filed required bond prior to outset of construction, and (2) interests of justice and convenience of parties and witnesses favored transfer.

Motion granted.

**1. Federal Courts ⬅101**

Before transfer may be ordered, it must be established that action might have been brought in the transferee district and it must be determined whether convenience of the parties and witnesses and the interest of justice would be served by transfer of venue. 28 U.S.C.A. § 1404(a).

**2. Federal Courts ⬅101**

In order for court to determine that action could have been brought in proposed transferee district, there must no real question as to whether venue or personal jurisdiction would be obtainable in the district. 28 U.S.C.A. § 1404(a).

**3. Licenses ⬅39.44**

Failure of corporation to file contractor's bond with state of Georgia at the outset of construction or at any time during construction does not affect the subject matter jurisdiction of courts in Georgia. O.C.G.A. § 48-18-30 et seq.

**4. Federal Courts ⬅131**

Fact that contractor had not filed bond in Georgia prior to start of construction did not preclude finding that federal court in Georgia would have jurisdiction over suit arising out of the construction project, so that action could be transferred there, despite Georgia statute providing that nonresident contractor who fails to comply with any provision of the bond statute cannot maintain an action to recover payment for performance on the contract in the courts of Georgia. 28 U.S.C.A. § 1404(a); O.C.G.A. § 48-18-30 et seq.

**5. Federal Courts ⬅105**

On motion to transfer for convenience of parties and witnesses, plaintiff's choice of forum should be given considerable deference and should not be disturbed unless the balance of convenience strongly favors the defendant. 28 U.S.C.A. § 1404(a).

**6. Federal Courts ⬅109**

Convenience of parties and witnesses and interests of justice would be served by transferring to Georgia from Delaware action brought by South Carolina contractor against company with principal place of business in Georgia in dispute over construction project in Georgia, even though defendant was a Delaware corporation, where majority of the defendant's employees and witnesses lived and worked in

7. As stated earlier, Count four, a strict liability claim only against Freshie, has been voluntarily

dismissed by DiIenno. (D.I. 63.)

**\*1267** 721 A.2d 1267

39 UCC Rep.Serv.2d 1062,
Prod.Liab.Rep. (CCH) P 15,489

Supreme Court of Delaware.

**REYBOLD GROUP, INC., Plaintiff
Below, Appellant,**
v.
**CHEMPROBE TECHNOLOGIES,
INC., Defendant Below, Appellee.**

**No. 248, 1998.**
Submitted: Dec. 1, 1998.

Decided: Dec. 22, 1998.

Building owner sued manufacturer of water repellant product for breach of implied warranty of merchantability. The Superior Court, New Castle County, granted summary judgment for manufacturer. Owner appealed. The Supreme Court, Holland, J., held that owner could not maintain action for breach of implied warranty of merchantability in absence of expert testimony or circumstantial evidence that product was defective.

Affirmed.

West Headnotes

[1]    Sales ⬥427

343 ----
    343VIII Remedies of Buyer
    343VIII(D) Actions and Counterclaims for Breach of Warranty
    343k427 Right of Action.

To be successful on a breach of warranty of merchantability claim, a plaintiff must prove: (1) that a merchant sold the goods; (2) which were defective at the time of sale; (3) causing injury to the ultimate consumer; (4) the proximate cause of which was the defective nature of the goods; and (5) that the seller received notice of the injury. 6 Del.C. § 2-314.

[2]    Evidence ⬥596(1)

157 ----
    157XIV Weight and Sufficiency
    157k596 Degree of Proof in General
    157k596(1) In General.

Plaintiff in a civil suit is required to prove all the elements of its claim by a preponderance of the evidence.

[3]    Sales ⬥441(3)

343 ----
    343VIII Remedies of Buyer
    343VIII(D) Actions and Counterclaims for Breach of Warranty
    343k438 Evidence
    343k441 Weight and Sufficiency
    343k441(3) Breach of Warranty.

