# EXHIBIT A



# *Uninsured Motorists*

(for bodily injury and property damage caused by uninsured and underinsured motorists)

## ADDITIONAL DEFINITIONS APPLICABLE TO THIS COVERAGE

· "UNINSURED MOTOR VEHICLE" — See definition in COVERAGE AGREEMENT section.

"PROPERTY DAMAGE" — See definition in COVERAGE AGREEMENT section.

# *Coverage Agreement*

## YOU AND A RELATIVE

We will pay damages, including derivative claims, which are due by law to **you** or a **relative** from the owner or driver of an **uninsured motor vehicle** because of **bodily injury** suffered by **you** or a **relative**, and because of property damage. Damages must result from an accident arising out of the:— ----

1. ownership;
2. maintenance; or
3. use;

of the **uninsured motor vehicle**.

## OTHER PERSONS

We will also pay damages, including derivative claims, which are due by law to other persons who:

1. are not a named insured or an insured household member for Uninsured Motorists coverage under another policy; and
2. suffer **bodily injury** while occupying:
   a) **your** auto.
   b) a motor vehicle **you** do not own, while it is used in place of **your** auto for a short time. **Your** auto must be out of use because of:
      (1) breakdown;
      (2) repair;
      (3) servicing;
      (4) loss; or
      (5) destruction.
   c) a four-wheel motor vehicle newly acquired by **you** to which the Auto Liability coverage of this policy applies. The coverage applies only during the first 30 days **you** own the vehicle, unless it replaces **your** auto.
   d) any other motor vehicle while it is being operated by **you** or a **relative**. This extension applies only in policies issued to persons (not organizations). However, the vehicle must not be:
      (1) owned by **you** or a **relative**; or
      (2) furnished to **you** or a **relative** for regular use.

## PROPERTY COVERED

Coverage for property damage applies to the following property:

1. **your** auto, including its loss of use.

U1

*Uninsured Motorists*

2. **your** auto's contents which are owned by you or a relative.
3. **your** auto's contents which are owned by any other person. However, such contents are covered only while their owner is occupying your auto.
4. property you or a relative own while it is contained in any of the following:
   a) a motor vehicle you do not own, while it is used in place of your auto for a short time. Your auto must be out of use because of:
      (1) breakdown;
      (2) repair;
      (3) servicing;
      (4) loss; or
      (5) destruction.
   b) any other motor vehicle while it is being operated by you or a relative. However, the vehicle must not be:
      (1) owned by you or a relative; or
      (2) furnished to you or a relative for regular use.

## RECOVERY

1. Before recovery, we and the insured must agree on two points:
   a) whether there is a legal right to recover damages from the owner or driver of an uninsured motor vehicle; and if so,
   b) the amount of such damages.

   If agreement can't be reached, the matter may go to arbitration. Refer to the GENERAL POLICY CONDITIONS for arbitration provisions.
2. Questions between the injured party and us regarding such person's entitlement to Uninsured Motorists coverage, or the limits of such coverage, are not subject to arbitration and shall be decided by a court of law.
3. Any judgment against the uninsured (including underinsured) will be binding on us only if it has our written consent.

## DEFINITIONS

For purposes of this coverage only:

1. An uninsured motor vehicle is:
   a) one for which there is no auto liability bond, insurance or other security in effect, applicable to the vehicle owner, operator, or any other liable person or organization, at the time of the accident.
   b) one which is underinsured. This is a motor vehicle for which bodily injury liability coverage or other security or bonds are in effect; however, their total amount is less than the limits of this coverage. See the Declarations for those limits.
   c) one for which the insuring company denies coverage or becomes insolvent.
   d) a "hit-and-run" motor vehicle which causes bodily injury to an insured or property damage to property of the insured. Bodily injury or property damage must be caused by physical contact of the "hit-and-run" motor vehicle with the insured or with an insured motor vehicle, or by a non-contact vehicle.

   The driver and the owner of the "hit-and-run" vehicle must be unknown. The insured must report the accident to the police or proper governmental authority. We must be notified within 30 days, or as soon as practicable, that the insured or his legal representative has a legal action for damages arising out of the accident. This notification must include facts supporting the action. If we request, any motor vehicle the insured was occupying at the time of accident must be made available for our inspection.

U2

# EXHIBIT 1

Westlaw.

Not Reported in F.Supp.2d                                                                 Page 1

Not Reported in F.Supp.2d, 2005 WL 3309613 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Briefs and Other Related Documents
Baylis v. Red Lion Group, Inc.D.Del.,2005.Only
the Westlaw citation is currently available.
United States District Court,D. Delaware.
April BAYLIS, Plaintiff,
v.
RED LION GROUP, INC., a corporation of the
State of Pennsylvania, Defendant.
**No. Civ.A. 04-1462-KAJ.**

Dec. 7, 2005.

Bayard Marin, Wilmington, Delaware, for Plaintiff.
Norman H. Brooks, Jr., Marks, O'Neill, O'Brien &
Courtney, P.C., Wilmington, Delaware, for
Defendant.

MEMORANDUM OPINION
JORDAN, J.

### I. INTRODUCTION

\*1 April Baylis ("Baylis") brought this suit against
Red Lion Group, Inc. ("Red Lion"), a Pennsylvania
corporation, claiming that she was injured by an
unreasonably    dangerous    fire    extinguisher
manufactured and distributed by Red Lion. Before
me is Red Lion's Motion for Summary Judgment
under Fed.R.Civ.P. 56(c). (Docket Item ["D.I."] 39;
the "Motion.") The court has jurisdiction over the
subject matter of this diversity action under 28
U.S.C. § 1332. For the reasons that follow, I will
grant the Motion.

### II. BACKGROUND [FN1]

> FN1.  The  following  background
> information  is  taken  from  the  parties'
> submissions  and  does  not  constitute
> findings of fact.

\*1 On November 14, 2002, Baylis participated in a
Health and Safety Day at her place of employment,
Honeywell International, Inc. ("Honeywell"). (D.I.
39 at 3, A17; D.I. 43 at 3.) The program included
fire    extinguisher    training    where,    under    the
supervision of Honeywell employees John Peters
and Jerry McCarthy, employees could put out fires
with fire extinguishers. (D.I. 39 at A13-14,
A19-20.) Baylis, who had never used a fire
extinguisher before (D.I. 43 at 3), listened to an
explanation of their use and picked up an
extinguisher to put out a fire set for the
demonstration. (D.I. 39 at A17.) When she
squeezed the trigger, carbon dioxide gas was
dispersed onto her left hand. (*Id.*) According to a
witness, Patrick McCarthy, carbon dioxide leaked
from the area where the "piping screws into the
handle and there is ... a compression fitting that
goes down around the piping that goes to the cone
of the extinguisher." (D.I. 43 at A35.) Baylis then
put down that extinguisher, picked up another one,
and put out the fire. (D.I. 39 at 3; D.I. 43 at 3.)
Later, she was treated for injuries from the leaked
carbon dioxide. (D.I. 43 at 3.)

\*1 Honeywell ordered from Red Lion the fire
extinguishers used on Safety Day. (D.I. 39 at A2.)
Before they were delivered to Honeywell, the
extinguishers    were    recharged,    inspected,    and
deemed to be safe and in good working condition
by Red Lion. (*Id.*) Red Lion delivered 21
extinguishers to Honeywell's loading dock on
November 13, 2002. (*Id.*) Red Lion transported the
extinguishers in an upright position in a van, in
which they were secured by ratchet strap belts while
in transit. (*Id.*)

\*1 The extinguishers were stored overnight in a
locked storeroom (D.I. 43 at A14, A54-55), which
was not excessively hot or cold (*Id.* at A52). On the
morning of November 14, Honeywell employees
moved the extinguishers approximately 150 yards
on a utility cart to the area where the fire training
took place. (*Id.* at A14-15, A52 .) What, if anything,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                      Page 2

Not Reported in F.Supp.2d, 2005 WL 3309613 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

may have happened to the extinguishers overnight or while being transferred to and from the storeroom is not known.

**\*1** After Baylis's injury, Honeywell's Health, Safety and Environmental Specialist, Russell Davis, placed a tag on the extinguisher he believed to be the first one used by Baylis. (D.I. 39 at A3.) On November 15, 2002, Red Lion retrieved all of the extinguishers, including the tagged one. (*Id.* at 5.) The tagged extinguisher was discharged, recharged, and discharged again, and Red Lion found no defective condition. (*Id.* at A3.)

**\*2** Baylis brings four causes of action against Red Lion. First, Baylis alleges that Red Lion negligently manufactured and distributed the fire extinguisher, failed to properly inspect it, failed to take reasonable steps to prevent the alleged defect, failed to warn Baylis of its risks, and failed to properly instruct users on safe operation of the extinguisher. (D.I. 39 at 1; D.I. 43 at 1.) Baylis says that this negligence caused her injuries. (*Id.*) Second, Baylis alleges that Red Lion is strictly liable for her injuries. (*Id.*) Third, Baylis alleges that Red Lion breached an implied warranty of merchantability. (*Id.*) Fourth, Baylis alleges that Red Lion breached an implied warranty of fitness for a particular purpose. (*Id.*)

### III. STANDARD OF REVIEW

**\*2** A court may grant summary judgment only if " the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Celotex v. Catrett,* 477 U.S. 317, 323 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.,* 57 F.3d 300, 302 n. 1 (3d Cir.1995) (internal citations

omitted). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt,* 63 F .3d 231, 236 (3d Cir.1995). A court should not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000). To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986) (internal citation omitted). When a motion for summary judgment is supported under Rule 56(c) by the moving party, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e) . A mere scintilla of evidence in support of the non-moving party is insufficient for a court to deny summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986).

### IV. DISCUSSION

**\*2** Since jurisdiction in this case is based on diversity of citizenship, I must apply the substantive law of Delaware. *Erie R.R. Co. v. Tompkins,* 304 U.S. 64 (1938). Baylis has failed to present evidence to support her claims under Delaware law, so I will grant Red Lion's Motion.

#### A. *Failure to Show that the Extinguisher was Defective When Delivered*

**\*3** Baylis's negligence claims are divided into claims of negligent manufacture and claims of negligent failure to warn. As further described herein, the claims of negligent manufacture, as well as the claims of strict liability and breach of an implied warranty of merchantability, require proof that the fire extinguisher was defective at the time Red Lion delivered it to Honeywell. Baylis has failed to offer such proof.

*1. Negligence*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 3309613 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**\*3** "In order to prove a claim of negligence in the context of a products liability action alleging a manufacturing defect, the plaintiff must establish that the product was defective." *Joseph v. Jamesway Corp.,* No. Civ.A.93C-12-182-JO, 1997 WL 524126, at \*3 (Del.Super.Ct. July 9, 1997). Where there is no direct evidence of a manufacturing defect based on expert examination of the product, a plaintiff may make a circumstantial prima facie case that the product was defective by showing "(1) a malfunction and (2) evidence eliminating abnormal use or reasonable secondary causes for the malfunction." *Id.* at \*2. In the context of negligence claims, Delaware courts have held that "the plaintiff must establish that negligence is the only possible inference from the circumstantial evidence." *Joseph,* 1997 WL 524126, at \*3; *see also Ciociola v. Del. Coca-Cola Bottling Co.,* 172 A.2d 252, 257 (Del.1961). In the absence of evidence that a product was defective at the time of sale, "[s]ummary judgment is appropriate." *Dilenno v. Libby Glass Div.,* 668 F.Supp. 373, 377 (D.Del.1987).

**\*3** Requiring a plaintiff to eliminate "abnormal use or reasonable secondary causes for the malfunction" is a heavy burden. *See Joseph,* 1997 WL 524126, at \*3 ("[T]he burden is not light...."). In *Ciociola,* the plaintiff injured her hand when a soda bottle broke in her hand. 172 A.2d at 255. The Court upheld a directed verdict for the defendant because the plaintiff failed to eliminate the possibility that the bottle was damaged after it was delivered by the defendant to the store where the accident took place. *Id.* at 257-59. The Court concluded:

**\*3** [T]he record falls short of proving that there could have been no damage to the bottle in question following the approximate [sic] twenty or so hours after the latest possible delivery of the bottle by defendant's delivery man.... There is no precise proof as to the course through which the particular bottle went.... Under the circumstances, therefore, we think the plaintiff's conclusion that the bottle was delivered with a defect in it does not necessarily follow from the proof in this record.

**\*3** *Id.* at 258. The plaintiff's contention that her parents, the store owners, would have heard or noticed any post-delivery damage to the bottle as it

sat in the store was insufficient to support her claim. *See id.* at 254 ("From this, plaintiffs argue that the inference is that the bottled soda drinks had been handled with care .")

**\*4** In *Dilenno,* the court granted summary judgment for the defendant in a similar case because the plaintiff "produced no evidence of a manufacturing defect apart from the occurrence of the accident itself. This is wholly insufficient." 668 F.Supp. at 378. The plaintiff in that case failed to eliminate the possibility that a jar, which broke in her hand, was "dropped or mishandled" after it was delivered by the defendant. *Id.* at 379. Similar reasoning was applied in *Fatovic v. Chrysler Corp.,* No. Civ.A.00C08299 HLA, 2003 WL 21481012, at \*3 (Del.Super.Ct. Feb. 28, 2003) (granting summary judgment because the plaintiff "presented no evidence negating other reasonable causes" of a malfunction in the removable top of a Jeep) and in *Joseph,* 1997 WL 524126, at \*5 (granting summary judgment because of insufficient evidence showing that a stationary bicycle was defective when delivered).

**\*4** Here, in the absence of direct evidence from an expert that the extinguisher was defective,[FN2] Baylis must rely upon circumstantial evidence. She argues that she has shown the extinguisher malfunctioned and that she has eliminated other reasonable causes for the malfunction, leaving as the only possible inference that Red Lion provided an extinguisher that was defective on delivery. But, like the plaintiff in *Ciociola,* Baylis has failed to eliminate the possibility of damage during the time between delivery and the malfunction. After Red Lion delivered the extinguishers, they were transported to a storeroom (D.I. 43 at A14, A54-55), kept there overnight (*id.*), and again moved by Honeywell employees the next day to the area used for the demonstration (*id.* at A14-15, A52). Baylis's assertion that "[t]he extinguishers were not dropped or otherwise mishandled while in the care of Honeywell" (*id.* at 4) is not supported by the evidence she presents. McCarthy testified that, from conversations with his boss (*id.* at A14), he knew the extinguishers were in storage and that he did not know who moved them to the demonstration site because "it was a busy morning and [he] just

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 3309613 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

knew that somebody had to get the extinguishers out back" (*id.* at A16). McClain's affidavit states that he received the extinguishers on November 13, that they were placed in the storeroom, and that, "to the best of [his] knowledge," none were "dropped or damaged by any Honeywell employee." (*Id.* at A54.) Baylis's argument based on those statements are similar to the *Ciociola* plaintiff's argument that her parents would have heard or noticed any damage to the bottles during the hours before the accident. As in *Ciociola,* the evidence is insufficient to support the inference of defect. Baylis has presented "no precise proof as to the course through which the particular [extinguisher] went." *See Ciociola,* 172 A.2d at 258. The absence of proof on this essential element requires a grant of summary judgment. *See Dilenno,* 668 F.Supp. at 377.