To establish a prima facie case that product was defective and a proximate cause of injuries, so as to maintain claim for breach of implied warranty of merchantability, plaintiff can rely on inference from competent evidence if such a finding relates to a matter which is within a lay person's scope of knowledge; however, if the matter in issue is one within the knowledge of experts only and not within the common knowledge of laymen, it is necessary for the plaintiff to introduce expert testimony to establish a prima facie case that product was defective. 6 Del.C. § 2-314.

[4]    Sales ⬥441(3)

343 ----
    343VIII Remedies of Buyer
    343VIII(D) Actions and Counterclaims for Breach of Warranty
    343k438 Evidence
    343k441 Weight and Sufficiency
    343k441(3) Breach of Warranty.

Typically expert testimony is required to prove causation in a claim for breach of the implied warranty of merchantability. 6 Del.C. § 2-314.

[5]    Sales ⬥441(3)

343 ----
    343VIII Remedies of Buyer
    343VIII(D) Actions and Counterclaims for Breach of Warranty
    343k438 Evidence
    343k441 Weight and Sufficiency
    343k441(3) Breach of Warranty.

For circumstantial evidence to substantiate a prima facie case that there was a breach of the implied warranty of merchantability, it must tend to negate other reasonable causes of the injury sustained or

© 2006 Thomson/West. No claim to original U.S. Govt. works.

there must be expert opinion that the product was defective. 6 Del.C. § 2-314.

[6]    Sales ⬄441(3)

343 ----
   343VIII Remedies of Buyer
   343VIII(D) Actions and Counterclaims for Breach of Warranty
   343k438 Evidence
   343k441 Weight and Sufficiency
   343k441(3) Breach of Warranty.

Building owner did not present either direct expert evidence or circumstantial evidence that manufacturer's water repellant product was defective, and thus could not succeed on claim that manufacturer breached implied warranty of merchantability. 6 Del.C. § 2-314.

Court Below--Superior Court of the State of Delaware, in and for New Castle County, C.A. No. 95C-05-124.

Upon appeal from the Superior Court. **AFFIRMED.**

*1268    Janet Z. Charlton, of Young, Conaway, Stargatt & Taylor, LLP, Wilmington, Delaware, for appellant.

Kathleen M. Miller, of Smith, Katzenstein & Furlow, LLP, Wilmington, Delaware, for appellee.

Before VEASEY, Chief Justice, HOLLAND, and HARTNETT, Justices.

HOLLAND, Justice:

This is an appeal by the plaintiff-appellant, Reybold Group, Inc. ("Reybold"), from a final judgment entered by the Superior Court in favor of the defendant-appellee, Chemprobe Technologies, Inc. ("Chemprobe"). The other defendant named in the original complaint, Fountain Caulking, Inc. ("Fountain"), was voluntarily dismissed from the action before the Superior Court granted Chemprobe's motion for summary judgment.

The Superior Court held, in a bench ruling, that Reybold could not sustain a cause of action for breach of the implied warranty of merchantability without proving the existence of a defect in the product through expert testimony. In this appeal, Reybold argues that the Superior Court's holding was

erroneous as a matter of law. According to Reybold, it was not required to prove a defect and it was entitled to establish its claim for a breach of the implied warranty of merchantability without expert testimony through circumstantial evidence.

We have concluded that, under the circumstances presented, the Superior Court's holding was correct. Therefore, the final judgment of the Superior Court must be affirmed.

*Facts (FN1)*

Reybold is the owner of a one-story commercial building at 18 Shea Way, Newark, Delaware. The building is divided into office suites. Reybold occupied Suite 116, the end unit in the building. Reybold was experiencing a leakage problem in Suite 116. Reybold believed the leak was caused by water seeping through the split-faced brick which comprised an exterior wall of the unit. Reybold contracted with Fountain to waterproof the brick.