> FN2. In fact, the evidence shows that no defect was found in the tagged extinguisher. Baylis's argument that the tagged device may not have been the one she used (*see* D.I. 43 at A13) still leaves her claims without direct evidence of defect.

### 2. *Strict Liability and Implied Warranty of Merchantability*

**\*5** Similarly, the claims for strict liability and for breach of an implied warranty of merchantability require Baylis to show that the extinguisher was in defective condition when it was delivered to Honeywell. *Reybold Group, Inc. v. Chemprobe Techs., Inc.,* 721 A.2d 1267, 1269 (Del.1998) (" [T]o be successful on a breach of warranty of merchantability claim, a plaintiff must prove ... [the goods] were defective at the time of sale...."); *Martin v. Ryder Truck Rental, Inc.,* 353 A.2d 581, 588 (Del.1976) ("Under the doctrine of strict liability ... [the defendant] may be held liable ... if the truck it placed in circulation proved to have a defect...."). Baylis rests her argument on the circumstantial proof of defect already discussed (D.I. 43 at 9-10), and the failure of that proof requires a grant of summary judgment on those claims as well.

**\*5** Accordingly, I will grant Red Lion's Motion on the negligent manufacture, strict liability, and implied warranty of merchantability claims.

### B. *Failure to Show a Negligent Failure to Warn*

**\*5** Baylis claims that Red Lion negligently failed to warn her of risks associated with using the fire extinguisher, and that this failure caused her injury. "Delaware has recognized a duty of care that sellers have to warn of known dangers associated with products they place on the market. A seller may have learned of such danger either through actual or constructive notice." *Smith v. Henry S. Branscome, Inc.,* No. 03-349, 2004 WL 2323634, at \*4 (D.Del. Oct. 8, 2004) (citing *Wilhelm v. Globe Solvent Co.,* 373 A.2d 218, 223 (Del.Super.Ct.1977)). A supplier has a duty to warn when it "knows or has reason to know that [the supplied product] is or is likely to be dangerous for the use for which it is supplied." *Betts v. Robertshaw Controls Co.,* No. Civ.A.89C-08-028, 1992 WL 436727, at \*2 (Del.Super.Ct. Dec. 28, 1992) (applying Restatement (Second) of Torts § 388).

**\*5** Baylis must show that Red Lion knew or had reason to know that the extinguisher was likely to be dangerous. Baylis never directly states what the known danger was, but she presumably bases her argument on the danger of carbon dioxide leaks. However, Baylis does not respond to Red Lion's argument that she has presented no evidence that Red Lion had actual or constructive knowledge of a danger from such leaks. *Cf. Betts,* 1992 WL 436727, at \*2 (denying summary judgment motion because the plaintiff presented some evidence showing that the defendant "should have known of the ... dangerous condition"). Accordingly, I will grant Red Lion's Motion on the failure to warn claim.

### C. *Failure to Show Applicability of Implied Warranty of Fitness*

**\*5** Finally, Baylis also claims that Red Lion breached an implied warranty of fitness for a particular purpose. Under the Delaware Uniform

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 5

Not Reported in F.Supp.2d, 2005 WL 3309613 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Commercial Code, a lessor may be liable for breaching this warranty if, at the time of contracting, the lessor has reason to know any particular purpose for which the goods are required and further knows that the lessee is relying on the lessor's superior skill to select goods for that particular purpose. 6 *Del.Code* § 2A-213; *see also Dilenno,* 668 F.Supp. at 376 (outlining the same elements for a warranty attaching to the sale of goods). This claim only arises when the goods are to be used for a special purpose particular to the individual user, not when the goods are used in their ordinary way. *Id.* at 376 (describing as "ridiculous" the argument that a jar was purchased for the particular purpose of opening and closing because that is "a jar's ordinary purpose"). In the absence of a special purpose, the remedy, if any, will be limited to one under the implied warranty of merchantability. *Id.* at 376-77.

\*6 Here, Baylis fails to show that Honeywell informed Red Lion of any use for the fire extinguishers beyond their ordinary use: extinguishing fires. Thus, Baylis's claim that Honeywell relied on Red Lion to provide extinguishers in proper working order does not invoke an implied warranty of fitness, but is instead a recasting of her implied warranty of merchantability claim. *See id.* Accordingly, I will grant Red Lion's Motion on the implied warranty of fitness claim.[FN3]

> FN3. Furthermore, even if Baylis had shown a special purpose, Honeywell did not rely on Red Lion's expertise because it told Red Lion exactly what type of extinguishers it wanted to rent (D.I. 39 at 12; D.I. 43 at 11).

### V. CONCLUSION

\*6 Based on the foregoing reasons and authorities, I will grant Red Lion's Motion for Summary Judgment. An appropriate order will issue.

*ORDER*

\*6 For the reasons set forth in the Memorandum Opinion issued in this matter today,

\*6 IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment (D.I.39) is GRANTED.

D.Del.,2005.
Baylis v. Red Lion Group, Inc.
Not Reported in F.Supp.2d, 2005 WL 3309613 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 2603661 (Trial Motion, Memorandum and Affidavit) Defendant's Reply Brief in Support of Motion for Summary Judgment (Sep. 9, 2005) Original Image of this Document (PDF)
• 2005 WL 2603837 (Trial Motion, Memorandum and Affidavit) Plaintiff's Reply Brief in Response to Defendant's Motion for Summary Judgment (Aug. 30, 2005) Original Image of this Document (PDF)
• 2005 WL 2385516 (Trial Motion, Memorandum and Affidavit) Defendant's Opening Brief in Support of Motion for Summary Judgment (Aug. 5, 2005) Original Image of this Document (PDF)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 2

# Westlaw.

Not Reported in A.2d                                                     Page 1

Not Reported in A.2d, 2003 WL 21481012 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

▷

Fatovic v. Chrysler Corp.Del.Super.,2003.Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Superior Court of Delaware.
Goran FATOVIC, et al., Plaintiffs,
v.
CHRYSLER CORPORATION, Baker Chrysler-Plymouth-Jeep-Eagle, Inc. and Chrysler Financial Company, L.L.C., Defendants.
**No. Civ.A. 00C08299 HLA.**

Submitted Nov. 12, 2002.
Decided Feb. 28, 2003.

Upon Defendants' Motions for Summary Judgment and Other Relief. Granted.

Darryl K. Fountain, Wilmington, Delaware, for Plaintiffs.
Michael J. Carlson, Anderson, Coe & King, Baltimore, for Defendants.

## ORDER

ALFORD, J.
**\*1** On this 28th day of February 2003, upon consideration of DaimlerChrysler Corporation, Baker Chrysler-Plymouth-Jeep-Eagle, Inc. and Chrysler Financial Company, L.L.C.'s ("Defendants" ) Motions for Summary Judgment and Other Relief, Goran Fatovic and Preciosa Fatovic's ("Plaintiffs") Response, and the oral argument heard on November 12, 2002, it appears to the Court that:

## FACTS

**\*1** This is a claim under various warranty and fraud theories against DaimlerChrysler Corporation, sued as Chrysler Corporation, ("Chrysler"), Baker Chrysler-Plymouth-Jeep Inc. ("Baker"), and Chrysler Financial Corporation ("CFC") based on

alleged defects existing in a 1999 Jeep Wrangler Sport ("Jeep") purchased by Plaintiffs. On or about August 7, 1998, Chrysler sold the Jeep to Butler. Co-defendant Baker subsequently obtained the Jeep from Butler in a swap of vehicles. Plaintiffs purchased the Jeep on or about May 26, 1999 from Baker. Plaintiffs previously owned two Jeep products, which they had purchased from Baker and went to Baker again knowing that they wanted to buy another Jeep. Plaintiffs do not remember anything about their dealings with Baker other than generally having a conversation with a Baker salesman and having taken a Jeep for a test drive. Plaintiffs purchased the Jeep for $21,935.00. Taxes and registration fees were $649.00. Plaintiffs made a cash deposit of $10,100.00 and received a credit of $3,435.00 on the trade-in of an old vehicle. Plaintiffs financed the balance owed ($9,049.00) with Co-Defendant CFC. The Jeep was sold with a limited express warranty, which requires Chrysler to bear the cost of repair of any defect in material, workmanship or factory preparation.

**\*1** Plaintiffs state that they returned the Jeep to Baker the same day that they purchased it and told the dealer that there was an air leak. This problem was solved by simply re-fastening the removable top to the Jeep properly. On June 14, 1999, Plaintiffs brought the Jeep to Baker, complaining that there was a water leak onto the right front floor. Baker identified and repaired an open seam in the cowl (a barrier between the engine compartment and the passenger area of the Jeep). There was no charge to the Plaintiffs. On June 21, 1999, Plaintiffs brought the Jeep to Baker, complaining that water was leaking under the heater duct. Baker identified the problem as a leaking evaporator box and repaired it. There was no charge to the Plaintiffs. On August 24, 1999, Plaintiffs brought the Jeep to Baker, complaining that the Jeep still had a water leak. Baker identified an apparent problem from the engine area into the passenger compartment and fixed it. There was no charge to the Plaintiffs. The last three leaks were from different parts of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                  Page 2

Not Reported in A.2d, 2003 WL 21481012 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

firewall, or the area between the engine and the passenger compartment. Subsequently, Plaintiffs discovered that water had leaked into the back of the Jeep, allegedly at the point where the removable hard top roof meets the body of the Jeep.

**\*2** At some point prior to November 4, 1999, Plaintiffs decided to rescind the sales contract and surrendered the Jeep for voluntary repossession. On November 15, 1999, the Jeep was picked up by Hatfield Auto Auction ("Hatfield"). Hatfield cleaned the Jeep for a charge of $70.00, but did no other work on the Jeep. On November 23, 1999, Plaintiffs, by their counsel, provided notice of Plaintiffs' recission of the sales contract. On December 2, 1999, the Jeep was sold at Auction for $16,600.00 to the Loman Auto Group ("Loman"), a dealership in Parsippany, New Jersey. Loman did a used car check on the Jeep to determine any problems and found none. On January 15, 2000, Loman sold the Jeep to Margaret O'Sullivan for the pretax amount of $19,539.00. With taxes and other fees, the cost was $21,019.14.

**\*2** Despite allegations made by Plaintiffs that the Jeep required major repairs, the facts reveal that the Jeep has been repurchased, without repair, and the current owner has experienced no leakage problems with the Jeep. Plaintiffs allege the following: Count 1) Breach of U.C.C. Express Warranty; Count II) Breach of U.C.C. Implied Warranty of Merchantability; Count III) Violation of the Magnuson-Moss Warranty Act-manufacturer's failure to fulfill its express warranty; Count IV) Violation of Magnuson-Moss Warranty Act-manufacturer's promise to repair most substantial nonconformities constitutes "deceptive warranties;" Count V) Violation of Magnuson-Moss Warranty Act-manufacturer's failure to comply with the implied warranty of merchantability; Count VI) Cancellation by Rejection; Count VII) Breach of Contract by failure to deliver and provide a vehicle fit for the ordinary purpose for which such goods are used; Count VIII) Breach of Contract-dealer's refusal or inability to effect proper repairs on said vehicle despite a multitude of service and repair visits; Count IX) Cancellation by Revocation of Acceptance; Count X) Rejection of Nonconforming Goods; Count XI) Vehicle sale has failed in its

essential purpose, in violation of 6 Del. C. sec 2-719(2); Count XII) Violation of Title 6, Chapter 50 Automobile Warranties; Count XIII) Consumer Fraud; and Count IVX) Deceptive Trade Practices.

## SUMMARY JUDGMENT

**\*2** Summary judgment is appropriate when the moving party has shown that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law.[FN1] In considering such a motion, the Court must evaluate the facts in the light most favorable to the non-moving party. [FN2] Summary judgment will not be granted under circumstances where the record reasonably indicates that a material fact is in dispute or if it seems desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances.[FN3]

> FN1. *Moore v. Sizemore,* 405 A.2d 679 (Del.Supr.1979).

> FN2. *Id.*

> FN3. *Ebersole v. Lowengrub,* 180 A.2d 467 (Del.Supr.1962).

## ANALYSIS

**\*2** Defendants first argue that they are entitled to judgment on all counts because (i) Plaintiffs do not have an expert to establish the existence of a defect in the Jeep and (ii) Plaintiffs made an election of remedies that excludes the possibility of an action against Defendants. Defendants argue that there is no material dispute of fact and therefore Defendants are entitled to judgment as a matter of law. Defendants state that it is undisputed that Ms. O'Sullivan still owns the Jeep and has never had problems related to water leaks of any sort. The Jeep now has 22,887 miles and has always been parked outside, either in her driveway or the commuter parking lot at the local train station. Defendants' expert will opine that the leakage was the result of the removable top being improperly placed or secured on the Jeep rather than as the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 3

Not Reported in A.2d, 2003 WL 21481012 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

result of any defect in the Jeep. Defendants state that while a manufacturing defect can sometimes be demonstrated by circumstantial evidence alone, this is permissible only where the manufacturer's fault is the only reasonable inference to be made from such evidence .[FN4] Defendants contend that the circumstantial evidence does not rule out the possibility of other explanations for the problem, such as improper placement of the removable top.

> FN4. *Joseph v. Jamesway Corporation,* 1997 Del.Super. LEXIS 264, C.A. No. 93c-12-182-JOH, (July 9, 1997)(citing *Ciociola v. Coca-Cola Bottling Co.,,* 172 A.2d 252, 257 (Del.Supr.1961); *Reybold Group, Inc. v. Chemprobe Technologies, Inc.,* 721 A.2d 1267, 1270 (Del.Supr.1988) (summary judgment appropriate where circumstantial evidence did not negate other possible causes).

**\*3** Plaintiffs argue that the fact that they do not have an expert does not bar their claims. The Delaware Supreme Court has held that some breach of warranty claims do not require expert testimony.[FN5] If the matter in issue is one within the common knowledge of laymen, introduction of expert testimony is not required.[FN6] However, the Superior Court's granting of Defendant's Motion for Summary Judgment in *Reybold* was affirmed by the Supreme Court which held that the Plaintiff could not maintain an action for breach of implied warranty of merchantability in the absence of expert testimony or circumstantial evidence that the product was defective.[FN7] Plaintiffs attempt to distinguish *Reybold* stating that it is a personal injury case involving an automobile accident. However, Plaintiffs misstate the case. *Reybold* involves a possible building leak, subsequent repair of the brick work and resulting noxious odor from a water repellant product which was used.[FN8] The Plaintiff suffered a disruption of business and out of pocket expenses as the company was forced to relocate, due to health concerns, for over two months while the odor dissipated.[FN9] The Plaintiff in *Reybold,* failed to establish a *prima facie* case through circumstantial evidence of a defect.[FN10] The Court emphasized that for circumstantial

evidence to support a *prima facie* case that there was a breach of implied warranty of merchantability, then Plaintiff's evidence must, " tend to negate other reasonable causes of the injury sustained or there must be expert opinion that the product was defective." [FN11]

> FN5. *Reybold Group, Inc., v. Chemprobe Technologies, Inc.,* 721 A .2d 1267, 1269 (Del.Supr.1998).
>
> FN6. *Id.*
>
> FN7. *Id.*
>
> FN8. 721 A.2d at 1268.
>
> FN9. *Id.*
>
> FN10. *Id.* at 1270.
>
> FN11. *Reybold Group, Inc., v. Chemprobe Technologies, Inc.,* 721 A.2d 1267, 1270 (Del.Supr.1998)(quoting *American Family Mutual Ins. Co. v. Sears, Roebuck & Co.,* 998 F.Supp. 1162, 1164 (D.Kan.1998).