On Saturday, March 18, 1995, Fountain applied Prime-A-Pell 200, a water repellant product manufactured by Chemprobe, to the exterior brick wall. This product is designed to seal block. On the day Prime-A-Pell 200 was applied to the building, Reybold's offices developed an offensive and noxious odor, which forced an employee who was working that day to leave the premises.

When Reybold's employees reported to work on Monday, March 20, 1995, the noxious odor was still present. Some of the employees suffered various health problems, including headaches, dizziness, lung and mouth irritation and heart palpitations. Chemprobe was contacted in an attempt to resolve the problem.

The employees were forced to vacate their suite for a period of two and one-half months until the odor dissipated. Reybold suffered a disruption of its business and out-of-pocket expenditures in moving phone lines, computers and furniture to a different office while the odor dissipated. The odor persisted until it gradually disappeared.

*Procedural History*

Reybold filed suit on May 11, 1995. The complaint asserted three counts: breach of the implied warranty of merchantability; breach of warranty of fitness for a particular purpose; and, negligence. The case scheduling order set a discovery

© 2006 Thomson/West. No claim to original U.S. Govt. works.

cut off date of June 9, 1997. Reybold took no action to prosecute its claims until June 12, 1997, when it served a request for production of documents and interrogatories on Chemprobe. The Superior Court held a status conference on July 9, 1997. A new discovery cut off date was set of October 7, 1997.

Chemprobe filed its initial motion for summary judgment on December 1, 1997. That motion was presented to the Superior Court on January 8, 1998. The Superior Court denied Chemprobe's motion, without prejudice to renew it after an additional 90 day discovery period to allow Reybold to develop the record. During that 90-day period, the **\*1269** only discovery conducted was the deposition of Charles Fountain, the individual who applied the Prime-A-Pell 200 to the Reybold building.

Chemprobe renewed its motion for summary judgment on April 3, 1998. When that motion was heard by the Superior Court on May 7, Reybold acknowledged that its only viable claim was for a breach of the implied warranty of merchantability. The complaint alleged that Prime-A-Pell 200 "is unfit for its ordinary purpose and would not pass without objection in the trade, and thus was unmerchantable at the time of sale."

In granting Chemprobe's motion for summary judgment, the Superior Court held that Reybold failed to make a *prima facie* showing of a defect, which was required before its case could be submitted to a jury. The Superior Court ruled that proof of a defect must be supported by expert testimony. In the absence of that evidence, the Superior Court concluded that Chemprobe was entitled to summary judgment.

### Cause of Action
### Implied Warranty of Merchantability

Delaware has enacted a form of the Uniform Commercial Code. (FN2) The statutory imposition of an implied warranty of merchantability is set forth in 6 *Del.C.* § 2-314. In *Monteleone,* this Court concluded that the plaintiff had proved all the necessary elements of a claim for a breach of an implied warranty of merchantability. (FN3) Those elements were identified as: "(1) that a merchant sold the goods; (2) that such goods were not 'merchantable' at the time of the sale; (3) that the plaintiff was damaged; (4) that the damage was caused by the breach of warrant of merchantability; and (5) that the seller had notice of the damage." (FN4) In *F.E. Myers,* the fourth element of the warranty claim was stated in terms of the "defective"

nature of the goods. (FN5)

Reybold argues that this Court intentionally omitted the word "defective" from the fourth element of the cause of action in *Monteleone,* even though we cited *F.E. Myers* in support of our holding. Thus, Reybold submits it was not required to show that the product was defective to sustain its cause of action against Chemprobe. In *Monteleone,* however, this Court was not called upon to address the plaintiff's burden of proving the defective nature of the goods because that fact was undisputed.