**\*3** In the instant case, Plaintiffs have presented no evidence negating other reasonable causes, such as misplacement of the removable top. Plaintiffs argue that they owned two other Jeeps and therefore know how to properly place the top and that this circumstantial evidence rules out the Defendants' proposed explanation for the leak. However, during his deposition, Mr. Fatovich stated that he had never taken the roof off of the previous Jeeps. Also, the Plaintiffs initial complaint regarding an air leak, was easily remedied when the top was simply re-fastened at the dealership. Plaintiffs return to the dealership for the "repair" of this air leak indicates a lack of knowledge by the Plaintiffs on how to properly place the Jeep top. Furthermore, the present owner has never had a leak problem, despite the fact that the Jeep was not repaired since the voluntary repossession. Here, as Defendants argue, Plaintiffs have failed to establish an essential element of its cause of action for a breach of implied warranty of merchantability through the use

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                 Page 4

Not Reported in A.2d, 2003 WL 21481012 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

of either circumstantial evidence or expert testimony. A manufacturing defect in the Jeep has not been successfully established through the circumstantial evidence presented by Plaintiffs, and no expert has been provided.

*3 Additionally, as Chrysler points out, Plaintiffs rescinded their purchase contract with Baker and did so prior to notifying Chrysler. Thus, Plaintiffs made an election of remedies and may not pursue other remedies against Chrysler that are inconsistent with this choice. The Supreme Court has stated that the, "doctrine of election of remedies is based on ' any decisive act of a party, with knowledge of his rights and of the facts, indicating an intent to pursue one remedy rather than the other." ' [FN12] This doctrine can be used to bar claims against other parties,[FN13] or additional claims against the same party.[FN14] In the instant case, Plaintiffs made a decisive act by rescinding the purchase contract and thus, are barred from pursuing other claims based on their ownership of the Jeep or their rights under the rescinded purchase contract.[FN15] Plaintiffs argue that an election of remedies is not required under the UCC and the Lemon Law in Delaware as the remedies are cumulative. However, Plaintiffs have not established the existence of a defect in order to enable Plaintiffs recourse under these statutes.

FN12. *Stoltz Realty Co. v. Raphael,* 458 A.2d 21, 23 (1983) (citation omitted).

FN13. *Id.*

FN14. *Simmons v. Brooks,* 66 A.2d 519 (D.C.1949).

FN15. *Id.*

*4 With regard to the express warranty claims (Count I) Chrysler and CFC had no contact with the Plaintiffs at or before the purchase of the Jeep, and thus no express warranties were provided other than the written, limited warranty provided with the Jeep. Defendants further separate arguments are discussed below.

*Defendant Chrysler's Arguments*

*4 With regard to the Magnuson-Moss Act claims (Counts III-V) Chrysler argues that 1) Plaintiffs failed to use Chrysler's dispute resolution system and, thus, have no right to pursue an action under the Act; 2) There is no private cause of action for deceptive warranties under the Act; and 3) Chrysler did not violate its express warranty or the implied warranty of merchantability and, thus, did not violate the Act in any event. Plaintiff argues that there is not a qualifying arbitration mechanism for the dispute resolution under Delaware Law. The Court finds that Chrysler did not violate either the express or implied warranties as noted above, since a defect has not been sufficiently established by the Plaintiff.

*4 Chrysler correctly contends that Count X & XI should be stricken because they are based on title 6, sections 2711 and 2719(2) of the Delaware Code, which provide for no cause of action, but rather describes remedies available to the Plaintiffs.

*4 Chrysler argues that it is entitled to judgment on Plaintiffs' Lemon Law Claim (Count XII). Under Delaware's Lemon Law, Title 6, Chapter 50, four attempts for the same problem are required to create a presumption that the consumer can recover. Further, the consumer cannot benefit from such a presumption unless the manufacturer has received " prior direct written notice." [FN16] In the present case, although Plaintiffs allege that the vehicle was brought in for repair four times for the same defect, the first time was on the day of purchase for an air leak and the last three times were for water leaks. Defendants argue that the water and air leaks are separate issues. However, despite this factual dispute, Plaintiffs never sent the required notice, until after the Jeep was voluntarily repossessed.

FN16. *See* Del.Code Ann. tit 6 § 5004(b).

*4 Plaintiffs also argue that under the Lemon Law, the issue before the Court is whether there's been reasonable opportunity to repair.[FN17] The *Bouchard* court held that the principal question is whether the automobile continually malfunctions.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                 Page 5

Not Reported in A.2d, 2003 WL 21481012 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

The court stated, "[i]t matters not that Defendants now claim that the vehicle has been fixed and is in superior condition." [FN18] However, in the instant case, Defendants are not claiming that the Jeep has been fixed. They are stating that it has not been fixed subsequent to Plaintiffs' ownership, that there have been no reported leakage problems, and the evidence suggests that the problem could likely be an improper fastening of the removable top.

> FN17. *Bouchard v. Savoca, D/B/A R-S Motor Sales,* 493 N.Y.S.2d 417 (N.Y.Sup.Ct.1985).

> FN18. *Id.* at 418. *See, also, Muzzy v. Chevrolet Division, General Motors Corp.,* 571 A.2d 609 (Vt.1989), *Pecor v. General Motors Corp.,* 150 Vt. 23, 547 A.2d 1364 (1988).

**\*4** Chrysler also argues that there is no evidence to support Plaintiff's claim of consumer fraud (Count XIII). The Consumer Fraud Act, title 6, section 2513 of the Delaware Code, makes it unlawful for any person to engage in any "deception, fraud, false pretense or concealment, suppression or omission, in connection with the sale or advertisement of any merchandise ..." Plaintiffs have shown no evidence that Chrysler had any knowledge of any problems prior to selling the Jeep.

**\*5** Finally, Chrysler argues that the evidence does not support Plaintiff's Deceptive Trade Practices Claim (Count XIV). There is no evidence that Chrysler engaged in any deception in this case, let alone a pattern of deception, as would be required to create a cause of action. [FN19] Plaintiff concedes that this count is "probably not within the mainstream of the law." [FN20]

> FN19. *Wald v. Wilmington Trust Co.,* 552 A.2d 853 (Del Super.Ct.1988).

> FN20. Transcript of November 12, 2002, Summary Judgment Motions at 7.

> *Defendant Baker's Arguments*

**\*5** Baker also alleges that it made no express warranty to the Plaintiff. Alternatively, Baker points out that Delaware law permits an express warranty to be disclaimed by the seller of a product. [FN21] In this case, the sales contract stated the Jeep was being sold "as is." Thus, Baker argues that there are no facts to support an express warranty claim against Baker. Baker also argues that it is entitled to judgment as to Plaintiff's claim for breach of implied warranty of merchantability. In order to establish a breach of implied warranty of merchantability under section 2-316 Plaintiffs must initially establish that the Jeep was 1) sold by a merchant, 2) the Jeep was not merchantable at the time of sale, 3) the Plaintiffs suffered an injury, 4) proximately caused by a defect, and 5) Plaintiffs provided notice to seller of injury. [FN22] Baker does not agree that the Jeep was defective, however, even if a defect were present, Baker was not put on notice of the problem and thus was given no opportunity to cure.

> FN21. Del.Code Ann. tit 6 § 2316.

> FN22. *Reybold Group, Inc. v. Chemprobe Technologies, Inc.,* 721 A .2d 1267, 1270 (Del.Supr.1998).

**\*5** Baker argues that Counts VI, IX and XI should be dismissed or stricken as they do not state a cause of action. As discussed above, the code sections relied upon are merely remedies available to Plaintiffs in the event they establish a cause of action under a section in the U.C.C. Additionally, Counts VI and IX allege a defect which has not been established in the instant case.

**\*5** Baker asserts that it is entitled to judgment on Plaintiffs claims for breach of contract, Counts VII and VIII, because Plaintiffs made an election of remedies to rescind the contract and in any event there was no breach.

**\*5** Baker argues that the Lemon law claim, Count XII, should be dismissed as it relates to Baker because the law provides a remedy for purchasers of defective vehicles against the manufacturer, not the automobile dealership.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2003 WL 21481012 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

**\*5** Baker again agrees with Chrysler in stating that
Baker is also entitled to summary judgment on
plaintiffs' claims of consumer fraud, Count XIII,
and deceptive trade practices, Count XIV.

### Defendant CFC's Arguments

**\*5** CFC asserts that any alleged liability on its part
is premised on the Federal Trade Commission's
Holder in Due Course Rule. This Rule allows a
plaintiff to pursue a claim against CFC for up to the
amount of any payment made by the plaintiff to
CFC. CFC will be deemed liable under the same
circumstances as the seller of the vehicle; in this
case Baker. CFC realleges and incorporates all the
above arguments for summary judgment.

### Conclusion

**\*5** Underlying all of Plaintiffs' claims against all of
the Defendants is the premise that the Jeep was
defective in some material way. As the alleged
defect has not been established through the
circumstantial evidence presented by Plaintiffs, and
no expert has been provided, there is no basis for
any of the claims. Thus, as a matter of law,
Plaintiffs can not prove a defect.

**\*6** For the aforementioned reasons, Defendants'
Motions for Summary Judgment are GRANTED.

**\*6** IT IS SO ORDERED.

Del.Super.,2003.
Fatovic v. Chrysler Corp.
Not Reported in A.2d, 2003 WL 21481012
(Del.Super.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 3

## Westlaw.

Not Reported in A.2d                                    Page 1

Not Reported in A.2d, 1997 WL 524126 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

**C**

Joseph v. Jamesway Corp.Del.Super.,1997.Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Superior Court of Delaware.
Harry JOSEPH and Brenda JOSEPH, individually and as husband and wife, Plaintiffs,
v.
JAMESWAY CORPORATION, a Delaware corporation, and ROADMASTER CORPORATION, a Delaware corporation, Defendants.
**No. Civ.A. 93C-12-182-JO.**

July 9, 1997.

Elwood T. Eveland, Jr., Woloshin, Tenenbaum & Natalie, P.A., for Plaintiffs.
Francis J. Jones, Jr., and Eileen K. Andersen, of Morris, James, Hitchens & Williams, for Defendant Roadmaster Corporation.

### *MEMORANDUM OPINION*

HERLIHY, Judge.
**\*1** Defendant Roadmaster Corporation has moved for summary judgment in this personal injury action. Plaintiff Harry Joseph claims he was riding a stationary bicycle, manufactured by Roadmaster, when it broke and he fell.

**\*1** The bicycle was returned to the store from which it had been purchased. It has now disappeared. Joseph's expert, thus, has been unable to examine it. Joseph has brought an action for negligence and breach of warranty. The expert has offered testimony about possible design and/or manufacturing defects in the bicycle.

**\*1** Roadmaster contends those opinions establish neither negligence nor proximate cause. It also argues that since the bicycle has been lost and is unavailable for examination, plaintiffs cannot maintain their claims. The issues are whether Joseph has shown there is a genuine issue of material fact on the issues of negligence or breach of warranty and the impact on the lost bicycle to Joseph's claims.

### *FACTS*

**\*1** Joseph injured his knee in an industrial accident in June 1991, ultimately resulting in knee cap replacement surgery. In 1992, as part of Joseph's continuing rehabilitation, Joseph's physician prescribed that Joseph ride an exercise bicycle for fifteen minutes, twice a day. With the approval of the worker's compensation adjuster, a stationary bicycle was purchased from Jamesway Corporation [FN1] and, on April 15, 1992, delivered to Joseph. With his family's help, Joseph assembled the bicycle.

> FN1. Jamesway was one of the two original defendants. It is no longer in the case.

**\*1** On June 22, 1992, Joseph was riding the stationary bicycle when he heard a crack and then fell backwards onto a basket full of clean towels. He alleges that he injured himself in the fall.

**\*1** Joseph's wife returned the bicycle to Jamesway and exchanged it for a new one. The broken bicycle was discarded before it could be inspected. It has never been recovered.

**\*1** Joseph's expert, Dr. Lacek, has now been deposed. Because of the importance and length of his deposition testimony to the issues raised in the current motion, the Court will cite and discuss it in greater detail later in this decision.

### *STANDARD OF REVIEW*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                Page 2

Not Reported in A.2d, 1997 WL 524126 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

**\*1** Summary judgment is proper when there are no genuine issues of material fact and the defendant is entitled to judgment as a matter of law.[FN2] The Court must view the evidence in a light most favorable to the non-moving party. [FN3] If there is no material factual issue, the defendant is entitled to summary judgment.[FN4]

> FN2. *Merrill v. Crothall-American, Inc.,* Del.Supr., 606 A.2d 96, 99-100 (1992).

> FN3. *Billops v. Magness Const. Co.,* Del.Supr., 391 A.2d 196, 197 (1978).

> FN4. *Pierce v. International Ins. Co. of Ill.,* Del.Supr., 671 A.2d 1361, 1363 (1996).

### DISCUSSION

#### Manufacturing Defect

**\*1** During oral argument and throughout this litigation, Joseph maintains that his claim involves both a design defect and a manufacturing defect. The substance of Joseph's expert's views, however, is that there was more likely a manufacturing defect than a design defect. In large part, he bases that view on the testimony of two of Roadmaster's employees. Their deposition testimony was that there had been no breakage of the seat pole, such as allegedly occurred here, on similar model bicycles.

**\*1** The Court's analysis, therefore, will first focus on the claim of a manufacturing defect. Roadmaster argues Joseph's claim is barred outright because of the disposal of the bicycle in question. It also contends that the record shows there is insufficient evidence of a manufacturing defect.

#### Loss of Bicycle

**\*2** Roadmaster argues in favor of a *per se* rule that loss of the bicycle results in dismissal of Joseph's claim. There is some authority in manufacturing defect cases to support this argument but the Court's analysis of case law in this area suggests a *per se*

rule is too harsh.

**\*2** In *Troy v. Kampgrounds of America, Inc.*[FN5], there was an explosion of a propane gas tank that was connected to several washing machines. Several official investigators examined the various remains right after the explosion, along with an investigator from the gas supplier. Several days after the explosion, the remains of the various equipment were destroyed. No plaintiff or defendant expert examined any part of the appliances.

> FN5. Pa.Super., 399 Pa.Super. 41, 581 A.2d 665 (1990).