[1] The Superior Court properly concluded that proof of a defect is an essential element of a claim for breach of warranty of merchantability. (FN6) Accordingly, to be successful on a breach of warranty of merchantability claim, a plaintiff must prove: "(1) that a merchant sold the goods; (2) which were defective at the time of sale; (3) causing injury to the ultimate consumer; (4) the proximate cause of which was the defective nature of the goods; and (5) that the seller received notice of the injury." (FN7)

### Proof of Defect
### Direct or Circumstantial Evidence

[2] The plaintiff in a civil suit is required to prove all the elements of its claim by a **\*1270** preponderance of the evidence. (FN8) To withstand Chemprobe's summary judgment motion, Reybold was required to present some evidence to support all of the elements of its claim for a breach of the implied warranty of merchantability. Reybold could prove those elements by either direct or circumstantial evidence.

[3] Before Reybold's cause of action for a breach of an implied warranty of merchantability could be submitted to the jury, Reybold was required to establish, *inter alia,* that Chemprobe's product was both defective and the proximate cause of the injury it sustained. It was permissible for Reybold to establish a *prima facie* case that Chemprobe's product was defective and a proximate cause of Reybold's injuries, based upon an inference from Reybold's competent evidence, if such a finding relates to a matter which is within a lay person's scope of knowledge. (FN9) On the other hand, "[i]f the matter in issue is one within the knowledge of experts only and not within the common knowledge of laymen, it is necessary for the plaintiff to introduce expert testimony in order to establish a *prima facie* case." (FN10)

[4][5] Reybold argues that expert testimony is not

721 A.2d 1267, Reybold Group, Inc. v. Chemprobe Technologies, Inc., (Del.Supr. 1998)                    **Page 4**

necessary to prove its breach of warranty of merchantability claim. While there may be some warranty claims that do not need expert testimony, typically expert testimony is required to prove causation in a claim for breach of the implied warranty of merchantability. (FN11) For circumstantial evidence to substantiate a *prima facie* case that there was a breach of the implied warranty of merchantability, "it must tend to negate other reasonable causes of the injury sustained or there must be expert opinion that the product was defective." (FN12)

### This Case
### Summary Judgment Proper

[6] Reybold presented no direct expert evidence that Chemprobe's Prime-A-Pell product was either defective or the proximate cause of its injury. Reybold argues that a jury should have been allowed to infer that a defect existed from circumstantial evidence alone. (FN13) In *MacDougall*, however, the court held that a plaintiff may submit circumstantial evidence to a jury from which it can infer a breach "in the absence of abnormal use and reasonable secondary causes." (FN14)

The Superior Court gave Reybold successive extensions to take additional discovery. The record reflects that Reybold failed to establish a *prima facie* case through circumstantial evidence of a defect, by negating other reasonable causes for the injury it sustained. Accordingly, without either circumstantial evidence or expert testimony, Reybold failed to establish an essential element of its cause of action for a breach of the implied warranty of merchantability. (FN15)

A motion for summary judgment is properly granted "against a party who fails to make **\*1271.** a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." (FN16) Reybold failed to establish a defect by either direct or circumstantial evidence. Therefore, the Superior Court properly concluded that, as a matter of law, Chemprobe's motion for summary judgment should be granted.

### Conclusion

The final judgment of the Superior Court is affirmed.

(FN1.) This recitation of the facts relies extensively upon the statements in Reybold's opening brief.

(FN2.) *See* 6 *Del.C.* Subtitle I.

(FN3.) *Neilson Business Equipment Ctr., Inc. v. Monteleone,* Del.Supr., 524 A.2d 1172, 1175 (1987).

(FN4.) *Id., citing F.E. Myers Co. v. Pipe Maintenance Servs., Inc.,* D.Del., 599 F.Supp. 697, 703 (1984).

(FN5.) *F.E. Myers Co. v. Pipe Maintenance Servs., Inc.,* 599 F.Supp. at 703.