**\*2** That inability was a factor in the trial court's award of summary judgment in favor of the defendants. However, employing a "malfunction" theory of products liability, that court held the trial court's award of summary judgment was in error. Such a theory allows a *prima facie* case to be made where there is (1) a malfunction and (2) evidence eliminating abnormal use or reasonable secondary causes for the malfunction.[FN6] This appears to be a circumstantial means of showing defect.

> FN6. Troy, 581 A.2d at 668.

**\*2** *Troy* is of limited value in the sense that the trial court appeared to have ignored that plaintiffs' expert opinion about the explosion's cause. Inferentially, however, the value is the plaintiffs were allowed to proceed even though no expert for any *party* saw the devices at issue.

**\*2** In a case involving a shattered coffee pot, the broken glass portions were lost by the plaintiffs or their counsel.[FN7] This loss prevented General Electric from preparing a defense and possibly suing one of the six or so suppliers of the glass component of the pot. The court quoted language from the unreported case of *Martin and Greenspan v. Volkswagon of America* [FN8]:

> FN7. *Roselli v. General Electric Co.,*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 1997 WL 524126 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

> Pa.Super., 410 Pa.Super. 223, 599 A.2d
> 685 (1991).
>
> FN8. E.D.Pa., No. 88-8261, 1989 WL
> 81296 (July 13, 1989).

**\*2** The defendant has been deprived of the opportunity to have an expert examine the car and to testify if appropriate, that a defect did not cause the Audi to malfunction. Therefore, the plaintiffs should not be permitted to proceed without producing the vehicle.

**\*2** To permit claims of defective products where a purchaser of the product has simply thrown it away after an accident, would both encourage false claims and make legitimate defense of valid claims more difficult. It would put a plaintiff (or a plaintiff's attorney) in the position of deciding whether the availability of the item would help or hurt his or her case. Where producing the product for defense inspection would weaken rather than strengthen a case, we unfortunately are obliged to conclude that some plaintiffs and attorneys would be unable to resist the temptation to have the product disappear.FN9

> FN9. *Roselli,* 599 A.2d at 687-88.

**\*2** The court went on to discuss the malfunction theory of recovery but in the context of recovery under strict liability.FN10 Delaware does not recognize or allow recovery for strict liability in sales.FN11

> FN10. *Id.* at 688.
>
> FN11. *Cline v. Prowler Industries of Maryland, Inc.,* Del.Super., 418 A.2d 968 (1980).

**\*3** In another case, where a sample of an "exploding " drain cleaner could not be provided, the court said summary judgment, under *Roselli,* would be awarded to the cleaner manufacturer.FN12

> FN12. *Lee v. Boyle-Midway Household Products, Inc.,* W.D.Pa., 792 F.Supp. 1001, 1006 (1992); accord *Bardaji v. Flexible Flyer Co.,* E.D.Pa., C.A. No. 95-CV-0521, McGlynn, J. (September 25, 1995) (1995 WL 568483) (sled broke but was returned to resort renting agency and was not produced).

**\*3** In *Dilenno v. Libbey Glass Div., Owens-Illinois, Inc.*FN13, the plaintiff bought a glass jar containing candy and peanuts. It was used for several days. While attempting to refasten its cork lid, the jar shattered and the plaintiff cut her wrist. Co-workers threw out the glass pieces.

> FN13. D.Del., 668 F.Supp. 373 (1987).

**\*3** Experts for both parties examined similar jars and found no defects. The court noted that such absence did not mean there were no manufacturing defects. It noted, however, that the plaintiff had the burden of proving a defect. It did not dismiss the plaintiff's action based alone on the absence of the glass jar pieces.FN14

> FN14. Dilenno, at 378.

**\*3** In this case, there is no suggestion that the return of the bicycle to Jamesway was for an evil or other improper motive. A replacement bicycle was obtained. Nor does it appear, based on the record to date, that Joseph's injuries immediately manifested themselves to any great degree alerting him to the need to take protective measures about the bicycle.

**\*3** For these reasons, the Court is reluctant to adopt a bright line rule that loss of evidence in a products liability case compels dismissal. The Court concurs that there are occasions where a plaintiff may be able to circumstantially prove a negligence case involving a manufacturing defect even where the product is lost or destroyed. Of course, the burden is not light; the plaintiff must establish that negligence is the only possible inference from the circumstantial evidence.FN15

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 1997 WL 524126 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Page 4

FN15. *Ciociola v. Coca-Cola Bottling Co.,*
Del.Supr., 172 A.2d 252, 257 (1961).

*Evidence of Manufacturing Defect*

**\*3** Negligence is never presumed. It must be
proven.[FN16] Ordinarily, questions of negligence
are not decided on motions for summary judgment
but are left for the trier of fact.[FN17] Where
undisputed facts compel only one conclusion,
however, the Court has the duty to enter a judgment
accordingly. [FN18]

FN16. *Wilson v. Derrickson,* Del.Supr.,
175 A.2d 400, 401-02 (1961).

FN17. *Roper v. Stafford,* Del.Supr., 444.
A.2d 289, 291 (1982).

FN18. *Faircloth v. Rash,* Del.Supr., 317
A.2d 871, 871 (1974).

**\*3** In order to prove a claim of negligence in the
context of a products liability action alleging a
manufacturing defect, the plaintiff must establish
that the product was defective.[FN19] Where a
plaintiff is attempting to prove negligence
circumstantially, he must establish that negligence
is the only possible inference.[FN20] If the
defendant can demonstrate the complete failure of
proof concerning an essential element of the
plaintiff's case, such as the existence of a defect,
summary judgment is warranted.[FN21]

FN19. *Farm Family Mutual Ins. Co. v.
Perdue, Inc.,* Del.Supr., No. 416, 1990,
Walsh, J. (January 2, 1992) (ORDER).

FN20. *Ciociola,* 172 A.2d at 257.

FN21. *Garneski v. Martin,* Del.Super.,
C.A. No. 86C-OC-196, Del Pesco, J.
(March 1, 1990) (*citing Celotex Corp. v.
Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91
L.Ed.2d 265 (1987)).

**\*3** Joseph must present some evidence of a

manufacturing defect at the time of delivery to
Jamesway.[FN22] Joseph's expert testified in his
deposition as follows:

FN22. *Kates v. Pepsi Cola Bottling Co. of
Salisbury, Md.,* Del.Super., 263 A.2d 308,
311 (1970).

**\*3** Q. Now, I think you told me earlier you think
there was a defect in the manufacturing of the
product?
**\*3** A. Yes. I believe I answered why on the basis for
that.
**\*3** Q. Because if failed under normal, expected
conditions?
**\*3** A. That was part of the answer, yes. The second
part was the deposition testimony, where neither of
the two gentlemen from Roadmaster testified, that
they were aware of a rash of these kinds of failures.
And my earlier response to that line of questioning
was, that leads me to believe we are dealing more
with a rogue.

**\*4** Q. I started by asking you: Do you know what
was the manufacturing defect? Why the bicycle
failed? And I think you said, No, you didn't,
because you did not have enough information. Is
that accurate?
**\*4** A. Yes.

**\*4** Q.... You can't specify for me the fractures or the
deformities on the bicycle after the incident, other
than in an area near [the seat post] all you know is
that it was deformed in some way?
**\*4** A. No. All I know is it broke.
**\*4** Q. You don't know how it broke.
**\*4** A. Since I don't have the pieces, no. All I know,
I have, essentially, a new unit that was under
maximum load being used within the prescribed
time frame and frequency of the manuals, and it
failed.
**\*4** Q. But you can't describe for me the specific
deformities or fractures; is that fair?
**\*4** A. That's correct. I can describe for you various

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                      Page 5

Not Reported in A.2d, 1997 WL 524126 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

ones. Are they applicable in this one? I can't say.

**\*4** Q. The second part of your conclusion, the bicycle was defective is a manufacturing defect; correct?
**\*4** A. When this report was prepared, yes. If I had strictly this report to go on, without noting else, absolutely a manufacturing defect.
**\*4** Q. But you can't tell me what the specific manufacturing defect is, other than it failed?
**\*4** A. In this particular case, yes. Seat post was too weak. It failed. But I can't tell you why it failed. I can tell you it should not have failed.

**\*4** Q. In other words, you can't tell me specifically what caused it. Just that it happened?
**\*4** A. Based on your line of questioning, yes.
**\*4** Q. And what is in the report?
**\*4** A. Yes.
**\*4** Q. Well, your answer troubles me, I thought I asked the question enough times.
**\*4** A. To say that I don't know specifically the mode of failure?
**\*4** Q. Right.
**\*4** A. That's correct

**\*4** Q. Were any tests ever done on [an exercise bicycle] or any other similar model?
**\*4** A. Not on thatexhibit; nor of any additional parts. What I was going to do is buy a bunch of seat posts.
**\*4** Q. That has not been done?
**\*4** A. No.
**\*4** Q. Is that being contemplated?
**\*4** A. It was contemplated.
**\*4** Q. Why was it rejected?
**\*4** A. Because the fracture or the exact parts that failed weren't available. I couldn't determine the mode of failure. Then I, therefore, can't determine the mode of loading under which it failed. Therefore, any testing I do, would be, essentially, erroneous. All I would be able to do is to be able to perform a different series of tests under load

conditions, under different directions, and set up what I will call a matrix. That's all as far as I could ever go with it.
**\*4** Q. Did you get that far?
**\*4** A. No. No testing was done.[FN23]

> FN23. Lacek deposition at 59-60, 62-63, 67-68, 73-74, 102-103, 29-30.

**\*4** This testimony and Joseph's version of how the bicycle seat pole broke are strikingly similar to the record before the Court in *DiIenno:*
**\*4** The sum total of DiIenno's evidence on this issue consists of her deposition testimony of the circumstances surrounding the accident and an expert report concluding that the jar was defective. At her deposition, DiIenno gave a detailed account of the jar's shattering, but she offered no explanation as to what caused the jar to shatter or how the jar was defective. The report of her expert concludes that the jar must have been defective to shatter the way it did. However, this conclusion was not based on scientific tests or data but solely on DiIenno's account of the accident and the assumption that the jar must have been defective because it shattered. Thus, DiIenno has produced no evidence of a manufacturing defect apart from the occurrence of the accident itself. This is wholly insufficient.[FN24]

> FN24. *DiIenno,* 373 A.2d at 378.

**\*5** This Court has said that while the inability to produce and test the broken bicycle is not *per se* fatal to Joseph's claim, his circumstantial evidence case must be that negligence is the only possible inference from the circumstantial evidence.[FN25]

> FN25. *Ciociola,* 172 A.2d at 257.

**\*5** In short, viewing the evidence in a light most favorable to him, all Joseph has shown is that the bicycle broke but no other Roadmaster bicycles broke. This is no more than conjecture or, at most,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                   Page 6

Not Reported in A.2d, 1997 WL 524126 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

a possibility. That is insufficient even to survive a motion for summary judgment.[FN26]

> FN26. *Phillips v. Delaware Power & Light Co.,* Del.Supr., 216 A.2d 281, 284 (1966).

**\*5** Therefore, as to a claim of a manufacturing defect, Roadmaster's motion for summary judgment must be **GRANTED**.

### *Design Defect*

**\*5** As noted, Joseph has also alleged there was a design defect in the bicycle.

### *Inability to Produce Bicycle*

**\*5** The inability to produce the product used is less important, if important at all, on a claim of a design defect. Such a defect implicates a product line flaw. Thus, Joseph's inability to produce the bicycle is less critical to his case.[FN27]

> FN27. *DiIenno,* 668 F.Supp. 373; *Evans v. FMC Corp.,* Del.Super., C.A.No. 89C-AU-27, Graves, J. (March 9, 1992); *Giordano v. The Firestone Tire & Rubber Co.,* N.D.Ill., No. 83C1298, Decker, J. (April 25, 1985) (1985 WL 1000).

### *Evidence of Design Defect*

**\*5** In his deposition testimony, Joseph's expert stated:
**\*5** Q. Your quarrel with the design is that there was no testing using the dynamic or cyclic loading. Is that what you are saying?
**\*5** A. Dynamic or cyclic loading.

**\*5** Q. So your complaint with the design of this product is that there is no evidence to you that it was ever tested with, basically, the pedals moving?
**\*5** A. Tested under greater than anticipated load conditions and at maximum rated load conditions to failure.

**\*5** Q.... So, the design defect, in your opinion, is the failure to test?
**\*5** A. that's were I would hold it. Yes.
**\*5** Q. Any other design defect with respect to this product ... or the bicycle involved in the incident itself?
**\*5** A. I would have to say, no.

**\*5** A. So, we are both clear, and you have a complete answer. Since I don't have the bicycle, I can't say even there was a design defect in what I will call insufficient or incomplete test program. Did it have a bearing on this accident? That, I don't know.

**\*5** Q.... I think you told me today, as a result of reading Mr. Craig's and Mr. Wilkerson's depositions and seeing their exhibits, that you now have an opinion with respect to design that we have already gone over?
**\*5** A. We have gone over, and I have also said, yes. I regard that as a design defect as part of the designs or the testing of the product. I also said, I can't tell you that had any bearing. I suspect it may have, but I can't say.

**\*5** Q. One area I want to make sure I'm clear on, because I'm confused. You have told us about an opinion with respect to design defect. Are you prepared to testify at this point that that design defect caused the incident with Mr. Joseph?
**\*6** A. I would have to say, no, for the reasons I explained earlier. [FN27] ?

> FN27. Lacek deposition at 56-57, 59, 72, 77 and 104.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 8 of 9

Not Reported in A.2d                                                                Page 7

Not Reported in A.2d, 1997 WL 524126 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

**\*6** There are two issues raised in this testimony. One, is there a cause of action for failure to test? Second, and more importantly, does this testimony demonstrate that Joseph cannot satisfy the proximate cause element of his claim?

**\*6** As to the first issue, there is no separate cause of action for failure to test.

**\*6** In *Kociemba v. G.D. Searle & Co.*[FN28], the court refused to permit a claim based solely on the failure to test. The court explained why the failure to test cannot stand as an independent cause of action.

> FN28. D.Minn., 707 F.Supp. 1517 (1989).

**\*6** Presumably, the reason that manufactures are under a duty to test their products is to discovery defects or dangers associated with use of the products. Once the manufacturer has discovered a defect or danger the manufacturer should either change the product's design or manufacturing process, or warn consumers of the danger associated with using the product.

**\*6** Thus, unless the manufacturer's breach of its duty to test leads the manufacturer to produce a product that is defective in design, manufacture, or warning, no injury can result. If the manufacturer designs the product safely, manufactures the product safely, and provides an adequate warning of dangers inherent in the use of the product, then a failure to test the product cannot, standing alone, cause any injury. The duty to test is a subpart of the other three duties because a breach of the duty to test cannot by itself cause any injury.[FN29]

> FN29. *Id.* at 1527.