(FN6.) The Superior Court cited *Towe v. Justis Bros., Inc.,* Del.Super., 290 A.2d 657, 658 (1972) and *Dilenno v. Libbey Glass Div., Owens-Illinois, Inc.,* D.Del., 668 F.Supp. 373, 377 (1987). *Accord General Motors Corp. v. Brewer,* Tex., 966 S.W.2d 56 (1998); *Lally v. Volkswagen of America,* Mass.App.Ct. 45 Mass.App.Ct. 317, 698 N.E.2d 28 (1998); *Ruffin v. Shaw Indus., Inc.,* 4th Cir., 149 F.3d 294 (1998); *Holowaty v. McDonald's Corp.,* D.Minn., 10 F.Supp.2d 1078 (1998); *Kirkman v. Sofamor,* W.D.N.C., No. Civ. 1: 98CV100, 1998 WL 666706, Thornburg, J. (July 21, 1998); *D'Amico v. Panasonic Corp.,* E.D.Pa., No. Civ.A. 96-5236, 1998 WL 110629, Waldman, J. (Mar. 11, 1998).

(FN7.) *Dilenno v. Libbey Glass Div., Owens-Illinois, Inc.,* 668 F.Supp. at 377; *F.E. Myers Co. v. Pipe Maintenance Servs., Inc.,* 599 F.Supp. at 703. *Accord Neilson Business Equipment Ctr., Inc. v. Monteleone,* 524 A.2d at 1175.

(FN8.) *See Neilson Business Equipment Ctr., Inc. v. Monteleone,* Del.Supr., 524 A.2d 1172 (1987).

(FN9.) *Money v. Manville Corp. Asbestos Disease Comp. Trust Fund,* Del.Supr., 596 A.2d 1372, 1375 (1991). *Cf. Chudnofsky v. Edwards,* Del.Supr., 208 A.2d 516, 518 (1965).

(FN10.) *Money v. Manville Corp. Asbestos Disease Comp. Trust Fund,* 596 A.2d at 1375 *quoting* M.S. Madden, *Products Liability* 533 (2nd ed.1988). *See Mountaire of Delmarva, Inc. v. Glacken,* Del.Supr., 487 A.2d 1137, 1141 (1984); *Weiner v. Wisniewski,* Del.Supr., 213 A.2d 857, 858 (1965); *Laskowski v. Wallis,* Del.Supr., 205 A.2d 825, 826 (1964).

(FN11.) *American Family Mutual Ins. Co. v. Sears,*

© 2006 Thomson/West. No claim to original U.S. Govt. works.

721 A.2d 1267, Reybold Group, Inc. v. Chemprobe Technologies, Inc., (Del.Supr. 1998)    **Page 5**

*Roebuck & Co.,* D.Kan., 998 F.Supp. 1162, 1164 (1998);    *St. Clair v. General Motors Corp.,* M.D.N.C., 10 F.Supp.2d 523 (1998); *Stereo Shop, Inc. v. Ivanoff,* Conn.Super.Ct., No. CV 9605632625, 1998 WL 61914, Hale, J. (Feb. 2, 1998). *See also* 1 James J. White & Robert S. Summers, *Uniform Commercial Code* § 9-8 at 518 (4th ed.1998).

(FN12.) *American Family Mutual Ins. Co. v. Sears, Roebuck & Co.,* 998 F.Supp. at 1164.

(FN13.) In support of its argument, Reybold cited *MacDougall v. Ford Motor Co.,* Pa.Super., 214 Pa.Super. 384, 257 A.2d 676 (1969).

(FN14.) *Id.* at 680.  *See also A.A.A. Exteriors, Inc. v. Don Mahurin Chevrolet and Oldsmobile, Inc.,* Ind.Ct.App., 429 N.E.2d 975 (1981).

(FN15.) *American Family Mut. Ins. Co. v. Sears Roebuck & Co.,* D.Kan., 998 F.Supp. 1162, 1164 (1998).

**\*1271_**    (FN16.) *Celotex v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). *Accord Burkhart v. Davies,* Del.Supr., 602 A.2d 56 (1991).

© 2006 Thomson/West. No claim to original U.S. Govt. works.