**\*6** In *Adams v. G.D. Searle & Co., Inc.,* the plaintiff alleged negligence in the defendant's failure to test the product. The court adopted the reasoning of *Kociemba* and found that "a manufacturer's duty to inspect and test is not a separate cause of action. The duty to test ... is a subpart of a manufacturer's duty to design a product with reasonable care, and

thus is subsumed in the plaintiff's claims for defective design and failure to warn." [FN30]

> FN30. Fla.App., 576 So.2d 728, 730-31 (1991).

**\*6** It is unclear from the expert's testimony that he considers the extent of Roadmaster's testing to be a failure to safely design the bicycle or a failure to warn potential users. While no discrete claim for failure to test will be recognized, for purposes of this motion, the Court will classify his opinion as coming within either the duty to design safely or the duty to warn.

**\*6** But, Joseph's claim must fail for a more fundamental reason. As with negligence, the issue of proximate cause is ordinarily one for the jury. [FN31] As part of his claim, Joseph must show there is a proximate cause between Roadmaster's negligence and his injuries.[FN32]

> FN31. *In re: Asbestos Litigation Pusey Trial Group v. Owens-Corning Fiberglas Corp.,* Del.Supr., 669 A.2d 108, 113 (1995).
>
> FN32. *Culver v. Bennett,* Del.Supr., 588 A.2d 1094, 1097 (1991).

**\*6** Joseph's expert testified that the design defect he claimed existed did not cause, or he could not say it caused, the injuries sustained. Without that linkage, Joseph's claim fails. For that reason, Roadmaster's motion for summary judgment on the grounds of a design defect must be **GRANTED**.

*Breach of Warranty*

**\*6** Joseph also made claims of breach of express warranty, breach of warranty of merchantability and breach of warranty of fitness for a particular purpose. Joseph's claims are based on the claim that the bicycle was defective. [FN33] Because Joseph cannot demonstrate that the bicycle was defective and/or that there was a defect [FN34] which

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                Page 8

Not Reported in A.2d, 1997 WL 524126 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

caused injury, the claims for breach of warranty
must fail. Defendants motion for summary
judgment, as to the claims for breach of warranty, is
**GRANTED**.

> FN33. Complaint at ¶ 16.

> FN34. *Towe v. Justis Brothers, Inc.,*
> Del.Super., 290 A.2d 657, 658 (1972) and
> *DiIenno,* 668 F.Supp. at 377.

*CONCLUSION*

**\*7** For the reasons stated herein, the motion of
defendant Roadmaster Corporation is **GRANTED**.

**\*7 IT IS SO ORDERED.**

Del.Super.,1997.
Joseph v. Jamesway Corp.
Not Reported in A.2d, 1997 WL 524126
(Del.Super.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 4

## Westlaw.

Not Reported in A.2d                                                                     Page 1

Not Reported in A.2d, 1997 WL 524127 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

**H**
Heronemus    v.    UlrickDel.Super.,1997.Only    the
Westlaw citation is currently available.
UNPUBLISHED    OPINION.    CHECK    COURT
RULES BEFORE CITING.
Superior Court of Delaware.
William M. **HERONEMUS** and Catherine A.
**HERONEMUS**, Plaintiffs,
v.
Charles **ULRICK** and Karen **ULRICK** t/a BLUE
WATER HOUSE BED & BREAKFAST, A.
Judson BENNETT, Kent BUCKSON and
ENTERTAINMENT & LEISURE USA, INC., a
Florida corporation, Defendants.
**No. Civ.A. 97C-03-168-JO.**

July 9, 1997.

David Roeberg, of Roeberg, Moore & Associates,
P.A., for plaintiffs.
Roger D. Landon, and Mary Anne McLane, of
Murphy, Welch, Spadaro & Landon, for defendant
A. Judson Bennett.
David P. Buckson, of Camden Delaware, for Kent
Buckson.

### *MEMORANDUM OPINION*
HERLIHY, Associate Judge.
**\*1** Defendants Kent Buckson and A. Judson
Bennett are the directors of Krazy Games, Inc., a
Delaware corporation.[FN1] The corporation leased
games for different events. Among the games were
inflatable sumo wrestler suits, which contestants
would wear and then bounce into one another, as
well as the game, which is the focus of this lawsuit,
the velcro wall. Contestants in this game would put
on a suit made of velcro and then jump off an
inflatable    springboard    onto    a    velcro    wall,
attempting to stick higher on the wall than the other
contestants.

FN1. Krazy Games has since filed for

bankruptcy.

**\*1** William Heronemus, the plaintiff, was injured
when using the velcro wall. Krazy Games leased
the wall to the Blue Water House Bed and
Breakfast [the lessees]. Heronemus donned the suit
and unsuccessfully attempted to jump on the wall
upside down. He landed on his head and sustained
significant physical injuries.

**\*1** Heronemus and his wife sued, among others,
Bennett and Buckson, who are being sued
personally on theories of tort and strict liability.
They allege that Krazy Games' own literature
claimed that a person could jump on the wall upside
down. They claim that Bennett and Buckson
personally took responsibility for, and subsequently
breached their duty in, discharging Krazy Games'
duty of care in leasing the velcro wall.

**\*1** Bennett and Buckson, pursuant to Rule 12(b)(6),
have moved to dismiss the action against them for
failure to state a claim. They argue that they
cannot be sued personally for the actions of the
corporation.

### *STANDARD OF REVIEW*

**\*1** When reviewing a motion to dismiss for failure
to state a claim, all well-pled allegations must be
accepted as true.[FN2] Such a motion cannot be
granted if a plaintiff may recover under any
conceivable set of circumstances susceptible of
proof under the complaint.[FN3]

> FN2. *Browne v. Robb,* Del.Supr., 583 A.2d
> 949, 950 (1990).

> FN3. *Precision Air, Inc. v. Standard
> Chlorine of Del., Inc.,* Del . Supr., 654
> A.2d 403, 406 (1995).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 2

Not Reported in A.2d, 1997 WL 524127 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

### DISCUSSION

**\*1** The Heronemuses have brought claims on theories of tort and strict liability.

### Tort Claims

**\*1** The Heronemuses maintain that the following are the bases for their tort claim:
**\*1** (1) The failure to warn the lessees that the game should not be used without adequately trained assistants and safety spotters;
**\*1** (2) The failure to supply or cause the corporation to supply the lessees adequately trained instructors and safety assistants to assist party guests;
**\*1** (3) The failure to warn the lessees that the corporation's advertisement that participants could propel themselves upside down against the wall was a dangerous use that should not be permitted;
**\*1** (4) The failure to test the velcro suit and wall to assure that participants would stick to the wall.[FN4]

FN4. Plaintiffs' response ¶ 2.

**\*1** Bennett and Buckson are being sued individually. "As a general rule, so far as personal liability on corporation contracts is concerned, officers of corporations are ... not liable on corporate contracts as long as they do not act and purport to bind themselves individually." [FN5] Is there an exception that will allow the Heronemuses to maintain their action?

FN5. *Brown v. Colonial Chevrolet Co.,* Del.Super., 249 A.2d 439, 441 (1968).

**\*1** Many jurisdictions recognize a basis for liability of directors sometimes referred to as the personal participation doctrine. It holds that "corporate officers are personally liable for torts which they commit, participate in, or inspire, even though the acts are performed in the name of the corporation." [FN6] In *T.V. Spano Building Corp. v. Wilson*[FN7], this Court held that corporate officers are liable for

their tortious conduct even though they were acting officially for the corporation.[FN8]

FN6. *Vuitch v. Furr,* D.C.App., 482 A.2d 811, 821 (1984).

FN7. Del.Super., 584 A.2d 523 (1990).

FN8. *Id.* at 530.

**\*2** On appeal, the Supreme Court quoted from Timothy P. Bjur and J. Jeffrey Reinholtz, *3A Fletcher Cyclopedia Corporations* § 1135 (1990):
**\*2** [C]orporate officers, charged in law with affirmative official responsibility in the management and control of the corporate business, cannot avoid personal liability for wrongs committed by claiming that they did not authorize and direct that which was done in the regular course of that business, with their knowledge and with their consent or approval, or such acquiescence on their part as warrants inferring such consent or approval.
[FN9]

FN9. *T.V. Spano Bldg. v. Dept. of Natural Res.,* Del.Supr., 628 A.2d 53, 61 (1993).

**\*2** The Supreme Court went on to say that knowledge of the act is not enough for personal liability. The corporate officer must have been actively involved in that the officer directed, ordered, ratified, approved or consented to the tort.
[FN10]

FN10. *Id.* at 61.

**\*2** In *Camacho v. 1440 Rhode Island Ave. Corp.* [FN11], the court stated:

FN11. D.C.App., 620 A.2d 242 (1993).

**\*2** [t]his type of liability is not derivative; it is based on wrongful acts by the individual being held accountable. Every individual is liable for his or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 3

Not Reported in A.2d, 1997 WL 524127 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

her own torts, and there is no exception for corporate officers. Corporate officers cannot be shielded from tort liability by claiming that the actions were done in the name of the corporation. [FN12]

FN12. *Id.* at 247.

**\*2** However, a corporate officer can only be held liable under this doctrine for misfeasance or active negligence.[FN13] They will not be held liable for nonfeasance or the omission of an act which a person ought to do.[FN14]

FN13. *Wicks v. Milzoco Builders, Inc.,* Pa.Supr., 503 Pa. 614, 470 A.2d 86 (1983), *Brindley v. Woodland Village Restaurant, Inc.,* Pa.Super., 438 Pa.Super. 385, 652 A.2d 865 (1995), *Michaels v. Lispenard Holding Corp .,* N.Y.App., 11 A.D.2d 12, 201 N.Y.S.2d 611 (1960). *See also Metromedia v. WCBM Maryland,* Md.App., 327 Md. 514, 610 A.2d 791, 794 (1992) (officer must have *actively* participated or directed act to be personally liable).

FN14. *Brindley,* 652 A.2d at 868 (*citing Wicks,* 503 Pa. 614, 470 A.2d 86, *Village at Camelback v. Carr,* Pa.Super., 371 Pa.Super. 452, 538 A.2d 528 (1988), *Loefler v. McShane,* Pa.Super., 372 Pa.Super. 442, 539 A.2d 876 (1988)) and *Michaels,* 201 N.Y.S.2d at 614.

**\*2** In *Terry v. Linscott Hotel Corp.*[FN15], a hotel guest brought an action against the hotel and its owners after they had jewelry stolen from their room. They claimed that the failure to provide adequate security and the failure to warn them of thefts and burglaries in the area constituted negligence.[FN16] Although plaintiffs were basing their claim on an Innkeeper statute, the court's reasoning is helpful to the case at bar. The statute only permitted claims based on misfeasance, not nonfeasance.[FN17] The court found that " [plaintiffs] only allegations of fault by [defendant]

for the loss of their jewelry are allegations of failure of [defendants] to provide adequate security precautions and failure to warn [plaintiffs] about the number of thefts in the hotel. These are allegations of nonfeasance or acts of omission." [FN18]

FN15. Ariz.App., 126 Ariz. 548, 617 P.2d 56 (1980).

FN16. *Id.* at 58.

FN17. *Id.* at 61.

FN18. *Id.* at 61.

**\*2** In *Steinke v. Beach Bungee, Inc.*[FN19], the parents of a 17-year old who suffered fatal injuries on a bungee cord ride brought an action against the corporation and the officers of the corporation. The ride operated by raising customers in a steel cage from which they would jump. The cage broke from its steel cable and fell 160 feet to the ground. Prior to the accident, the corporation was having problems with the winch mechanism. It was advised to hire an engineer and to have a new safer winch system installed.[FN20] The officers rejected this idea and instead hired a shrimp boat repairman to install the new system.[FN21] The new winch had an explicit warning, which the officers were aware of, which said the winch was not suitable for lifting persons.[FN22] The officers attempted to scratch out the word "person" from the warning.[FN23] At some point during the ten days that the new winch was in place until the accident occurred, someone attached an unauthorized state license to the machine, to give the appearance that the machine was licensed.[FN24] The court in *Steinke* found that despite a strong presumption that officers are not liable for the torts of the corporation, they held the officers personally liable because of their active participation in the tort.[FN25]

FN19. 4th Cir., 105 F.3d 192 (1997).

FN20. *Id.* at 194.

FN21. *Id.* at 195.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                               Page 4

Not Reported in A.2d, 1997 WL 524127 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

FN22. *Id.* at 194.

FN23. *Id.* at 195.

FN24. *Id.* at 194.

FN25. *Id.* at 195-96.

**\*3** In *Hunt v. Rabon*[FN26], the plaintiff, as administrator of the estate of a deceased, brought an action against a hospital for negligence. Plaintiff sought to hold the trustees of the hospital personally liable.[FN27] His complaint said the trustees:

FN26. S.C.Supr., 275 S.C. 475, 272 S.E.2d 643 (1980).

FN27. *Id.* at 643.

**\*3** failed to hold meetings, failed to oversee any aspect of the hospital management, failed to confirm the inspection of such dangerous and complex equipment as the medical gas unit, and failed to insure that rules and regulations as prescribed by the State Board of Health, as well as their own rules and regulations, were complied with by the hospital staff.[FN28]

FN28. *Id.* at 644.

**\*3** The court found that although corporate officers can be held liable for torts which they commit or participate in, "[t]he allegations in the complaint linking the member of the board of trustees with the tortious act are legally insufficient to hold them liable for the wrongs alleged."[FN29]

FN29. *Id.* at 644.

**\*3** In the case at hand, the Heronemuses seek to hold Bennett and Buckson liable for their failure to warn, failure to provide safety spotters and failure to test the game. Even taken as well-pled, these are not allegations that Bennett and Buckson directed, ordered, ratified, approved or consented to any wrong. As in *Terry* and *Hunt,* these are claims of

nonfeasance or the omission of an act which a person ought to do. There is no allegation or misfeasance such as occurred in *Steinke.* Allegations of nonfeasance are insufficient to maintain a claim under the personal participation doctrine.

**\*3** As to any claims based in tort, this Court **GRANTS** the motions to dismiss of defendants Bennett and Buckson.[FN30]

FN30. There are further potential problems with the tort claims which the Court need not address. First, the game appears to contain open and obvious dangers. *See Barnes v. Fulton,* Ga.App., 213 Ga.App. 806, 446 S.E.2d 213, 214 (1994) (no need to warn of open and obvious dangerous activities like trampolining, fire, falling from heights and water), *see also Riley v. Brasunas,* Ga.App., 210 Ga.App. 865, 438 S.E.2d 113 (1994) and *Burchinal v. Gregory,* Co.App., 41 Colo.App. 490, 586 P.2d 1012, 1013-14 (1978). There is no need to warn when an activity is openly and obviously dangerous. *Macey v. AAA-1 Pool Builders and Service Co.,* Del.Super., C.A. No.. 88C-JN-10, Herlihy, J. (April 30, 1993). Furthermore, the duties claimed by plaintiffs appear to arise under the contract, and not by operation of law. If so, any claim must be brought in contract. *Garber v. Whittaker,* Del.Super., 174 A. 34, 36 (1934) ( "where the action is based entirely on a breach of the terms of a contract between the parties, and not on a violation of some duty imposed by law, an action on the case will not lie, and the plaintiff must sue, if at all, in contract."); *see also Georgetown Realty, Inc. v. Home Ins. Co.,* Or.Supr., 313 Or. 97, 831 P.2d 7, 12 (1992) ("[i]f the plaintiff's claim is based solely on a breach of a provision in the contract, which itself spells out the party's obligation, then the remedy normally will be only in contract"). The plaintiffs concede that the officers would not incur personal liability based on a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                Page 5

Not Reported in A.2d, 1997 WL 524127 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

claim of breach of contract. Plaintiffs' response at ¶ 3.

*Strict Liability*

**\*3** The Heronemuses have also brought claims against Bennett and Buckson on a theory of strict liability. The argument here is:

**\*3** (1) a corporation can be strictly liable in tort for leasing a defective product [FN31];

> FN31. *Martin v. Ryder Truck Rental, Inc.,* Del.Supr., 353 A.2d 581 (1976).

**\*3** (2) corporate officers can be held personally liable if they participate in the commission of a tort;
**\*3** (3) Bennett and Buckson participated in leasing a defective product; therefore, they are personally liable.

**\*3** The argument has some appeal, but ultimately, their claim fails.[FN32]

> FN32. The Court recognizes that a corporate officer can be held strictly liable under CERCLA, in cases involving the disposal or transportation of hazardous substances. *Analytical Measurements, Inc. v. Keuffel & Esser Co.,* D.N.J. 816 F.Supp. 291, 296 (1993). However, this liability is founded under a specific statute, not common law. *See* 42 *U.S.C.* § 9607(a).

**\*3** Strict tort liability is liability without fault.[FN33] Liability is imposed even though the defendants may be innocent of any wrongdoing. [FN34] On the other hand, liability is imposed under the personal participation doctrine because the corporate officer has participated in an act of misfeasance.[FN35]

> FN33. *SW (Delaware), Inc. v. American Consumers Indus., Inc.,* Del.Supr., 450 A.2d 887, 888 (1982).

> FN34. *Ranalli v. Edro Motel Corp.,*

N.J.Super., 690 A.2d 137, 141 (1997). *See also Carrecter v. Colson Equipment Co.,* Pa.Super., 346 Pa.Super. 95, 499 A.2d 326, 329-30 (1985) (liability can exist even where the defendant has exercised all possible care in the preparation and sale of his product).

> FN35. See footnote 13.

**\*3** If there is an allegation of misfeasance, a plaintiff can bring an action based on tort and impose individual liability under the personal participation doctrine. As discussed above, the Heronemuses have not alleged misfeasance, only nonfeasance. The attempt to squeeze the personal participation doctrine into a claim of strict liability is the equivalent of attempting to fit the proverbial round peg into a square hole. To allow such a claim would completely ignore the basis for the personal participation doctrine and would open the doors for personal liability even where the corporate officer has "exercised all possible care." [FN36] This is something this Court is unwilling to do.

> FN36. *Carrecter, supra,* n. 34.

**\*4** In addition, a claim of strict liability in a lease situation may also be barred by the enactment of Article 2A of the Uniform Commercial Code (Leases). After the enactment of Article 2 of the Uniform Commercial Code (Sales), the Delaware Supreme Court found that claims of strict liability in sales were preempted.[FN37] Whether the later enactment of Article 2A had the same effect on leases has been questioned,[FN38] but has never been decided. While this Court need not resolve the issue, it is important to note that the official comments to Article 2A state:

> FN37. *Cline v. Prowler Indus. of Maryland, Inc.,* Del.Supr., 418 A.2d 968 (1980).

> FN38. *Golt v. Sports Complex, Inc.,* Del.Super., 644 A.2d 989, 991 n. 1 (1994).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 1997 WL 524127 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

**\*4** The Article on Sales provided a useful point of reference for codifying the law of leases.... [A]ny case law interpreting those provision should be viewed as persuasive but not binding on a court when deciding a similar issue with respect to leases. FN39

> FN39. *Official Cmt* § 2A-101, 1B U.L.A. 655 (1989).

**\*4** Although "Delaware has not adopted the Official Comments prepared by the drafters of the Uniform Commercial Code, these comments are nevertheless useful in interpreting the Code, as it is to be applied in Delaware, in view of the Code's expressed purpose of making uniform the law among the various jurisdictions." FN40

> FN40. *Appeal of Copeland,* 3rd Cir., 531 F.2d 1195, 1203 n. 4 (1976).

**\*4** Because the personal participation doctrine does not apply to claims of strict liability, this Court **GRANTS** the motions of Bennett and Buckson to dismiss as to all claims brought under a theory of strict liability.

### CONCLUSION

**\*4** For the foregoing reasons, the motions of defendants Kent Buckson and A. Judson Bennett to dismiss as to all claims brought against them in their individual capacities are **GRANTED.**

**\*4 IT IS SO ORDERED.**

Del.Super.,1997.
Heronemus v. Ulrick
Not Reported in A.2d, 1997 WL 524127 (Del.Super.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 5

LEXSEE 1995 U.S. DIST. LEXIS 13730



Cited
As of: Feb 23, 2007

**ROBIN CIANFRANI, Plaintiff, v. KALMAR-AC HANDLING SYSTEMS, INC., et al., Defendants, and EASTERN TRUCK LIFT COMPANY, INC., Defendant/Third Party Plaintiff, v. DOLE FRESH FRUIT COMPANY, Third Party Defendant.**

**CIVIL ACTION NO. 93-5640 (JEI)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY**

**1995 U.S. Dist. LEXIS 13730**

**September 11, 1995, Decided**

**COUNSEL:** [*1] KOPS & FENNER, P.C., By: Gershon D. Greenblatt, Esq., Philadelphia, PA, Attorneys for Plaintiff.

PORZIO, BROMBERG & NEWMAN, By: Anne F. Baretz, Esq., Morristown, NJ, Attorneys for Defendants Kalmar-AC Handling Systems, Inc., and Kalmar AC Group, Inc. LAVIN, COLEMAN, FINARELLI & GRAY, By: William J. Ricci, Esq., Sandra Hourahan, Esq., Mount Laurel, NJ, Attorneys for Defendant Komatsu Forklift (U.S.A.), Inc. MARKS, O'NEILL, REILLY & O'BRIEN, P.C., By: Kevin J. O'Brien, Esq., Westmont, NJ, Attorneys for Defendants City of Wilmington, Port of Wilmington, and Michael Biase. GARRIGLE AND PALM, By: William A. Garrigle, Esq., Cherry Hill, NJ, Attorneys for Defendant/Third Party Plaintiff Eastern Lift Truck Company, Inc. COOPER PERSKIE APRIL NIEDELMAN WAGENHEIM & LEVENSON, P.A., By: Joseph D. Deal, Esq., Cherry Hill, NJ, Attorneys for Third Party Defendant Dole Fresh Fruit Company.

**JUDGES:** Joseph E. Irenas, U.S.D.J.

**OPINION BY:** Joseph E. Irenas

**OPINION:**

**OPINION**

**IRENAS,** District Judge:

On February 26, 1993, plaintiff Robin Cianfrani was injured when struck by a forklift while working at a loading dock in Wilmington, Delaware. On December 21, 1993, plaintiff filed this diversity action, [*2] bringing negligence, strict liability, and breach of warranty claims against defendants Kalmar-AC Handling Systems, Inc. and Kalmar-AC Group, Inc. (collectively "Kalmar"), Komatsu Forklift U.S.A., Inc. ("Komatsu"), Eastern Lift Truck Company ("Eastern"), the City and the Port of Wilmington, and Michael Biase, the operator of the forklift at the time of the accident. Eastern, which leased the forklift to plaintiff's employer, Dole Fresh Fruit Company ("Dole"), has also brought a third-party claim against Dole alleging that it is entitled to indemnification under the terms of the lease agreement between those two parties.

All defendants move for summary judgment on some or all of plaintiff's claims. Kalmar, Komatsu, and Eastern argue that this matter is governed by Delaware law, which does not recognize a cause of action for strict products liability. Kalmar and Komatsu further contend that the breach of warranty claim is barred by the applicable statute of limitations, and that they were not negligent as a matter of law. The City and Port of Wilmington and Biase argue that they are protected from liability by the "borrowed servant" doctrine. Plaintiff opposes these motions [*3] and cross-moves for summary judgment on the City and Port of Wilmington and Biase's borrowed servant defense. Dole has also moved for summary judgment on Eastern's indemnification claim.

The Court finds that Delaware law applies to this case and that Delaware does not recognize a cause of

action for strict products liability. Summary judgment in favor of all defendants on the strict products claim is therefore appropriate. Furthermore, the statute of limitations on the breach of warranty claim against Komatsu and Kalmar has run. Their motions for summary judgment on the breach of warranty claim will therefore be granted, but their motion for summary judgment on the negligence claim will be denied. Because Dole did not control Biase's operation of the forklift at issue, the City and Port of Wilmington and Biase's motion for summary judgment based on the borrowed servant doctrine will be denied, and plaintiff's cross-motion for summary judgment on this claim will be granted. Dole's motion for summary judgment on Eastern's indemnity claim will be granted because Eastern will ultimately be liable only for its own negligence, if at all, and Delaware law disfavors the interpretation of [*4] non-specific indemnity language to protect a party from its own negligence.

## SUMMARY JUDGMENT STANDARD

Under Fed. R. Civ. P. 56(c), "summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). A non-moving party may not rest upon mere allegations, general denials, or vague statements in opposition to a summary judgment motion. If the non-moving party's evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Bixler v. Central Penna. Teamsters Health & Welfare Fund, 12 F.3d 1292 (3d Cir. 1993); Trap Rock Indus. Inc. v. Local 825, Int'l Union of Operating Engineers, 982 F.2d 884, 980-91 (3d Cir. 1992).

However, it is not the role of the judge at the summary judgment stage to weigh the evidence or to evaluate its credibility, but to determine "whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., [*5] 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). The Court must draw all inferences in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, the Court must accept the non-movant's version as true. Pastore v. Bell Tel. Co. of Penna., 24 F.3d 508, 512 (3d Cir. 1994).

The substantive law governing the dispute will determine which facts are material, and only disputes over those facts "that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. A genuine issue of material fact for trial does not exist "unless the party opposing the motion can adduce evidence which, when considered in light of that party's burden of proof at trial, could be the basis for a jury finding in that party's favor." J.E. Mamiye & Sons, Inc. v. Fidelity Bank, 813 F.2d 610, 618 (3d Cir. 1987) (Becker, J., concurring).

## BACKGROUND

Plaintiff, a Pennsylvania resident, has worked for Dole in Wilmington, Delaware since 1989. At the time of the accident, she was employed as an expediter for Dole at a warehouse facility in Wilmington. Dole [*6] leased this facility from defendant the Port of Wilmington.

Dole's lease required it to use "port labor," or municipal employees, as forklift operators, checkers, crane operators, laborers, and supervisors at the leased warehouse facility. When Dole required workers at the leased facility, it would contact the Port, which would send the requested workers along with a supervisor. The supervisor would make sure that the appropriate labor was present and record the number of hours worked by each worker, who would then receive a check from the City of Wilmington. The City of Wilmington would then bill Dole for this labor monthly. (Donaldson Dep. at 72-75; Lennon Dep. at 111, 115.)

As a Dole expediter, plaintiff oversaw port labor in the loading of fruit from the warehouse onto trucks. (Lennon Dep. at 16.) Generally, the expediter will receive an order from the company and then direct a Port forklift operator, called a "runner," to pull a specific type of fruit and deposit it at the doorway between the interior refrigerated area of the warehouse and the exterior loading dock area. At that point, a Dole expediter and a Port checker will check the fruit to make sure it conforms with the [*7] order. The Dole expediter will then direct a different Port forklift operator to load the fruit onto a specific truck. (Casper Dep. at 28-33.)

Biase was a port laborer and at the time of the accident was operating a forklift for Dole. When the accident occurred, plaintiff was standing on the loading dock near the edge of the loading bay next to the bay where Biase was loading a truck. Biase had just picked up a pallet of fruit at the refrigerator door and was backing onto the loading dock. As he backed up, he swung out to the right and struck plaintiff with the left rear wheel of the forklift. In her Second Amended Complaint, plaintiff alleges that the accident was caused by a lack of an audible and/or visual warning device that would activate when the forklift was operated in reverse (a backup alarm), as well as a lack of adequate operator visibility (field of vision) when backing up the forklift. (Second Amended Complaint at P 14.)

The forklift involved in the accident was a Kalmar Model P50, Serial No. 144518A. The base unit of the

forklift was manufactured by Komatsu Manufacturing Co., now known as defendant Komatsu Forklift (U.S.A.), Inc. Komatsu has its United States headquarters [*8] in California and has a manufacturing facility in La Palma, California. As constructed by Komatsu, the base unit did not have an backup alarm.

On June 15, 1989, Komatsu, through the Nichimen Corporation, sold the base unit of the forklift to defendant Kalmar-AC Handling Systems, Inc. (Komatsu Ex. "G".) Kalmar is an Ohio corporation with its principal place of business in Ohio. n1 Kalmar equipped the base with a mast, forks, carriage, and low back rest and sold the assembled forklift to Eastern. When Kalmar sold the forklift to Eastern, it did not have a backup alarm.

> n1 The other Kalmar defendant named in the Second Amended Complaint, Kalmar-AC Group, Inc., is a Delaware holding company with no operations. (Dea Aff. P 1.)

There is some dispute as to the exact date of sale of the forklift to Eastern. Kalmar has produced a sales invoice dated August 16, 1989, indicating that the forklift was shipped to Eastern on August 10, 1989. (Dea Aff. Ex. "A".) Plaintiff has produced an identical invoice dated August 16, [*9] 1990, indicating that the forklift was delivered to Eastern on August 10, 1990. However, the number "90" on this invoice is in a typeface different from the remainder of the invoice, and the invoice is stamped "REC'D SEP 5 1989." While this does not indicate who stamped the invoice as received, an invoice cannot normally be received almost a year before the invoice date. Therefore, the Court finds that a reasonable factfinder could only conclude that Kalmar delivered the forklift to Eastern on August 16, 1989. n2

> n2 The explanation for the discrepancy appears to be that Eastern falsified the invoice to make the year-old forklift look new so as to obtain bank financing. It was represented to the court that this action was taken at the encouragement of an employee of the lender.

Eastern is a New Jersey corporation with its principal place of business in New Jersey. On February 9, 1993, only two weeks before the date of the accident, Eastern leased the forklift to Dole. The lease agreement between Eastern and Dole provided [*10] in part that Dole would indemnify Eastern "for all claims . . . arising or incurred because of the Equipment or the storage, use or operation thereof." (Dole's Ex. "A".)

The record is unclear as to whether Eastern equipped the forklift with an audible backup alarm. Defendants have offered the deposition testimony of John M. Stevens, Eastern's retail sales manager, who testified that the forklift was equipped with an operational backup beeper before it was rented to Dole. (Stevens Dep. at 85-86 and 152-55.) Stevens' recollection was based primarily on an "Eastern Lift Truck--Quality/Safety Check Sheet" dated February 8, 1993, the day before the forklift was rented to Dole. (Plaintiff's Opposition to Kalmar' Motion Ex. 11.) Under "Other Optional Equipment," the sheet indicates "B/U Beeper (Take Off Used Stock)" with a check in the column for "Okay." (Id.)

However, several deponents have testified that to the best of their recollection, the forklift involved in the accident was never equipped with an operating backup alarm system from the time it was leased to Dole. (Plaintiff's Opposition to Kalmar's Motion Exs. 19-22.) Furthermore, two work orders completed by Buddy Kirkbride, [*11] an Eastern mechanic, and dated February 19, 1993, are silent as to the operation of the backup beeper. While Stevens testified that an Eastern mechanic would usually check the backup beeper during such a maintenance call, (Stevens Dep. at 160), Kirkbride testified that he could not remember whether the backup alarm was installed on the forklift or was working at the time he paid the call. (Kirkbride Dep. at 46.) The record is clear that the forklift did not have an operational backup alarm at the time of the accident.

Several deponents also testified that it was a fairly common occurrence for Port employees to disable backup alarms on forklifts due to "the annoyance problem." (See, e.g., Stafford Dep. at 12-14.) Kirkbride testified that the port laborers' proclivity to disable these alarms could be constrained by installing them within the counterweight or the engine of the forklift rather than in the forklift's overhead guard, where the system in this case was allegedly installed. (Kirkbride Dep. at 19, 23.)

## ANALYSIS

### A. Choice of Law

In a diversity action, a federal district court applies the choice of law rules of the state in which it sits. Klaxon Co. v. Stentor [*12] Elec. Mfg. Co., 313 U.S. 487, 496, 85 L. Ed. 1477, 61 S. Ct. 1020 (1941); McFarland v. Miller, 14 F.3d 912, 917 (3d Cir. 1994). New Jersey applies a "governmental interest" test to choice to law issues. Veazey v. Doremus, 103 N.J. 244, 510 A.2d 1187 (N.J. 1986). Under this test, the court must first "determine whether a conflict exists between the law of the interested states." Id. at 1189. This determination must be made "on an issue-by-issue basis." Id.

Case 1:05-cv-00284-GMS    Document 83-2    Filed 02/23/2007    Page 37 of 43

Page 4
1995 U.S. Dist. LEXIS 13730, *

If the court finds that a conflict does exist, it must then determine "the state with the greatest interest in governing the particular issue." To do this, the court must "identify the governmental policies underlying the law of each state and how those policies are affected by each state's contacts to the litigation and the parties." Id. It is "the qualitative, not the quantitative, nature of a state's contacts [that] ultimately determines whether its law should apply." Id.

1. Existence of Conflict

Defendants contend that Delaware law should apply to this case, while plaintiff argues that New Jersey or Pennsylvania law should apply. The Court finds a conflict in the substantive law of these jurisdictions. [*13] Both New Jersey and Pennsylvania recognize a strict liability cause of action for defective products, see N.J.S.A. 2C:58C-1 et seq.; Webb v. Zern, 422 Pa. 424, 220 A.2d 853, 854 (Pa. 1966), while Delaware has concluded that in sales transactions, its version of the Uniform Commercial Code, 6 Del. C. §§ 2-101 et seq., preempts a cause of action for strict products liability. Cline v. Prowler Indus. of Maryland, Inc., 418 A.2d 968 (Del. 1980). Therefore, under Delaware law, plaintiff would be limited to a breach of warranty action under the UCC and a negligence claim, while under New Jersey or Pennsylvania law she would enjoy a strict liability action. Indeed, at least in New Jersey, the strict liability action would be to the exclusion of a breach of warranty or negligence claim. Tirrell v. Navistar Int'l, Inc., 248 N.J. Super. 390, 591 A.2d 643, 647 (N.J. Super. App. Div. 1991), certif. denied, 599 A.2d 166 (N.J. 1991); McWilliams v. Yamaha Motor Corp. USA, 780 F. Supp. 251, 262 (D.N.J. 1991), aff'd in part, rev'd in part on other grounds, 987 F.2d 200 (3d Cir. 1993).

Plaintiff argues that no conflict between the laws of the states exists because under [*14] Delaware choice of law rules, a Delaware court would apply New Jersey products liability law to this action. However, the relevant question here is what law the courts of New Jersey, not Delaware, would apply to this case. The New Jersey Supreme Court has held that the choice of law provisions of other interested jurisdictions are irrelevant to the governmental interest analysis. Pfau v. Trent Aluminum Co., 55 N.J. 511, 263 A.2d 129, 136-37 (N.J. 1970). Instead, the court must determine what jurisdiction has the greatest interest in applying its substantive law to the facts at hand. n3

n3 Furthermore, the Court seriously doubts that Delaware courts would apply New Jersey law to this action. The choice of law provision of the Delaware UCC, 6 Del. C. § 1-105(1), provides that the Delaware version of the UCC "ap-

plies to transactions bearing an appropriate relation to this state." A breach of warranty action under the UCC usually accrues when tender of delivery is made. 6 Del. C. § 2-725.

While plaintiff has argued that a Delaware court would apply New Jersey law because Dole accepted delivery of the forklift in New Jersey, the record appears to indicate that Eastern shipped the forklift to Dole in Delaware and that "tender of delivery" actually took place in that state. (See Dole's Ex. "A".) Furthermore, in the only Delaware case cited by plaintiff for her position, Sellon v. General Motors Corp., 571 F. Supp. 1094 (D. Del 1983), the court simply found that under either a "significant relationship" test or the common law rule of place of performance, foreign law governed the transaction at issue. 571 F. Supp. at 1097. Commentary to the UCC indicates that application of forum law is usually inappropriate only "where the parties have clearly contracted on the basis of some other law." UCC Comment 2. Because that is not the case here, Delaware courts in all likelihood would apply Delaware law to this transaction.

[*15]

As to the other issues in this case, the application of the "borrowed servants" doctrine and Eastern's indemnification claim against Dole, the Court finds that there is no conflict between the law of New Jersey and that of the other interested states. However, for the sake of consistency, the Court will apply the law of the state with the most significant governmental interest to those claims as well.

2. Governmental Interest

We find that Delaware plainly has the strongest governmental interest in applying its law to the liability issues in this case. Although New Jersey has abandoned the strict application of the rule of lex loci delecti in tort cases, see Pfau, 263 A.2d at 130-31, it has recognized that the place of the injury is an important factor to consider in determining what state has the greatest interest in a case involving an injury caused by a product. Mowrey v. Duriron Co., 260 N.J. Super. 402, 616 A.2d 1300, 1305 (N.J. Super. App. Div. 1992). In determining whether to apply the law of the state where the injury took place, a court will consider whether the occurrence of the accident there was "merely fortuitous" or whether "the key parties regularly [*16] engaged in their occupations and their business" in that state. Moye v. Palma, 263 N.J. Super. 287, 622 A.2d 935, 938 (N.J. Super. App. Div. 1993).

In this case, plaintiff was injured in Delaware and worked in Delaware for more than three years before the accident. The forklift at issue was rented by Eastern to Dole for use at its facility in Wilmington, Delaware. Biase, who was operating the forklift, is a Delaware resident and was employed as a laborer at the Port of Wilmington. Both the City and Port of Delaware, defendants in this matter, are obviously Delaware entities. In light of these factors, the occurrence of the injury in Delaware was clearly more than fortuitous.

Plaintiff has argued that these considerations are inapposite because under Delaware law, her breach of warranty claim will sound in contract rather than tort. However, regardless of this distinction, this case is in essence about an injury suffered by an individual at her place of employment in Delaware due to an alleged defect in a vehicle that was leased to the employer in Delaware, which at the time of the accident was operated by a Delaware resident whose paycheck came from a Delaware municipal entity. [*17] Delaware clearly has the strongest governmental interest in this case, irrespective of what substantive law it will actually apply.

Plaintiff's arguments for the application of New Jersey and Pennsylvania law are equally without merit. New Jersey's only contacts with the case are that Eastern is a New Jersey company with its principal place of business in New Jersey and that plaintiff chose to file her suit here. These are wholly inadequate to justify application of New Jersey law. Plaintiff has also argued that New Jersey law should apply because Eastern delivered the forklift to Dole in New Jersey. As noted above, the Court doubts that proposition as a factual matter. But even if this were the case, New Jersey's interest in the case would still be no greater than California's, where Komatsu is headquartered and where the base of the forklift was manufactured, or Ohio's, where Kalmar is incorporated and headquartered and where the forklift was shipped before its sale to Eastern. None of these states has an interest nearly as great as Delaware's.

Finally, plaintiff argues that Pennsylvania law should apply because plaintiff is a Pennsylvania citizen, her workers' compensation benefits [*18] were paid by Pennsylvania, she received her medical treatment there, and many of her witnesses are located in that jurisdiction. New Jersey courts have recognized all these as valid governmental interests in conducting a choice of law analysis. Mowrey, 616 A.2d at 1305. However, when faced with a balance of interests similar to that presented in this case, New Jersey courts have generally concluded that the law of the situs of the accident should apply. For example, in Moye, the plaintiff was a New Jersey resident who was employed as a driver in New York. During the course of his employment he was involved in an accident in New York. Although both his

workers' compensation petition and his negligence action were filed in New Jersey, 622 A.2d at 936, the court concluded that New York's interest in regulating its highways outweighed New Jersey's interest in providing compensation for the plaintiff, especially because the plaintiff was a regular user of New York roads. Id. at 938-39.

Other New Jersey courts have reached similar conclusions. See O'Connor v. Busch Gardens, 255 N.J. Super. 545, 605 A.2d 773, 775 (N.J. Super. App. Div. 1992) (New Jersey's legitimate concern [*19] for its injured citizens was outweighed by "Virginia's legitimate interest in discouraging unsafe local property conditions and unsafe conduct . . . ."); Mowrey, 616 A.2d at 1306 n.7 (applying same analysis). These cases properly recognize that the interest of the state where the accident occurred in protecting those within its boundaries from hazardous conditions will normally outweigh the interest of the plaintiff's residence in providing its citizens with recovery, especially where the plaintiff has a significant relationship with the state where the accident occurred.

In this case, Delaware clearly has a strong interest both in preventing negligently operated or defectively designed forklifts from operating in the state as well as in defining the circumstances under which people who do business in or ship goods to Delaware will be exposed to liability. The people most likely to be affected by such activity, whether as plaintiffs or defendants, are Delawareans, and the happenstance that an out-of-state resident is the victim of the accident does not lessen this interest.

While plaintiff's state of residence may have a legitimate governmental interest in providing a tort victim [*20] with a fair recovery, this interest is, relatively, far stronger where the issue relates to damages rather than liability. In this opinion we are concerned solely with issues relating to liability, i.e. what conduct will impose on a defendant the obligation to pay damages. Were the court faced with issues relating to the measurement of damages (limitation statutes, prejudgment interest, delay damages, inflation, psychic injuries, etc.) the governmental interest of the injured party's domicile might be entitled to more weight, particularly where the injured party is neither a citizen of the forum nor a citizen of the place where the injury occurred. See, Draper v. Airco, Inc., 580 F.2d 91, 97 (3d. Cir. 1978); Busik v. Levine, 63 N.J. 351, 307 A.2d 571, 580, n.7 (1973).

Section 146 of The Restatement (2d) of Conflict of Laws (1971) indicates that "the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless with respect to a particular issue, some other state has a more significant relationship" under the general conflict principles set forth in §

6. Comment b. to § 171, which deals with damages, notes that "the state of [*21] conduct and injury will not, by reason of these contacts alone, be the state that is primarily concerned with the measurement of damages in a tort action."

We emphasize that the extent of a state's governmental interest in a dispute is not increased or lessened by the way its legislature has chosen to deal with that issue. It may be that Delaware's liability rules are more solicitous of defendants than those of Pennsylvania. But Delaware's interest in the liability laws governing goods shipped into and used within its borders is no less than Pennsylvania's interest in goods shipped into the Commonwealth. The Court concludes that, with respect to liability issues, Delaware has the strongest governmental interest and its law should apply.

### B. Strict Liability

As already noted, Delaware law does not recognize strict products liability for sales transactions. Cline, 418 A.2d 968. Komatsu and Kalmar are both "sellers" of the forklift within the meaning of the UCC. See 6 Del. C. § 2-106(1) (defining a "sale" as "the passing of title from the seller to the buyer for a price."). Therefore, the summary judgment in their favor on the strict liability claims will be granted. [*22]

Eastern, however, is not a seller of the forklift, but rather leased the forklift to Dole. While the parties do not address this distinction in their briefs, the Delaware Supreme Court had previously concluded that the warranty provisions of Article 2 of the UCC, 6 Del. C. §§ 2-313 to 2-315, do not extend to leases of goods and therefore do not preempt strict products liability actions. Martin v. Ryder Truck Rental, Inc., 353 A.2d 581, 584 (Del. 1976). See also Cline, 418 A.2d at 980 (specifically upholding Martin). In Martin, Ryder rented a truck to Gagliardi Brothers, Inc. Id. at 582. While being operated by a Gagliardi employee, the brakes on the truck failed and it struck plaintiff, a pedestrian. Id. The court concluded that plaintiff could maintain a strict liability action against Ryder. Id. at 588-89.

Martin would appear to compel a conclusion that Eastern may be held strictly liable for the rented forklift. However, the Delaware legislature recently adopted Article 2A of the UCC, which governs leases. 6 Del. C. § 2A-101 et seq. This provision became effective on June 19, 1992, 68 Del. Laws c. 249 § 6 (1992), before the date of the accident [*23] in this case.

While no Delaware court has squarely addressed this issue, at least one court has recognized the possibility that Article 2A might preempt strict liability claims in lease transactions. See Golt by Golt v. Sports Complex, Inc., 644 A.2d 989, 991 n.1 (Del. Super.) (declining to

address whether Article 2A preempted strict liability for leased goods because the statute was not enacted until after the accident occurred), appeal refused, 647 A.2d 382 (Del. 1994). However, Article 2A contains implied warranty provisions identical in substance to those in Article 2, compare 6 Del. C. §§ 2-314 and 2-315 with 6 Del. C. §§ 2A-212 and 2A-213, and the Cline court found the Article 2 provisions adequate to preempt a strict products liability action in a sales transaction. 418 A.2d at 974-80. The Court therefore concludes that Delaware courts would hold that Article 2A preempts a strict liability claim arising out of an injury caused by a leased good, and Eastern's motion for summary judgment on this claim will be granted.

### C. Breach of Warranty

The Delaware UCC specifically extends all express and implied warranties "to any natural person who may reasonably [*24] be expected to use, consume or be affected by the goods and who is injured by breach of the warranty." 6 Del. C. § 2-318. Komatsu and Kalmar nonetheless move for summary judgment on plaintiff's breach of warranty claim, contending that the statute of limitations for this claim has expired. Under the Delaware UCC, a breach of warranty action "must be commenced within 4 years after the cause of action has accrued." 6 Del. C. § 2-725(1). See also Johnson v. Hockessin Tractor, Inc., 420 A.2d 154, 156-58 (Del. 1980) (section 2-725 applies to breach of warranty actions resulting in personal injury). Such an action accrues "when tender of delivery is made." 6 Del C. § 2-725(2).

Plaintiff's original complaint was filed December 21, 1993, and four years before that date would be December 21, 1989. We must therefore determine whether "tender of delivery" was made by these defendants before this date. Komatsu sold the forklift to Kalmar on June 15, 1989, and as we have already concluded, the only reasonable interpretation of the record is that Kalmar delivered the forklift to Eastern on August 10, 1989. Both of these tenders took place outside the statute of limitations, and plaintiff's [*25] breach of warranty claims against Komatsu and Kalmar are therefore barred.

Plaintiff has advanced two arguments in opposition to this conclusion, both of which the Court rejects. First, she has argued that because Delaware would apply New Jersey law to this matter, the Court should apply the relevant New Jersey statute of limitations, which runs for two years after the date of the injury. N.J.S.A. 2A:14-2. The Court has rejected that argument elsewhere, and rejects it again here.

Plaintiff also argues that "tender of delivery" occurred not when each defendant delivered the forklift to the subsequent buyer, but rather when Eastern delivered

the forklift to Dole. However, the law is clear that "the 'delivery' in UCC § 2-725 is the delivery by the original seller to the original buyer and not the delivery made at a later date to the ultimate user." 5 Anderson UCC § 2-725:104 at 270 (3d ed. 1994). The breach of warranty claims against Komatsu and Kalmar are therefore barred.

D. Negligence Claims Against Komatsu and Kalmar

Both Komatsu and Kalmar have argued that they were not negligent in failing to install a backup alarm system. Under Delaware negligence law, a manufacturer [*26] has a duty to provide the safety devices that a reasonably prudent manufacturer under the same circumstances would provide. Graham v. Pittsburgh Corning Corp., 593 A.2d 567, 571 (Del. Super. 1990). See also Massey-Ferguson, Inc. v. Wells, 383 A.2d 640, 642 (Del. 1978). Komatsu and Kalmar argue that under the circumstances presented here, they had no duty to provide a backup alarm. n4

> n4 Kalmar has also argued that these defendants cannot be held negligent because Eastern installed a working alarm and their failure to do so therefore could not be the proximate cause of plaintiff's injury. The Court finds that genuine issues of material fact exist as to whether Eastern ever equipped the forklift at issue with a working backup alarm system.

In support of this argument, Kalmar has offered the 1990 American National Standards Institute ("ANSI") national standards governing lift trucks. (Kalmar's Ex. "K"). The parties appear to agree that these standards were in force at the time the forklift in issue was [*27] manufactured. They provide:

#### 4.15 Warning Device

4.15.1 Every truck shall be equipped with an operator-controlled horn, whistle, gong, or other sound-producing device(s).

4.15.2 The user shall determine if operating conditions require the truck to be equipped with additional sound-producing or visual (such as lights or blinkers) devices, and be responsible for providing and maintaining such devices.

ANSI B.56.1, Part II, § 4.15.2 (1990) (Kalmar's Ex. "K".) OSHA regulations require that all powered industrial trucks meet ANSI standards. 29 C.F.R. § 1910.178(a) (2).

Komatsu and Kalmar contend that under the ANSI standard, Dole (or Eastern, at the request of Dole) had the sole duty to determine whether a backup alarm system was necessary in light of the operating conditions for this forklift. The Fourth Circuit recently addressed this question under the same ANSI standard. Austin v. Clark Equip. Co., 48 F.3d 833 (1995). In that case, a forklift operator was impaled by a mast on a second forklift, and claimed that the accident could have been avoided if the forklift she was operating had a backup alarm. Id. at 835.

Applying Virginia [*28] law which, like Delaware, does not recognize a strict products liability cause of action, the court affirmed a grant of summary judgment in favor of a manufacturer. The court first noted that "'when a customer exercises an option to purchase a product without a safety feature, it is axiomatic that the manufacturer should not be held liable for damages which that safety feature may have prevented." Id. at 837 (quoting Butler v. Navistar Int'l Transp. Corp., 809 F. Supp. 1202, 1209 (W.D. Va. 1991)). The court concluded that the ANSI standards set forth above "recognize this principle of responsibility," and upheld the lower court's ruling that the manufacturer could not be held liable for failing to provide these devices. Id Cf. Verge v. Ford Motor Co., 581 F.2d 384, 389 (3d Cir. 1978) (where vehicle at issue had many uses, some of which did not require safety devices, strict products liability action against manufacturer would not lie).

Under Delaware law, however, evidence of industry standards "is neither always necessary nor controlling." Delmarva Power & Light v. Stout, 380 A.2d 1365, 1367 (Del. 1977). Delaware courts will recognize a standard of care "fixed by [*29] judicial decision or legislative enactment." Id. Therefore, the question here is whether OSHA's adoption of the ANSI standards set forth above is a legally endorsed standard of care applicable to this case.

We note at the outset that the ANSI standard at issue in this case does not deal with the design of a forklift or with the specific safety features which must be installed to make one safe. Rather, it determines who has the responsibility for making the final determination on these issues. While it is true that OSHA requires all powered industrial trucks used by an employer to meet ANSI "design and construction requirements," it is not clear that OSHA even considered the issues raised by § 4.15.2, let alone adopted its allocation of responsibility. OSHA is concerned with safety in the workplace, not with where in the chain of production a particular safety device is installed. We simply cannot find that the OSHA regulation in 29 C.F.R. § 1910.178(a)(2) amounts to a govern-

mental determination to allocate responsibility as set forth in § 4:15.2.

Austin's ultimate holding is based on the proposition that "the reasonable need for audible alarms, rear view mirrors, and strobe-lights [*30] depended upon the environment in which the lift truck was used. . . " Id. at p. 837. If it is true, in fact, that forklifts can reasonably be expected to be used in settings where these kind of safety devices are unnecessary, the holding is unassailable. But this is a factual question on which there is disagreement, with plaintiff's experts suggesting that a reasonably prudent manufacturer would not anticipate such use. It is for the jury to determine whether the construction of a forklift without a backup alarm is so dangerous that no reasonable manufacturer would undertake the task. Komatsu's and Kalmar's motions for summary judgment on the negligence claim will therefore be denied.

E. Borrowed Servant Doctrine

Biase and the City and Port of Wilmington (collectively "Wilmington") move for summary judgment on the grounds that Biase was Dole's "borrowed servant" at the time of the accident. They therefore contend that (1) as a co-employee, plaintiff's negligence claim against Biase is barred by Delaware's workmen's compensation statute, 19 Del. C. § 2304, and (2) as a Dole employee, Biase's alleged negligence is not imputable to the City and Port of Wilmington. Plaintiff [*31] argues that the borrowed servant doctrine is inapplicable to these facts, and has brought a cross-motion for summary judgment on this defense.

Before addressing this issue, we must clarify what claims are brought against the Wilmington defendants. The Second Amended Complaint names all defendants in all three counts, and mentions only liability for the defective design of the forklift. However, from the papers submitted with regard to the instant motions, it is clear that plaintiff does not bring strict liability or breach of warranty claims against the Wilmington defendants, but rather seeks to hold (1) Biase liable for negligently operating the forklift, (2) the City and Port of Wilmington vicariously liable for Biase's negligence, and (3) the City and Port of Wilmington vicariously liable if it turns out that a port laborer disabled a backup alarm installed by Eastern. In light of this, the Court will grant summary judgment in favor of the Wilmington defendants on the strict liability and breach of warranty claims, and will grant plaintiff leave to amend her pleadings to set forth the claims enunciated above. See Fed. R. Civ. P. 15(d). n5

n5 Plaintiff also claims that Eastern was negligent in that it installed any backup alarm system

in the forklift's overhead guard rather than within the counterweight or the engine where it could not be easily disabled. (Kirkbride Dep. at 19, 23.) In its opposition, Kalmar argued that plaintiff had not raised this claim in pretrial discovery and asked the Court to disregard it. (Kalmar Reply Brief at 14-15.) We will allow plaintiff to amend her complaint to state this claim pursuant to Rule 15(d).

[*32]

Delaware courts have recognized the "general rule . . . that an employee, with his consent, may be loaned by his general employer to another to perform specific services, and that, in the course of and for the purpose of performing such services, he may become the employee of the specific employer rather than the employee of the general employer." Richardson v. John T. Hardy & Sons, Inc., 54 Del. 567, 182 A.2d 901, 902 (Del. 1962). The linchpin of this analysis "is, with respect to the alleged negligent act in question, whether or not he was acting in the business of and under the direction of the general or specific employer." Id. at 903. The court must determine "which employer has the right to control and direct his activities in the performance of the act allegedly causing the injury, and whose work is being performed." Id. See also Loden v. Getty Oil Co., 316 A.2d 214, 216 (Del. Super.) ("Of these factors, the one given the greatest weight is the power to control and direct the activities of the employee in the performance of the act which caused the injury."), aff'd, 326 A.2d 868 (Del. 1974).

Under this analysis, Delaware courts have uniformly recognized that [*33] negligence in the actual operation of heavy machinery will be imputed to the general, rather than specific, employer. Richardson, 182 A.2d at 903; Brittingham v. American Dredging Co., 262 A.2d 255, 256 (Del. 1970); Paoli v. Dave Hall, Inc., 462 A.2d 1094, 1097 (Del. Super. 1983). On the other hand, where an allegedly negligent act involves matters controlled by the specific employer, the doctrine will apply. For example, in Richardson, the court found that a backhoe operator had become an employee of the lessor of the backhoe where negligence was alleged in the piling of dirt too close to the edge of a ditch, and the lessor had specifically told the operator where to pile the dirt. 182 A.2d at 903.

If there was any evidence in the record that plaintiff directed Biase to load pallets on the forklift in a certain way, to load a particular number or weight of pallets on a particular lift, or to position the pallets on the forks in a certain configuration, the facts might be closer to Richardson. However, the record only supports a finding that plaintiff identified which pallets she wanted loaded

1995 U.S. Dist. LEXIS 13730, *

onto the designated trucks. How this was accomplished was determined [*34] solely by Mr. Biase.

We think that the "borrowed servant" doctrine does not apply here. Dole directed Wilmington employees as to what fruit to pick up and which truck to put it on; Wilmington employees actually operated the forklifts. Delaware courts do not apply the borrowed servant doctrine where "negligence occurred in the actual operation of the equipment." Paoli, 462 A.2d at 1098. Therefore, Wilmington's motion for summary judgment will be denied.

The only case cited favorably by Wilmington, Faircloth v. Rash, 317 A.2d 871 (Del. 1974), is easily distinguished. That case involved fire damage resulting from the allegedly negligent welding of a hitch. Id. at 871. In that case the employee did the welding at the plaintiff's place of business, and the plaintiff had supplied the welder with all parts and tools and told him what work to do and where to place the hitch. Id. at 872. The court concluded that the plaintiff had the right to control and direct the performance of the welding itself, regardless of whether it actually exercised this right. Id.

In this case, the evidence of record shows that Dole expediters controlled only the flow of fruit in the warehouse. [*35] They did not, and could not, control the actual operation of the forklifts. A forklift operator's skill, which is at issue in this case, can ultimately be regulated only by the party responsible for hiring, training, and, in appropriate cases, firing. Dole had none of these powers; indeed, Dole required the Port's permission even to remove a forklift driver from its own warehouse.

Because there is no genuine dispute as to these facts, plaintiff's cross-motion for summary judgment will be granted. Compare Paoli, 462 A.2d at 1098 (plaintiff alleged negligence in both operation of crane and in placement of loads; because issue of fact remained as to whether plaintiff's employer retained discretion over placement of loads, cross-motion for summary judgment was denied). Finally, plaintiff's allegation that Wilmington employees disabled the backup alarm is clearly outside the borrowed servant doctrine. Plaintiff's cross-motion for summary judgment on this issue will be granted as well.

F. Eastern's Indemnity Claim

Eastern contends that Dole is liable for any damages assessed against it under the indemnification clause in the contract. As already noted, this provision provides: [*36]

> LESSEE [Dole] assumes all risk and liability for and agrees to indemnify, save

and hold LESSOR [Eastern] harmless for all claims and liens, all loss of or damage to the Equipment and all loss, damage, claims, penalties, liability and expenses, including attorney's fees, howsoever arising or incurred because of the Equipment or the storage, use or operation thereof.

(Dole's Ex. "A".) Dole moves for summary judgment on this defense, contending that it is not required to indemnify Eastern for liabilities caused as a result of Eastern's fault.

On its face the indemnity is extremely broad and would apply apart from the negligence or fault of either Dole or Eastern. Under Delaware law, however, contractual provisions purporting to relieve a party from liability for damages resulting from the party's own fault are not favored. J.A. Jones Constr. Co. v. City of Dover, 372 A.2d 540, 546 (Del. Super.), appeal dismissed, 377 A.2d 1 (Del. 1977). An indemnity clause will usually be interpreted to cover damages caused by the indemnified party's conduct only where the contractual language itself refers specifically to such damages. See Paoli, 462 A.2d at 1098 (collecting [*37] cases).

The language of the indemnity clause at issue here clearly does not refer specifically to damages caused by Eastern's own conduct. To the extent Eastern argues that Dole (1) failed to request backup alarms on the forklifts or (2) had backup alarms installed but failed to maintain them, it may have a valid defense to liability. If the jury were to find Eastern not liable there would be no need for indemnification. But even if the jury were to believe that Dole and Eastern were both negligent, the judgment against Eastern that would create the need for indemnification would necessarily derive from Eastern's actions alone. The worker's compensation tort bar protects Dole from liability to an injured employee.

In this case Eastern would be entitled to indemnification only if it were found liable to the plaintiff; there is no theory of Eastern's liability which does not involve some form of active wrongdoing by Eastern. Since the indemnification clause does not explicitly provide for indemnification for Eastern's wrongful or negligent conduct, the clause is not enforceable under Delaware law. Summary judgment is therefore granted to Dole.

CONCLUSION

Summary judgment on plaintiff's [*38] strict liability claim will be granted in favor of all defendants. Summary judgment on plaintiff's breach of warranty claim will be granted in favor of Komatsu, Kalmar and the Wilmington defendants, but their motion for sum-

1995 U.S. Dist. LEXIS 13730, *

mary judgment on plaintiff's negligence claims will be denied. Plaintiff's cross-motion for summary judgment on the borrowed servant defense will be granted. Dole's motion for summary judgment on Eastern's indemnity claim will be granted.

In light of this ruling, plaintiff may proceed with her negligence and breach of warranty claims against Eastern and her negligence claims against Kalmar, Komatsu and the Wilmington defendants. An appropriate order will be entered by the Court on even date herewith.

Joseph E. Irenas

U.S.D.J.

DATED: September 11, 1995